**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ANNA MARIA VASSILIADES

18, Navarinou Street, 5th Floor,     )
Agios Andreas, CY-11OO Nicosia,   )
Republic of Cyprus                )
                                  )
and                          )
                                  )
GIORGOS VASSILIADES,      )   Civil Action No. _____
                                  )
10, Doiranis Street,          )
CY-2400 Nicosia,            )   **COMPLAINT FOR**
Republic of Cyprus         )   **DECLARATORY AND**
                                  )   **INJUNCTIVE RELIEF**
              *Plaintiffs*,     )
                                  )
v.                          )
                                  )
ANTONY BLINKEN, in his official capacity as the  )
Secretary of State,         )
                                  )
2201 C Street, N.W.         )
Washington, D.C. 20520      )
                                  )
U.S. DEPARTMENT OF STATE,   )
                                  )
2201 C Street, N.W.         )
Washington, D.C. 20520      )
                                  )
JANET YELLEN, in her official capacity as  )
Secretary of the Treasury,     )
                                  )
1500 Pennsylvania Avenue, N.W.   )
Washington, D.C. 20220      )
                                  )
U.S. DEPARTMENT OF THE TREASURY,  )
                                  )
1500 Pennsylvania Avenue, N.W.   )
Washington, D.C. 20220      )
                                  )
              *Defendants.*   )
_____  )

Plaintiffs Anna Maria Vassiliades ("A.M. Vassiliades") and Giorgos Vassiliades ("G. Vassiliades") (collectively, "Plaintiffs") seek declaratory and injunctive relief and state as follows:

## INTRODUCTION

1.      The issue at the heart of this case is whether Plaintiffs, two adult children of Cypriot national and lawyer Christodoulos Georgiou Vassiliades ("C.G. Vassiliades"), should be designated as Specially Designated Nationals ("SDNs"), and deprived of access to funds—even for basic human needs like food and health care—for no reason other than the fact that their father, C.G. Vassiliades was the target of U.S. Department of State ("State Department") sanctions administered by the Department of the Treasury's Office of Foreign Assets Control ("OFAC") for allegedly assisting Russian oligarchs.  C.G. Vassiliades was given no opportunity to be heard before sanctions were imposed against him, he has denied the charges against him, and he has received no judicial process.  But regardless of the strength of any alleged claim against C.G. Vassiliades, there is no allegation—and no reason to believe—that Plaintiffs, his children, participated in any alleged offending behavior.

2.      This action challenges the designation of A.M. Vassiliades and G. Vassiliades as SDNs by the State Department on April 12, 2023, as part of the United States' sanctions targeting Russia.  The President declared an emergency with respect to the Russian invasion of Ukraine pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq., and authorized the imposition of sanctions to redress that emergency in Executive Order ("E.O.") 14024.  On April 12, 2023, the State Department designated A.M. Vassiliades and G. Vassiliades as SDNs—*not* for any *personal wrongdoing* but based *solely* on the fact that they are children of their father, C.G. Vassiliades, who the State Department designated an SDN that same day.

3.      Section 1(a)(v) of E.O. 14024 is unlawful.  By permitting designations against children to be imposed based simply on the alleged misdeeds of their parents, it exceeds the authority conferred on the President by IEEPA, violates the Constitution's condemnation of the "Corruption of Blood" principle, and violates the Fifth Amendment's equal protection and due process guarantees.

4.      Plaintiffs' designations pursuant to E.O. 14024 violate the same constitutional provisions and are "arbitrary and capricious" under the Administrative Procedures Act ("APA"), 5 U.S.C. § 500 *et seq.*

5.      Plaintiffs' designations are contrary to the remedial purpose of sanctions, which is to encourage sanctioned parties to stop sanctionable behavior, because there is no misbehavior on the part of the Plaintiffs that sanctions could incentivize them to stop.

6.      Defendants' ongoing refusal to lift Plaintiffs' designations is arbitrary and capricious for the same reasons as their initial designation decision.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1361, and 5 U.S.C. §§ 701–706.

8.      Sovereign immunity is waived by 5 U.S.C. § 702.

9.      A judgment setting aside agency action as unlawful is authorized by 5 U.S.C. § 706(2).

10.     Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, Federal Rules of Civil Procedure 57 and 65, and the inherent equitable powers of a United States District Court.

11.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1).

## THE PARTIES

12.     Plaintiff A.M. Vassiliades is a Cypriot national who resides at 18, Navarinou Street, 5th Floor, Agios Andreas, CY-11OO Nicosia, Republic of Cyprus.

13.     Plaintiff G. Vassiliades is a Cypriot and British national who currently resides at 10, Doiranis Street, CY-2400 Nicosia, Republic of Cyprus.  Prior to April 12, 2023, G. Vassiliades was a resident of the United Kingdom and resided at Aria House, Flat 28, 5-15 Newton Street, London, WC2B 5EN, United Kingdom.  On April 8, 2023, G. Vassiliades visited Cyprus to spend the Greek Orthodox Easter with his family.  A few days later, on April 12, 2023, G. Vassiliades was designated.  Since then, he has been unable to return to his home and ordinary residence in the United Kingdom as he would not be able to live and subsist on his own, without employment, without access to his bank accounts, and without any income.  Since his designation, he has been living at his family's home in Cyprus.

14.     Defendant Antony Blinken is the Secretary of State and the senior official at the State Department.  He is sued in his official capacity.

15.     Defendant U.S. Department of State is a Department of the Executive Branch of the United States Government and an agency within the meaning of 5 U.S.C. § 551(1).

16.     Defendant Janet Yellen is the Secretary of the Treasury.  She is sued in her official capacity.

17.     Defendant U.S. Department of the Treasury is a Department of the Executive Branch of the United States Government and an agency within the meaning of 5 U.S.C. § 551(1).

## FACTUAL ALLEGATIONS

### A.     Background on IEEPA

18.     IEEPA specifies its general policy and purpose—to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President of the United States declares a national emergency with respect to such threat.  50 U.S.C. § 1701(a).  The President's authority is restricted in that it may only be exercised to deal with an unusual and extraordinary threat from an officially declared national emergency.  50 U.S.C. § 1701(b).  The means and scope of the President's authority are further specified in 50 U.S.C. § 1702, and additional limitations are set forth in 50 U.S.C. § 1703.

19.     In rejecting challenges that IEEPA violates the non-delegation doctrine, the U.S. Government has argued, and courts have upheld, the constitutionality of the statute because "the President's powers are 'explicitly defined and circumscribed.'"  *United States v. Amimazami*, 645 F.3d 564, 576 (3d Cir. 2011) (quoting *United States v. Arch Trading Co.,* 987 F.2d 1087, 1092–94 (4th Cir. 1993)).  The President's authority is limited to actions designed to "deal with" the emergency that has been declared.  50 U.S.C. § 1701(a).  IEEPA does not confer upon the President a free-wheeling authority to sanction whoever the President may choose, only those who pose a threat related to the declared emergency.

20.     Sanctions are meant to be protective, *not punitive*.  OFAC, the federal agency that administers U.S. sanctions, provides guidance stating that "the ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior."  *See* https://home.treasury.gov/policy-issues/financial-sanctions/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-an-ofac-list.  The guidance also offers examples of situations in which a delisting

may be warranted, including "a positive change in behavior" or when "the basis of designation no longer exists." *Id.* OFAC's own regulations further allow SDNs to "assert that the circumstances resulting in the designation no longer apply, and to . . . propose remedial measures . . . which the person believes would negate the basis for designation." 31 C.F.R. § 501.807.

21.     But sanctions cannot "bring about a positive change in behavior" or be lifted once "the basis of designation" has been addressed unless there is some misbehavior that can be changed.  In the case of Plaintiffs, one cannot change who their parents are.  Bringing about "change" is not possible when children are designated for the purported sins of their father.  There is no need to "bring about a positive change in behavior" on the part of children who have not engaged in any sanctionable conduct.  And there is no way for them to change their bloodline.  Thus, designation based on lineage is inconsistent with "the ultimate goal of sanctions."

22.     Section 1(a)(v) of E.O. 14024 is both novel and barbaric in that it authorizes the designation of "a spouse or adult child of any person whose property and interests in property are blocked."  It is effectively a form of terrorism in which innocent children are harmed and crippled financially and the U.S. government threatens to continue harming the children of a designated parent until the parent complies with the demands of the U.S. government.  Prior Executive Orders customarily have not gone so far—even when targeting terrorists, drug traffickers, and rogue countries.  Because such tactics are utterly unamerican, sanctions regimes typically do not authorize designating the children of designees, absent a reason to believe the children were subject to sanctions in their own right.

**B.     Constitutional Concerns with Injuring Children to Coerce Their Parents**

23.     The notion that children should be made to suffer for the sins of their fathers was explicitly *rejected* by our founders in the Constitution.  In England, treason carried a penalty of

corruption of blood, which caused the forfeiture of the guilty person's estate in its entirety such that the person's heirs would be left with nothing.  The Supreme Court explained that Blackstone regarded this as an "oppressive mark of feudal tenure" and hoped that it "may in process of time be abolished by act of parliament."  The Framers of the United States Constitution responded to this recommendation.  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473 n.35 (1977) (quoting Blackstone).  Article III, Section 3 prohibits imposing the sanction of "Corruption of Blood," and limits any forfeitures to the lifetime of the person found guilty.  The Founders viewed the concept of punishing children for the acts of their parents as a "rank injustice," and the Supreme Court explained that "[n]o one ever doubted that it was a provision introduced for the benefit of the children and heirs alone."  *Wallach v. Van Riswick*, 92 U.S. 202, 210 (1875).

24.     IEEPA was drafted against a historical backdrop that viewed any effort of using sanctions to harm the children of sanctioned persons as *unconstitutional*.  The United States imposed sanctions on those who gave assistance to the Confederacy during the Civil War.  Although the sanctions legislation passed by Congress called for the outright forfeiture of all such Confederate property, the President objected that it would unconstitutionally reintroduce the corruption of blood principle to impose the forfeiture beyond the life of the person who had aided the Confederacy, and Congress concurred through a joint resolution.  *See, e.g.*, *Miller v. United States*, 78 U.S. 268, 273 (1870); *Wallach*, 92 U.S. 202.  The President's actions in E.O. 14024 go far beyond the proposed Civil War Era sanctions that were thought to be unconstitutional by restricting the ability of children to inherit from their parents.  E.O. 14024 directly harms children, allowing them to be personally designated based on the actions of their parents and to bear directly the full weight of sanctions designed to address allegations of wrongdoing against others, even when the children are entirely innocent.

25.     In a host of contexts, the Supreme Court has recognized that imposing hardships on children for the actions of their parents violates equal protection and due process principles.  For example, the Supreme Court has struck down numerous statutes that restricted access to benefits or otherwise harmed illegitimate children "[b]ecause illegitimacy is beyond the individual's control and bears 'no relation to the individual's ability to participate in and contribute to society.'" *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985) (internal citation omitted). Similarly, the Court has denied States the right to deny public education to children because their parents brought them to the country illegally, as the children suffer the consequences and are powerless to change their circumstances.  *Plyler v. Doe*, 457 U.S. 202, 219-20 (1987).

26.     In deciding these cases, the Supreme Court explicitly rejected the Government's claim that the Constitution allows the President to terrorize children in an effort to coerce their parents.  In *Plyler*, the Supreme Court rejected the notion that depriving the children of undocumented aliens of an education could be used as a tool to coerce their parents' behavior.  The Court explained: "Even if the State found it expedient to control the conduct of adults by acting against their children, legislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice." *Id.* at 220.  The Supreme Court gave the same rationale in striking down restrictions on the ability of illegitimate children to obtain benefits: "[V]isiting . . . condemnation on the head of an infant is illogical and unjust.  Moreover, imposing disabilities on the . . . child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing.  Obviously, no child is responsible for his birth and penalizing the . . . child is an ineffectual—as well as unjust— way of deterring the parent." *Weber v. Aetna Cas. and Surety Co.*, 406 U.S. 164, 175 (1972).

27.     In *Korematsu v. United States*, 323 U.S. 214 (1944), the Supreme Court did uphold as a wartime measure a criminal prohibition against people refusing to evacuate public areas and move to internment camps, but "only if his parents were of Japanese birth." *Id.* at 234 (Jackson, J., dissenting).  Justice Jackson dissented because "if any fundamental assumption underlies our system, it is that guilt is personal and not inheritable.  Even if all of one's antecedents had been convicted of treason, the Constitution forbids its penalties to be visited upon him. . . .  But here is an attempt to make an otherwise innocent act a crime merely because this prisoner is the son of parents as to whom he had no choice and belongs to a race from which there is no way to resign.  If Congress in peacetime legislation should enact such a criminal law, I should suppose this Court would refuse to enforce it." *Id.* at 243–44.  IEEPA is such peacetime legislation, but *Korematsu* is no longer good law in the wartime context either.  The Supreme Court recently took the "opportunity to make express what is already obvious: *Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2433 (2018) (quoting Justice Jackson's dissent in *Korematsu*).  Like the children in *Korematsu*, children designated by E.O. 14024 cannot change the fact of their ancestry and they face the burden of sanctions despite the absence of any personal wrongdoing.

### C.     Designation of the Vassiliades Children

28.     The State Department's April 12, 2023, designation explained that G. Vassiliades "is being designated pursuant to Section 1(a)(v) [of E.O. 14024] for being the spouse or adult child of [Christodoulos] Vassiliades."  No other explanation for the designation was offered.

29.     The State Department's explanation for designating A.M. Vassiliades is slightly different, but her designation appears to rest on the same basis.  The State Department notes that

she "is the adult daughter of [Christodoulos] Vassiliades," but the State Department does not officially designate her under Section 1(a)(v) based on her blood relationship.  Instead, it explains that it "designated pursuant to Section 1(a)(iii)(C) for being or having been a leader, official, senior executive officer, or member of the board of directors of Vassiliades UK."  Vassiliades & Co UK Limited ("Vassiliades UK"), had been designated the same day "pursuant to Section 1(a)(vii) for being owned or controlled by or having acted or purported to act for or on behalf of, directly or indirectly," C.G. Vassiliades and another designated lawyer at Christodoulos G. Vassiliades & CO. LLC ("CGV LLC").  Nevertheless, neither A.M. Vassiliades as an ex-employee and ex-director of Vassiliades UK nor Vassiliades UK itself had done any work on behalf of Russian clients, nor has OFAC or the State Department identified any sanctionable behavior by Vassiliades UK or by A.M. Vassiliades.  No other employees of Vassiliades UK were designated.  Thus, the designation of Vassiliades UK seems to rest upon nothing more than its ownership by C.G. Vassiliades.

30.     Further, as Plaintiffs have submitted to OFAC and State on countless occasions, Vassiliades UK was a dormant entity preparing for dissolution at the time of its designation and had been inactive (with no business activities, no clientele, no employees, and no office premises) since October 2022, months prior to A.M. Vassiliades' designation.  A.M. Vassiliades made all reasonable efforts to resign from Vassiliades UK, and her resignation became effective in accordance with UK law on February 29, 2024.

31.     Thus, A.M. Vassiliades' designation, like the designation of G. Vassiliades, appears to now rest *solely* on her status as the adult child of C.G. Vassiliades.  In any event, her designation does not rest upon any allegation that she or Vassiliades UK had engaged in any sanctionable conduct themselves.  We note that Plaintiffs have requested the administrative record countless times but have not received it.

**D.      Consequences of Plaintiffs' Designation**

32.      The D.C. Circuit recognizes that "[a]s a general matter, the effect of an OFAC designation on the designee's private interests is 'dire.'  'By design, a designation by OFAC completely shutters all domestic operations of an entity' and can render it 'indefinitely . . . financially defunct.'" *Fares v. Smith*, 901 F.3d 315, 323 (D.C. Cir. 2018) (first quoting *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196 (D.C. Cir. 2001), second quoting *Al Haramain Islamic Found., Inc. v. Dep't of Treasury*, 686 F.3d 965, 976–79 (9th Cir. 2012) (alterations in original)).  That has been the case with respect to both A.M. Vassiliades and G. Vassiliades.

33.      It was likely no surprise for the State Department and OFAC to learn from Plaintiffs that European (EU, UK and Swiss) financial institutions were choosing to comply with U.S. sanctions, as they tend to do so given the fear of U.S. secondary sanctions or designation.  In fact, Treasury has publicly touted its intentional use of the threat of secondary sanctions to cut off sanctioned individuals from access to foreign financial institutions.  As recently as June 12, 2024, Treasury announced that it was responding to Russia's transition to a war economy by taking steps to create a "greater risk of sanctions" for foreign financial institutions "conducting or facilitating significant transactions, or providing any service, involving any person blocked pursuant to E.O. 14024."[1]

34.      Even before Treasury enhanced this risk to foreign financial institutions, Plaintiffs' financial institutions in Europe were unwilling to risk secondary sanctions (being sanctioned for assisting a sanctioned party) by conducting or facilitating any transactions for Plaintiffs.  They

---

[1] Treasury, "As Russia Completes Transition to a Full War Economy, Treasury Takes Sweeping Aim at Foundational Financial Infrastructure and Access to Third Country Support" (June 12, 2024), available at https://home.treasury.gov/news/press-releases/jy2404 (last accessed June 13, 2024).

have refused to grant Plaintiffs access to their funds, depriving them of the means to sustain themselves and their families, including by allowing payment of day-to-day expenses like food, childcare, and healthcare. A.M. Vassiliades was a new mother at the time of her designation and was denied the ability to provide for her newborn infant. Foreign financial institutions even refused to grant Plaintiffs access to their funds to pay legal fees for their counsel, thus risking their right to legal representation.

35.     A.M. Vassiliades submitted living expenses license requests out of despair and because of her need to access her accounts to provide for her family's basic needs. Had Plaintiffs been U.S. persons, OFAC would have issued such living expenses licenses. Instead, OFAC informally told Plaintiffs that it could not issue such licenses, claiming it lacks jurisdiction to grant any license request as Plaintiffs are non-U.S. persons, with no other nexus to the U.S. This explanation runs counter to the fact that, having sanctioned those same persons, OFAC would logically have the authority to issue licenses that limit the impact of those sanctions. It is unclear why OFAC believes it has jurisdiction to impose greater sanctions on Plaintiffs but lacks jurisdiction to lessen those sanctions through basic humanitarian licenses.

36.     While doing nothing may require less effort, Defendants are well aware that there is no jurisdictional barrier preventing them from offering relief through comfort letters, which Plaintiffs have requested multiple times in the past 14 months since Plaintiffs' designation. Defendants routinely use comfort letters to limit the extraterritorial application of their designations. Although a comfort letter is not a license, strictly speaking, it is the functional equivalent in the extraterritorial context. It assures foreign financial institutions that they will not be designated or subjected to secondary sanctions by the U.S. Government based on their processing of transactions for SDNs, if those transactions are for specific purposes allowed by the

comfort letter.  Thus, financial institutions that voluntarily comply with U.S. sanctions to avoid secondary sanctions will, upon receipt of a comfort letter, process limited transactions on behalf of an SDN.

37.     The Treasury Department's recent announcement regarding the increased risk of secondary sanctions for foreign financial institutions heightens the urgent and practical need for a comfort letter so that Plaintiffs can use their own money to cover basic living expenses and to pay the legal fees of their counsel.

38.     Like the U.S. Government, the Cypriot Government claims it cannot redress this situation, as Plaintiffs are not subject to EU sanctions, and relief from U.S. sanctions must come from the U.S. government.  In the meantime, Cypriot banks are refusing to give Plaintiffs access to their funds without a comfort letter from Defendants, acting based on their internal policies and fear of U.S. secondary sanctions.

39.     As of the date of this submission, OFAC and the State Department have refused to issue licenses or comfort letters in relation to Plaintiffs' living expenses generally and have provided no explanation for such refusal.  Defendants have issued A.M. Vassiliades a very limited comfort letter that has enabled her to make health care-related payments for herself and her infant son.  The fact that OFAC provided this comfort letter, however limited its scope, demonstrates that there is no jurisdictional barrier preventing OFAC from issuing such letters.

40.     Additionally, Plaintiffs' companies have been suffering from severe financial hardship and are unable to complete basic payments, including paying salaries, utility bills, local taxes, and other expenses necessary to keep the companies (totally unrelated to Plaintiff's father or CGV LLC) afloat.  This unfairly penalizes their employees and suppliers.  Plaintiffs have already provided very clear explanations of these issues in their de-listing petitions and

questionnaire replies.  And their companies have no dealings with Russian oligarchs or other SDNs or with Plaintiffs' father, C.G. Vassiliades.  But Defendants have used the comfort-letter process to allow only one of Plaintiffs' companies, a Cypriot company with a winery business in Cyprus, to make limited payments of employees' overdue salaries, social insurance premiums, and local taxes.  The initial comfort letter did not name the company accurately and Defendants refused to correct the name before the letter's stated expiration, making it ineffective in allowing the company to make the contemplated payments.  The second comfort letter yet again had the wrong company name but was reissued about a month before the comfort period expired.  Because it takes substantial time for a financial institution to diligence the purpose of a payment and become comfortable that it fits within the scope of a comfort letter, the company was unable to make all necessary payments before the letter expired.  Defendants granted an extension until December 2023 that allowed the company to complete the contemplated payments at the time—but Defendants stated that they will not provide any further comfort letters allowing similar payments in the future.  Defendants did not provide any reasoning for this refusal nor any reason for their continuous errors regarding the name of the company.

### E.   Plaintiffs' De-Listing Petitions

41.   Plaintiffs submitted de-listing petitions to the State Department and OFAC requesting that they be freed from the burden of sanctions, particularly given the absence of any personal wrongdoing.  As previously submitted to OFAC and the State Department, Plaintiffs are suffering the severe consequences of U.S. sanctions because European financial institutions are voluntarily complying with U.S. sanctions (not binding in the EU, UK or Switzerland) out of fear of being subject to U.S. secondary sanctions.  Only Defendants can provide relief and, ironically, Plaintiffs would be in a better situation if they were U.S. residents or if they had also been designated in the

EU, as their fundamental rights, including the right to access their funds to pay for day-to-day expenses, would have been respected.  No decision on Plaintiffs' de-listing petitions has been issued to date, more than a year after their designations.  Defendants continue to state that they cannot provide a timeline to issue a decision regarding the de-listing.

### 1.   G. Vassiliades' De-Listing Petition

42.    G. Vassiliades submitted a de-listing petition on June 22, 2023, about two months after his designation.  His de-listing petition is straightforward and explains in detail and with supporting evidence that he was never involved in any of the legal or business affairs of his father, C.G. Vassiliades, or his fathers' law firm, CGV LLC.  Instead, G. Vassiliades was either a minor or a student, living in London during the vast majority of the time when his father is alleged to have engaged in sanctionable activity.  None of this seems to matter to OFAC or the State Department—which does not contest any of these claims but rests their sanctions decision on the immutable fact that C.G. Vassiliades is his father.

43.    The de-listing was requested on an expedited basis not only because the sole criteria for designation was consanguinity, but also given the severe financial hardship that the extraterritorial application of the sanctions was and is still inflicting on G. Vassiliades.  Instead of expediting the process as requested, OFAC issued a questionnaire on October 18, 2023, requesting additional information.  Although we understand that issuing a questionnaire may be the norm in processing de-listing applications, the questionnaire was burdensome and included requests for information and documents that should have already been in possession of the State Department prior to the designation, such as identifying information for G. Vassiliades, including his full name, date of birth, and aliases.  Moreover, given that the designation rests only upon the identity of his father, it is not clear why questions about anything else matter.

44.     G. Vassiliades submitted all the supporting documentation and the answers to the questionnaire on December 4, 2023.  Six months have elapsed since G. Vassiliades filed answers to the questionnaire and no measures have been taken to redress his wrongful designation.

45.     While G. Vassiliades was (and still is) suffering from the severe extraterritorial consequences of the U.S. designation, the UK—an ally of the U.S., with which the U.S. is supposedly coordinating sanctions measures targeting Russia—concluded that G. Vassiliades was suitable to become a British national, and he received his first British passport in July 2023.

### 2.  A.M. Vassiliades' De-Listing Petition

46.     A.M. Vassiliades submitted a de-listing petition on June 12, 2023, two months after her designation.  Her de-listing petition explains in detail with supporting documentation that she was *not* involved in any of the alleged sanctionable legal or business affairs of her father, C.G. Vassiliades, or of his law firm, CGV LLC.  Instead, A.M. Vassiliades was either a student and/or living in the UK during the vast majority of the time when the alleged sanctionable activity of her father occurred.

47.     The de-listing was requested on an expedited basis as well, given the severe financial hardship that the extraterritorial application of the sanctions was and still is causing A.M. Vassiliades.  Instead of expediting the process as requested, OFAC issued a very burdensome questionnaire on October 18, 2023, requesting additional information that already should have been in the State Department's possession or had previously been explained in detail in her de-listing request, such as A.M. Vassiliades' full name, date of birth, and aliases.

48.     A.M. Vassiliades submitted all the supporting documentation and the answers to the questionnaire on December 5, 2023.  Six months have passed since A.M. Vassiliades filed

answers to the questionnaire, and no measures have been taken to redress her wrongful designation.

49.     Importantly, the answer to A.M. Vassiliades' questionnaire, explained in detail that since the time of her U.S. designation, she had been working with UK counsel to safely resign from her post as a director of Vassiliades UK, even though Vassiliades UK was already dormant at the time of her designation (and has been dormant since October 2022, without business activities, employees, clients or any office premises).

50.     A.M. Vassiliades intended to resign from Vassiliades UK since her designation in the U.S. but wanted to first ensure with the advice of U.K. counsel that such resignation was in line with U.K. economic sanctions.  U.K. counsel initially advised that it was recommended to maintain the status quo in Vassiliades UK (i.e., not to resign).  Given the inaction of the U.S. Government and additional considerations under U.K. law, U.K. Counsel advised A.M. Vassiliades that a UK Office of Financial Sanctions Implementation license was not required for a resignation, and that such resignation was then permissible under U.K. law.  After further and careful consideration of her U.K. counsel's advice issued on January 10, 2024, A.M. Vassiliades submitted her resignation from Vassiliades UK on February 29, 2024.

51.     A.M. Vassiliades' resignation has been accepted by the UK Companies House as of the same date of her submission, and she is no longer an officer of Vassiliades UK or in any way involved with Vassiliades UK.  *See* Termination of a Director Appointment Form, available at: https://find-and-update.company-information.service.gov.uk/company/09371804/filing-history).  Other than being the adult daughter of her father, C.G. Vassiliades, being a director of Vassiliades UK (a dormant entity since October 2022) was the *only* stated reason for her

designation.   This reason *no longer exists*, given A.M. Vassiliades's resignation, effective on February 29, 2024.

52.    A.M. Vassiliades also submitted this information to the State Department as a follow-up to her questionnaire response and informed them, on March 7, 2024, that she was no longer a director of Vassiliades UK (a dormant entity since October 2022) and that the *only* remaining criteria for her designation was the corruption of blood.







**G.   Failure of Plaintiffs' De-Listing Petitions**

64.    Now, more than a year after Plaintiffs filed their de-listing petitions—on June 12, 2023 for A.M. Vassiliades and June 22, 2023 for G. Vassiliades—Defendants have still not issued a decision or communicated any anticipated timeline for a de-listing decision, or issued any further comfort letters to address Plaintiffs' severe financial hardship and inability to support themselves or pay for their basic living expenses.

65.    Defendants' initial response to Plaintiffs' petitions was to instruct Plaintiffs to fill out lengthy questionnaires that requested information that should already have been known to Defendants, such as Plaintiffs' full names, dates of birth, and aliases.

66.    On December 4, 2023, and December 5, 2023, respectively, G. Vassiliades and A.M. Vassiliades submitted complete responses to these questionnaires, along with extensive supporting documentation.  In the six months since that time, Defendants have taken no further action.  Nor have they communicated any anticipated timeline for action.  Nor, with the limited exceptions noted above, have they responded to any of Plaintiffs' requests for comfort letters to address Plaintiffs' severe financial hardship and inability to support themselves or pay for their basic living expenses.

67.    Defendants have failed to act in a reasonable time on Plaintiffs' petitions, which appear to have been functionally denied.

██    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

**COUNT I:  DEFENDANTS HAVE EXCEEDED THEIR STATUTORY AUTHORITY**

69.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in all preceding paragraphs.

70.    IEEPA does not provide the Executive Branch with an unfettered authority to sanction anyone it chooses, but limits the President's authority to impose sanctions to actions that "deal with" an ongoing national security crisis.  *See* 50 U.S.C. § 1701.  Any action under IEEPA that cannot be shown to deal with the ongoing national security crisis is therefore outside the President's scope of authority under the statute and is unconstitutional.  *See also Loper Bright Enterp. v. Raimondo*, No. 22-451 (U.S. June 28, 2024) (overruling *Chevron* deference).

71.    IEEPA does not authorize sanctions to be imposed on persons who do not themselves pose any threat related to the emergency declared by the President.  While the President

may order that property owned or controlled by a designated person be blocked, IEEPA does not authorize imposing sanctions upon the children of a designated person.  Nor does IEPPA allow individuals employed by an entity that is owned or controlled by a designated person to be designated unless such an individual poses a risk related to the declared emergency.  Here, neither Plaintiff is alleged to have done anything to aid Russia in its war effort in Ukraine, so there is no statutory basis for their designations.  Because E.O. 14024's criteria for imposing sanctions against Plaintiffs exceed the scope of the statutory authority conferred by IEEPA, and any other statute, the designations of Plaintiffs are invalid.

### COUNT II:  PLAINTIFFS' DESIGNATIONS VIOLATE THE APA

72.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in all preceding paragraphs.

73.     The State Department and Treasury Department are agencies subject to the requirements of the APA.  *See* 5 U.S.C. § 701(b)(1).

74.     Defendants' designation of Plaintiffs as SDNs constitutes final agency action that is reviewable by this Court.

75.     The APA requires a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *See* 5 U.S.C. § 706(2)(A).

76.     Defendants' designation of Plaintiffs as SDNs is arbitrary and capricious because it is "not in accordance with law," because there is no statutory authority for the designations.

77.     Additionally, under the arbitrary and capricious standard, the agency must offer "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."  *Ohio v. EPA*, No. 23A349, Slip Op. at 11–12 (U.S. 2024) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (cleaned

up).  An agency action is arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.  Here, Defendants failed to consider the lawfulness of sanctions against individuals who have not engaged in any misconduct based on the identity of their father and the consistency of such sanctions with the "ultimate goal" of "bring[ing] about a positive change in behavior."

78.    Defendants' designation of Plaintiffs as SDNs also is arbitrary and capricious because there is no rational connection between the need to sanction them and the need to deal with the emergency situation posed by Russia's invasion of Ukraine.  Defendants make no allegation that either Plaintiff has aided Russia's invasion of Ukraine or poses any danger of doing so.  Plaintiffs have absolutely no effect whatsoever on Russia's invasion of Ukraine.

79.    To the extent that Defendants may claim that IEEPA authorizes the United States Government to engage in an act of terrorism—harming children as a means to coerce obedience from their parents—they would be wrong.  Such actions are gravely immoral and inherently arbitrary and capricious.  They have not been permitted by Congress and are precluded by the Constitution.

80.    Defendants' designation of Plaintiffs as SDNs merely because their father has been designated an SDN violates the prohibition against imposing "Corruption of Blood" as a sanction in Article III and embodied in the Due Process Clause.  The prohibition against a court or Congress imposing corruption of blood as a sanction, even following a trial for treason under the beyond a reasonable doubt standard, cannot be circumvented on the theory that Congress can delegate to the State Department and Treasury Department the power, which Congress itself lacks, to impose such

a sanction under an administrative standard that is lower than probable cause.  The Clause would be meaningless otherwise.

81.     Defendants' designation of Plaintiffs as SDNs is not based on their own personal conduct, but on the alleged sanctionable actions of their father, C.G. Vassiliades.  Imposing sanctions on a person without any regard to personal fault, and particularly when used as an act of terrorism to harm children to coerce their parents, absolutely offends fundamental Fifth Amendment due process and equal protection principles.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs A.M. Vassiliades and G. Vassiliades pray as follows:

1. That this Court set aside the designations of Plaintiffs as unlawful under 5 U.S.C. § 706(2), or at least issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that Plaintiffs' designation of A.M. Vassiliades and G. Vassiliades is unlawful;

2. That this Court order Defendants to delist Plaintiffs A.M. Vassiliades and G. Vassiliades from the SDN list; and

3. That this Court grant Plaintiffs A.M. Vassiliades and G. Vassiliades such other and further relief as the Court may determine to be just and proper under the circumstances.

Dated:  July 3, 2024

Respectfully submitted,

By:  /s/ Christopher D. Man

Christopher D. Man (Bar No. 453553)
Cari N. Stinebower (Bar No. 457147)
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, D.C.  20036

(202) 282-5000 (phone)
(202) 282-5100 (fax)
CMan@winston.com
CStinebower@winston.com

*Counsel for Messrs. Anna Maria and Giorgos Vassiliades*