**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ANNA MARIA VASSILIADES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ANTONY BLINKEN, in his official<br>capacity as Secretary of State, *et al.*,<br><br>Defendants. | Civil Action No. 1:24-cv-01952 (TJK) |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.   Statutory and Regulatory Framework ........................................................................ 2

   A.   The International Emergency Economic Powers Act ............................................ 2

   B.   Economic Sanctions in Response to Harmful Foreign Activities of the
        Russian Government ........................................................................................ 4

II.  The Department of State's Designations of Plaintiffs .................................................. 6

III. Plaintiffs' Complaint ............................................................................................... 8

LEGAL STANDARDS OF REVIEW .................................................................................. 9

DISCUSSION ................................................................................................................. 10

I.   Plaintiffs' Challenge to the President's Selection of Designation Criteria Fails ............. 10

   A.   The President's Selection of Designation Criteria is Unreviewable.................... 10

        1.   Plaintiffs' Claim Presents a Political Question ........................................ 10

        2.   The Court Otherwise Lacks Jurisdiction to Review Plaintiffs' *Ultra
             Vires* Claim ...................................................................................... 18

   B.   Plaintiffs Fail to State a Claim that the President Acted *Ultra Vires*.................... 21

II.  Plaintiffs' APA Claim Fails ..................................................................................... 27

   A.   The Department of State's Decisions were Reasonable ....................................... 27

   B.   Plaintiffs' Constitutional Theories Fail ............................................................. 28

        1.   Plaintiffs Cannot Assert Constitutional Rights ........................................ 28

        2.   Plaintiffs' Constitutional Arguments are Meritless ................................. 30

III. The Requested Relief is Improper ............................................................................ 36

CONCLUSION ............................................................................................................... 37

i

# TABLE OF AUTHORITIES

## CASES

*32 County Sovereignty Committee v. Department of State*,
   292 F.3d 797 (D.C. Cir. 2002) ........................................................................... 29

*Abbott v. Abbott*,
   560 U.S. 1 (2010) ................................................................................................. 24

*Al-Aqeel v. Paulson*,
   568 F. Supp. 2d 64 (D.D.C. 2008) ..................................................................... 31

*Al-Aulaqi v. Obama*,
   727 F. Supp. 2d 1 (D.D.C. 2010) ................................................................. 17, 18

*Al-Tamimi v. Adelson*,
   916 F.3d 1 (D.C. Cir. 2019) .......................................................................... 17, 18

*Alvin v. Suzuki*,
   227 F.3d 107 (3d Cir. 2000) ............................................................................... 31

*Ameziane v. Obama*,
   699 F.3d 488 (D.C. Cir. 2012) ........................................................................... 16

*Armstrong v. Exec. Off. of the President, Off. of Admin.*,
   1 F.3d 1274 (D.C. Cir. 1993) ............................................................................. 25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................... 9, 10

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................. 10, 11, 16, 17

*Bancoult v. McNamara*,
   445 F.3d 427 (D.C. Cir. 2006) ........................................................................... 12

*Basengezi v. Smith*,
   Civ. A. No. 23-1249 (JEB), 2024 WL 1050340 (D.D.C. Mar. 11, 2024), *appeal filed*,
   No. 24-5130 (D.C. Cir. May 14, 2024) .............................................................. 34

*Bazzi v. Gacki*,
   468 F. Supp. 3d 70 (D.D.C. 2020) ............................................................... 29, 30

*BEG Invs., LLC v. Alberti*,
   85 F. Supp. 3d 13 (D.D.C. 2015) ....................................................................... 35

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................... 10

*Bello v. Gacki*,
   94 F.4th 1067 (D.C. Cir. 2024) ....................................................................... 23, 30

*BellSouth Corp. v. FCC*,
   144 F.3d 58 (D.C. Cir. 1998) ............................................................................... 35

*Bernhardt v. Islamic Republic of Iran*,
   Civ. A. No. 18-2739 (TJK), 2023 WL 2598677 (D.D.C. Mar. 22, 2023) ......................... 25, 26

*Bishop v. Wood*,
   426 U.S. 341 (1976) ............................................................................................ 32

*Chandler v. Berlin*,
   Case No. 18-cv-02136 (APM), 2018 WL 8646840 (D.D.C. Oct. 16, 2018) ........................... 25

*Chang v. United States*,
   Civ. A. No. 22-352 (RBW), 2023 WL 8697831 (D.D.C. Dec. 15, 2023), *aff'd*,
   2024 WL 3299620 (D.C. Cir. July 2, 2024) ............................................................ 35

*Changji Esquel Textile Co. v. Raimondo*,
   40 F.4th 716 (D.C. Cir. 2022) ............................................................................ 21

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) ............................................................................................ 24

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948) ................................................................................ 13, 16, 37

*Comcast Corp. v. FCC*,
   526 F.3d 763 (D.C. Cir. 2008) ............................................................................ 25

*Comm. on the Judiciary of the U.S. House of Representatives v. Miers*,
   542 F.3d 909 (D.C. Cir. 2008) ............................................................................ 36

*Ctr. for Biological Diversity v. Trump*,
   453 F. Supp. 3d 11 (D.D.C. 2020) ............................................................. 11, 13, 18

*Dalton v. Specter*,
   511 U.S. 462 (1994) ................................................................................ 18, 19, 20

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) .................................................................................. *passim*

*Deripaska v. Yellen*,
   Case No. 19-cv-00727 (APM), 2021 WL 2417425 (D.D.C. June 13, 2021), *aff'd*,
   2022 WL 986220 (D.C. Cir. Mar. 29, 2022) ............................................................ 27

*Deripaska v. Yellen,
No. 21-5157, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022) .............................................. passim

DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.,
887 F.2d 275 (D.C. Cir. 1989) ........................................................................................ 13, 27

El-Shifa Pharm. Indus. Co. v. United States,
607 F.3d 836 (D.C. Cir. 2010) ........................................................................................ 10, 13

Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury,
638 F.3d 794 (D.C. Cir. 2011) ................................................................................................ 33

Est. of Phillips v. District of Columbia,
455 F.3d 397 (D.C. Cir. 2006) ............................................................................................... 33

Farrakhan v. Reagan,
669 F. Supp. 506 (D.D.C. 1987), aff'd, 851 F.2d 1500 (D.C. Cir. 1988) ............................... 20

FCC v. Beach Commc'ns, Inc.,
508 U.S. 307 (1993) .............................................................................................................. 36

Franklin v. Massachusetts,
505 U.S. 788 (1992) ........................................................................................................ 25, 36

Frederick Douglass Found., Inc. v. District of Columbia,
531 F. Supp. 3d 316 (D.D.C. 2021) ....................................................................................... 35

Fulmen Co. v. OFAC,
547 F. Supp. 3d 13 (D.D.C. 2020) ............................................................................ 19, 29, 30

Gill v. Islamic Republic of Iran,
249 F. Supp. 3d 88 (D.D.C. 2017) ......................................................................................... 25

Haig v. Agee,
453 U.S. 280 (1981) ........................................................................................................ 16, 36

Hejeij v. Gacki,
Civ. A. No. 19-cv-1921 (TFH), 2020 WL 5545555 (D.D.C. Sept. 16, 2020) .......................... 29

Hettinga v. United States,
560 F.3d 498 (D.C. Cir. 2009) ............................................................................................... 31

Hinton v. Corr. Corp. of Am.,
624 F. Supp. 2d 45 (D.D.C. 2009) ......................................................................................... 10

Holder v. Humanitarian L. Project,
561 U.S. 1 (2010) .................................................................................................................. 16

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ......................... 33, 35

*\*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  333 F.3d 156 (D.C. Cir. 2003) ......................................................................... 12, 33

*Industria Panificadora, S.A. v. United States*,
  763 F. Supp. 1154 (D.D.C. 1991), *aff'd on other grounds*,
  957 F.2d 886 (D.C. Cir. 1992) ........................................................................... 15

*\*Islamic Am. Relief Agency (IARA-USA) v. Gonzales*,
  477 F.3d 728 (D.C. Cir. 2007) .................................................................... *passim*

*Jama v. Immigr. & Customs Enf't*,
  543 U.S. 335 (2005) ......................................................................................... 19

*Jifry v. FAA*,
  370 F.3d 1174 (D.C. Cir. 2004) ........................................................................ 28

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) ......................................................................................... 28

*Kadi v. Geithner*,
  42 F. Supp. 3d 1 (D.D.C. 2012) ................................................................... 29, 35

*Karadzic v. Gacki*,
  602 F. Supp. 3d 103 (D.D.C. 2022) .............................................................. 23, 34

*Khadr v. United States*,
  529 F.3d 1112 (D.C. Cir. 2008) .......................................................................... 9

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024) ..................................................................................... 24

*Mark v. Republic of the Sudan*,
  77 F.4th 892 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1456 (2024) ...................... 36

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ......................................................................................... 30

*Mobarez v. Kerry*,
  187 F. Supp. 3d 85 (D.D.C. 2016) ....................................................................... 9

*Mora v. City of Gaithersburg*,
  519 F.3d 216 (4th Cir. 2008) ............................................................................. 31

*N. Air Cargo v. U.S. Postal Serv.*,
  674 F.3d 852 (D.C. Cir. 2012) ........................................................................... 37

v

*N. Am. Butterfly Ass'n v. Wolf*,
   977 F.3d 1244 (D.C. Cir. 2020) ..................................................................... 30

*Nat'l Collegiate Preparatory v. D.C. Charter Sch. Bd.*,
   Civ. A. No. 19-1785 (JEB), 2019 WL 7344826 (D.D.C. Dec. 11, 2019) ................................. 32

*National Council of Resistance of Iran v. Department of State*,
   251 F.3d 192 (D.C. Cir. 2001) ....................................................................... 29

*New Vision Photography Program, Inc. v. District of Columbia*,
   54 F. Supp. 3d 12 (D.D.C. 2014) .............................................................. 32, 33

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ............................................................... 36, 37

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977) .................................................................................. 35

*OKKO Bus. PE v. Lew*,
   133 F. Supp. 3d 17 (D.D.C. 2015) ............................................................ 15, 28

*Olenga v. Gacki*,
   507 F. Supp. 3d 260 (D.D.C. 2020) ..................................................... 5, 15, 23, 34

*Orvis v. Brownell*,
   345 U.S. 183 (1953) ................................................................................... 3

*Pejcic v. Gacki*,
   Case No. 19-cv-02437 (APM), 2021 WL 1209299 (D.D.C. Mar. 30, 2021) ........................... 6

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
   182 F.3d 17 (D.C. Cir. 1999) ................................................................. 14, 15

*Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*,
   43 F. Supp. 3d 28 (D.D.C. 2014) .................................................................... 6

*Propper v. Clark*,
   337 U.S. 472 (1949) ................................................................................... 3

*Rahmani v. Yellen*,
   Civ. A. No. 24-0285 (RC), 2024 WL 1701681 (D.D.C. Apr. 19, 2024) ................................ 12

*Rakhimov v. Gacki*,
   Civ. A. No. 19-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020) ............... 2, 11, 29, 32

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ............................................................... 11, 31

*Regan v. Wald,*
   468 U.S. 222 (1984) ........................................................................................... 3, 4, 24

*Rusaviainvest, OOO v. Yellen,*
   No. 18 Civ. 5676 (PGG), 2023 WL 6198256 (S.D.N.Y. Sept. 21, 2023) ............................... 16

*Sanchez v. Off. of State Superintendent of Educ.,*
   45 F.4th 388 (D.C. Cir. 2022) .......................................................................... 35, 36

*Sanchez-Espinoza v. Reagan,*
   568 F. Supp. 596 (D.D.C. 1983), *aff'd,* 770 F.2d 202 (D.C. Cir. 1985) ................................ 18

*Sanchez-Espinoza v. Reagan,*
   770 F.2d 202 (D.C. Cir. 1985) .......................................................................... 36, 37

*\*Schneider v. Kissinger,*
   412 F.3d 190 (D.C. Cir. 2005) ...................................................................... 10, 12, 16

*Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004) ..................................................................................... 24

*Swan v. Clinton,*
   100 F.3d 973 (D.C. Cir. 1996) ............................................................................ 37

*Thuneibat v. Syrian Arab Republic,*
   167 F. Supp. 3d 22 (D.D.C. 2016) ........................................................................ 26

*Trump v. Hawaii,*
   585 U.S. 667 (2018) ..................................................................................... 26

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936) ................................................................................... 17, 24

*United States v. George S. Bush & Co.,*
   310 U.S. 371 (1940) ..................................................................................... 12

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990) ..................................................................................... 28

*Women Prisoners of D.C. Dep't of Corr. v. Dist. of Columbia,*
   93 F.3d 910 (D.C. Cir. 1996) ............................................................................. 35

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury,*
   750 F. Supp. 2d 150 (D.D.C. 2010) ...................................................................... 16

*Zevallos v. Obama,*
   793 F.3d 106 (D.C. Cir. 2015) .............................................................. 22, 30, 31, 33

**STATUTES**

5 U.S.C. § 702 ................................................................................................... 25

5 U.S.C. § 704 ................................................................................................... 25

5 U.S.C. § 706 ..................................................................................................... 2

50 U.S.C. §§ 1701-1702 ............................................................................... 12, 20

50 U.S.C. §§ 1701-1708 ...................................................................................... 1

50 U.S.C. § 1701 ........................................................................................ *passim*

50 U.S.C. § 1702 ........................................................................................ *passim*

50 U.S.C. § 1703 ....................................................................... 3, 12, 14, 17

50 U.S.C. § 1622 ....................................................................... 3, 4, 14, 17

50 U.S.C.A. § 4305 ............................................................................................. 2

65th Cong. Ch. 106, 40 Stat. 411 (1917) (codified at 50 U.S.C. §§ 4301-4341) .......................... 2

**RULES**

Fed. R. Civ. P. 12 ............................................................................................. 25

**REGULATIONS**

31 C.F.R. § 501.807 ............................................................................................ 5

31 C.F.R. § 587.802 ............................................................................................ 5

Exec. Order 12978,
   60 Fed. Reg. 54,579 (Oct. 21, 1995) ............................................................... 3

Exec. Order 13219,
   66 Fed. Reg. 34,777 (June 26, 2001), as amended by Exec. Order 13304,
   68 Fed. Reg. 32,315 (May 28, 2003) ............................................................. 33

Exec. Order 13224,
   66 Fed. Reg. 49,079 (Sept. 23, 2001) ............................................................. 3

Exec. Order 13671,
   79 Fed. Reg. 39,949 (July 8, 2014) ............................................................... 34

Dep't of State, Notice of Dep't of State Sanctions Actions,
   88 Fed. Reg. 58,017 (Aug. 24, 2023) ...................................................... 7, 8, 30

Executive Order 14024,
86 Fed. Reg. 20,249 (Apr. 19, 2021) ................................................................ *passim*

Executive Order 14114,
88 Fed. Reg. 89,271 (Dec. 26, 2023) ..................................................................... 15

**UNITED STATES CONSTITUTION**

U.S. Const. art. III, § 3 ............................................................................................ 35

**OTHER AUTHORITIES**

*Hearing on Ukraine: Five Years After the Revolution of Dignity: Ukraine's Progress and Russia's Malign Activities Before the S. Subcomm. on Europe and Regional Security Cooperation of the S. Comm. on Foreign Relations* (June 18, 2019),
https://perma.cc/6TD8-35DJ ...................................................................... 23

James Madison, "Political Observations," National Archives (Apr. 20, 1795) ............................ 11

Multilateral REPO Task Force, *Global Advisory on Russian Sanctions Evasion* (Mar. 9, 2023),
https://home.treasury.gov/system/files/136/REPO_Joint_Advisory.pdf ................................. 23

OFAC, *Filing a Petition for Removal from an OFAC List*,
https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-an-ofac-list ........................................................................... 5

OFAC, *SDN List*,
https://www.treasury.gov/ofac/downloads/sdnlist.pdf ............................................. 5

OFAC, *Syria Designations; Syria-related Designations and Designation Removal* (July 29, 2020),
https://ofac.treasury.gov/recent-actions/20200729 ................................................ 31

Restatement (Fourth) of Foreign Relations Law § 306 (2018) ................................................ 24

U.S. Dep't of State, *Further Curbing Russia's Efforts to Evade Sanctions and Perpetuate its War against Ukraine* (Apr. 12, 2023),
https://perma.cc/4KLA-5JE2 ................................................................... *passim*

U.S. Dep't of State, *How the United States is Holding Russia and Belarus to Account* (last updated April 15, 2024),
https://www.state.gov/holding-russia-and-belarus-to-account ...................................... 6, 17

U.S. Dep't of State, *Imposing Further Sanctions in Response to Russia's Illegal War Against Ukraine* (Sept. 14, 2023),
https://www.state.gov/imposing-further-sanctions-in-response-to-russias-illegal-war-against-ukraine/ ................................................................................... 6

U.S. Dep't of State, *Learn More About the Department of State's Delisting Process*,
    https://www.state.gov/sanctions-delisting/ ........................................................................ 5, 6

U.S. Dep't of State, *Promoting Accountability and Imposing Costs on the Russian
    Federation and Its Enablers for Putin's Aggression Against Ukraine* (June 2, 2022),
    https://www.state.gov/promoting-accountability-and-imposing-costs-on-the-russian-
    federation-and-its-enablers-for-putins-aggression-against-ukraine/ ................................... 7

U.S. Dep't of State, *Syria Caesar Act Designations* (June 17, 2020),
    https://2017-2021.state.gov/syria-caesar-act-designations/ ..................................................... 31

U.S. Dep't of State, *Taking Action to Degrade Russia's Wartime Economy Ahead of G7
    Leaders' Summit* (June 12, 2024),
    https://www.state.gov/taking-action-to-degrade-russias-wartime-economy-ahead-of-g7-
    leaders-summit/ ........................................................................................................................ 6

U.S. Dep't of the Treasury, *FACT SHEET: Disrupting and Degrading – One Year of U.S.
    Sanctions on Russia and Its Enablers* (Feb. 24, 2023),
    https://perma.cc/LXK2-BGCY ................................................................................................. 23

U.S. Dep't of the Treasury, *U.S. Treasury Escalates Sanctions on Russia for Its Atrocities
    in Ukraine* (Apr. 6, 2022),
    https://home.treasury.gov/news/press-releases/jy0705 ........................................................... 7

U.S. Dep't of the Treasury, *With Wide-Ranging New Sanctions, Treasury Targets Russian
    Military-Linked Elites and Industrial Base* (Sept. 14, 2023),
    https://home.treasury.gov/news/press-releases/jy1731 ...................................................... 6, 7

**INTRODUCTION**

Pursuant to Article II of the Constitution, as well as powers conferred on him by Congress in the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1708 ("IEEPA"), the President has the authority to impose economic sanctions on individuals and entities in response to declared national emergencies.  In 2021, the President declared a national emergency and issued Executive Order 14024, 86 Fed. Reg. 20,249 (Apr. 19, 2021) ("EO 14024"), to confront the threat posed by certain harmful foreign activities of the Government of the Russian Federation.  Acting in accordance with this authority, on April 12, 2023, the Department of State determined that Christodoulos Georgiou Vassiliades is or has been a leader, official, senior executive officer, or member of the board of directors of both the Government of the Russian Federation and Sberbank Investment Limited.  As a result, the Department of the Treasury, Office of Foreign Assets Control ("OFAC") added Christodoulos Georgiou Vassiliades to the list of Specially Designated Nationals and Blocked Persons ("SDNs"), thereby blocking all of his property and interests in property in the United States or in the possession or control of a U.S. person.  As part of that same action, the Department of State also designated individuals and entities in his network, including his adult children, Plaintiffs Anna Maria Vassiliades and Giorgos Vassiliades.

Plaintiffs now challenge their designations.  First, they claim that the President exceeded his authority under IEEPA by permitting the Secretary of State to designate an individual on the basis that he or she is an adult child of another SDN designated under EO 14024.  But the Department of State did not designate Anna Maria Vassiliades for being the adult child of Christodoulos Georgiou Vassiliades.  In any event, the President's selection of designation criteria is unreviewable, both because it presents a political question and because the Court otherwise lacks jurisdiction to review the President's exercise of discretion under IEEPA.  Second, and similarly,

Plaintiffs contend that the Department of State's determinations lacked a rational basis and therefore contravened the Administrative Procedure Act, 5 U.S.C. § 706(2)(C) ("APA"). However, Plaintiffs do not deny that they meet the criteria for designation set forth by the President. The Department of State permissibly relied on that criteria, and it need not demonstrate that Plaintiffs pose a specific threat to U.S. national security or foreign policy. And insofar as they claim that the Department of State violated their constitutional rights, Plaintiffs—foreign nationals with no connections to the United States—have not established that they enjoy any such rights. Plaintiffs' theories, which are long on hyperbole but short on facts and law, also fail on the merits.

For these reasons, discussed more fully below, the Court should grant Defendants' motion and dismiss Plaintiffs' claims in their entirety.

## BACKGROUND

### I. Statutory and Regulatory Framework

#### A. The International Emergency Economic Powers Act

For nearly its entire history, the United States has utilized economic sanctions as a critical means to protect national security and achieve foreign policy goals. *See Rakhimov v. Gacki*, Civ. A. No. 19-2554 (JEB), 2020 WL 1911561, at *1 (D.D.C. Apr. 20, 2020). During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917. *See* 65th Cong. Ch. 106, 40 Stat. 411, 411-16 (1917) (codified as amended at 50 U.S.C. §§ 4301-4341). As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies. *See* 50 U.S.C.A. § 4305(b)(1); *see also Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981). Although TWEA does not use the term "block," the authority it conveys to the Executive Branch to regulate, prevent, or prohibit transactions has consistently been

interpreted to encompass the power to block or freeze an entity's property. *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).

In 1977, Congress amended TWEA and enacted IEEPA. *See* S. Rep. No. 95-466, at 1-2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. IEEPA limited TWEA's application to periods of declared wars, but also extended the President's authority to declared national emergencies. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Although the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States[.]" 50 U.S.C. § 1701(a). Once such a national emergency is declared, IEEPA authorizes the President to, among other things:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B). Pursuant to this expansive authority, and in response to a variety of declared national emergencies, Presidents have imposed and authorized sanctions with respect to many countries, including Iran, Burma, and North Korea, as well as individuals engaged in or associated with certain conduct, such as narcotics traffickers and terrorists. *See, e.g.*, Exec. Order 12978, 60 Fed. Reg. 54,579 (Oct. 21, 1995); Exec. Order 13224, 66 Fed. Reg. 49,079 (Sept. 23, 2001).

As a check on the President's expansive powers, IEEPA includes both consultation and reporting requirements to ensure that Congress is appropriately apprised of the President's decisions. 50 U.S.C. § 1703. Moreover, national emergencies declared under IEEPA are subject to the National Emergencies Act. *Id.* § 1622; *see, e.g.*, EO 14024, Preamble. As such, "Congress

has reserved to itself the authority to terminate any declared national emergency by concurrent resolution." *Wald*, 468 U.S. at 228 n.9 (citing 50 U.S.C. § 1622).

**B.**   **Economic Sanctions in Response to Harmful Foreign Activities of the Russian Government**

In April 2021, pursuant to IEEPA, the President issued EO 14024.  86 Fed. Reg. at 20,249. In doing so, the President identified specific "harmful foreign activities of the Government of the Russian Federation," including efforts to "foster and use transnational corruption to influence foreign governments; . . . to undermine security in countries and regions important to United States national security; and to violate well-established principles of international law, including respect for the territorial integrity of states[.]" *Id.*  The President further determined that such activities "constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[,]" and declared "a national emergency to deal with that threat." *Id*. In order to address this national emergency, the President blocked all property and interests in property of persons meeting certain criteria as determined by the Secretary of State or the Secretary of the Treasury.  *Id*. § 1.  Of relevance here, EO 14024 authorizes the designation of individuals or entities determined by the Secretary of State, in consultation with the Secretary of the Treasury, "to be or have been a leader, official, senior executive officer, or member of the board of directors of . . . the Government of the Russian Federation" or "an entity whose property and interests in property are blocked pursuant to this order[,]" *id.* §§ 1(a)(iii)(A), 1(a)(iii)(C), or "to be a spouse or adult child of any person whose property and interests in property are blocked pursuant to" Section 1(a)(ii) or 1(a)(iii) of EO 14024, *id.* § 1(a)(v).

In addition to conferring this authority to designate individuals and entities, the President

more generally delegated administration of the Order to the Secretaries of State and the Treasury.[1]
For instance, the Order provides that "[a]ll departments and agencies of the United States shall
take all appropriate measures within their authority to carry out the provisions of this order[,]" *id.*
§ 8, and that "[n]othing in this order shall be construed to impair or otherwise affect . . . the
authority granted by law to an executive department or agency, or the head thereof[,]" *id.*
§ 11(a)(i).

In accordance with these provisions, both the Department of State and OFAC consider
whether to lift sanctions imposed by the applicable agency pursuant to EO 14024.  U.S. Dep't of
State, *Learn More About the Department of State's Delisting Process*,
https://www.state.gov/sanctions-delisting/ (outlining steps to request reconsideration of a decision
by the Department of State that sanctions are warranted); OFAC, *Filing a Petition for Removal
from an OFAC List*, https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/filing-a-
petition-for-removal-from-an-ofac-list (outlining steps to request reconsideration of a decision by
OFAC that sanctions are warranted).  OFAC has promulgated a regulation to govern its evaluation
of such requests, 31 C.F.R. § 501.807; *Olenga v. Gacki*, 507 F. Supp. 3d 260, 266 (D.D.C. 2020),
and the Department of State follows a process similar to OFAC's, *see*
https://www.state.gov/sanctions-delisting.  Specifically, the Department of State will consider any
information or arguments that an SDN submits, including (but not limited to) assertions regarding
"a positive change in behavior, the death of an SDN or listed person, the basis for the designation
or other sanction no longer exists, or the designation or other sanction was based on mistaken

---

[1] The Secretary of the Treasury has delegated her authority under EO 14024 to OFAC.  31 C.F.R.
§ 587.802.  OFAC maintains a list of individuals or entities whose assets are blocked; this Specially
Designated Nationals and Blocked Persons List is known as the SDN List.  *See* OFAC, *SDN List*,
https://www.treasury.gov/ofac/downloads/sdnlist.pdf.  Persons designated pursuant to EO 14024
(as well as other authorities) are broadly referred to as SDNs.

identity." *Id.*  Once an SDN submits a petition, the Department of State will acknowledge receipt and may issue a questionnaire to gather additional information relevant to its decision-making process.  *Id.*  In evaluating a petition, the agency may also consider unclassified and classified reporting, as well as the foreign policy implications of removing or maintaining sanctions against a particular SDN.  *Id.*; *Pejcic v. Gacki*, Case No. 19-cv-02437 (APM), 2021 WL 1209299, at *3 (D.D.C. Mar. 30, 2021).  The Department of State consults with OFAC during this process, including prior to making a final decision.  https://www.state.gov/sanctions-delisting.  If the agency denies the petition, the SDN may submit additional petitions in the future.  *Id.*

## II.     The Department of State's Designations of Plaintiffs

It is the policy of the United States "to ensure the Russian Federation . . . pay[s] a severe economic and diplomatic price for Russia's aggression against Ukraine."  U.S. Dep't of State, *How the United States is Holding Russia and Belarus to Account* (last updated April 15, 2024), https://www.state.gov/holding-russia-and-belarus-to-account; *see Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.").  To effectuate that policy, the United States—"along with its allies and partners"—has imposed sweeping sanctions designed to degrade Russia's economy. https://www.state.gov/holding-russia-and-belarus-to-account; *see also, e.g.*, U.S. Dep't of State, *Taking Action to Degrade Russia's Wartime Economy Ahead of G7 Leaders' Summit* (June 12, 2024),    https://www.state.gov/taking-action-to-degrade-russias-wartime-economy-ahead-of-g7-leaders-summit/; U.S. Dep't of State, *Imposing Further Sanctions in Response to Russia's Illegal War Against Ukraine* (Sept. 14, 2023), https://www.state.gov/imposing-further-sanctions-in-response-to-russias-illegal-war-against-ukraine/; U.S. Dep't of the Treasury, *With Wide-Ranging*

6

*New Sanctions, Treasury Targets Russian Military-Linked Elites and Industrial Base* (Sept. 14, 2023), https://home.treasury.gov/news/press-releases/jy1731; U.S. Dep't of State, *Promoting Accountability and Imposing Costs on the Russian Federation and Its Enablers for Putin's Aggression Against Ukraine* (June 2, 2022), https://www.state.gov/promoting-accountability-and-imposing-costs-on-the-russian-federation-and-its-enablers-for-putins-aggression-against-ukraine/.

Consistent with these goals, on April 12, 2023, the Department of State invoked its authority under EO 14024 to impose sanctions against more than 80 individuals and entities "that continue to enable and facilitate Russia's aggression." U.S. Dep't of State, *Further Curbing Russia's Efforts to Evade Sanctions and Perpetuate its War against Ukraine* (Apr. 12, 2023), https://perma.cc/4KLA-5JE2. Among these was "the network of the lawyer Christodoulos [Georgiou] Vassiliades," which "ha[s] served as prolific enablers of a number of Russian oligarchs." *Id.* The Department of State designated Christodoulos Georgiou Vassiliades himself "for being or having been a leader, official, senior executive officer, or member of the board of directors of the Government of the Russian Federation, and . . . for being or having been a leader, official, senior executive officer, or member of the board of directors of Sberbank Investment Limited, an entity that is blocked pursuant to E.O. 14024." *Id.*; *see* Dep't of State, Notice of Dep't of State Sanctions Actions, 88 Fed. Reg. 58,017, 58,019 (Aug. 24, 2023); *see also* EO 14024, §§ 1(a)(iii)(A), 1(a)(iii)(C).[2] The Department of State further noted that "[Christodoulos

---

[2] Sberbank Investment Limited is a subsidiary of Sberbank, "Russia's largest state-owned bank." U.S. Dep't of the Treasury, *U.S. Treasury Escalates Sanctions on Russia for Its Atrocities in Ukraine* (Apr. 6, 2022), https://home.treasury.gov/news/press-releases/jy0705. OFAC designated Sberbank under EO 14024 for operating or having operated in the financial services sector of the Russian Federation economy. *Id.*; *see* EO 14024, § 1(a)(i).

Georgiou] Vassiliades . . . is also being sanctioned by the United Kingdom." https://perma.cc/4KLA-5JE2.

As part of its April 12, 2023 action, the Department of State also designated Kyriaki Demetriou Kamperi, a business associate of Christodoulos Georgiou Vassiliades, based on Kamperi's role at Sberbank Investment Limited.  *Id.*; *see* EO 14024, § 1(a)(iii)(C).  Further, the Department of State sanctioned seven entities owned or controlled by Christodoulos Georgiou Vassiliades or by Vassiliades and Kamperi, including Vassiliades & CO. UK Limited. https://perma.cc/4KLA-5JE2; *see* EO 14024, § 1(a)(vii).

Additionally, the Department of State sanctioned two members of Christodoulos Georgiou Vassiliades's family.  First, the Department of State determined that his daughter, Anna Maria Vassiliades, is or has been "a leader, official, senior executive officer, or member of the board of directors of" Vassiliades & CO. UK Limited, and therefore designated her pursuant to Section 1(a)(iii)(C) of EO 14024.  https://perma.cc/4KLA-5JE2; 88 Fed. Reg. at 58,020-21.  Second, the agency relied on Section 1(a)(v) of EO 14024—permitting the designation of "a spouse or adult child of any person whose property and interests in property are blocked pursuant to" Section 1(a)(ii) or 1(a)(iii) of EO 14024—to sanction Christodoulos Georgiou Vassiliades's adult son, Giorgos Vassiliades.  https://perma.cc/4KLA-5JE2; 88 Fed. Reg. at 58,021.

On June 22, 2023, Plaintiffs submitted delisting petitions to the government.  Compl. ¶¶ 42, 46, ECF No. 1.  In response, the government requested additional information from Plaintiffs.  *Id.* ¶¶ 44, 47.  As of this filing, the petitions remain under review.  *Id.* ¶ 64.

## III.    Plaintiffs' Complaint

Plaintiffs filed this action on July 3, 2024, naming as Defendants the Secretary of State, the Department of State, the Secretary of the Treasury, and the Department of the Treasury.  *Id.* ¶¶ 14-

17.  Plaintiffs advance two theories concerning the Department of State's decisions to designate them pursuant to EO 14024.  *Id*. ¶¶ 69-81.  First, Plaintiffs argue that the President's inclusion of Section 1(a)(v) in EO 14024 exceeded his statutory authority because "IEEPA does not authorize imposing sanctions upon the children of a designated person."  *Id.* ¶ 71 (Count I).  Plaintiffs further contend that IEEPA permits the designation of individuals only if they "pose[] a risk related to the declared emergency," and as "neither Plaintiff is alleged to have done anything to aid Russia in its war effort in Ukraine, . . . there is no statutory basis for their designations."  *Id*.  Second, Plaintiffs reconstitute this argument by asserting that the Department of State's designation decisions are arbitrary and capricious and thus violate the APA.  *Id.* ¶¶ 73-81 (alleging in Count II that "there is no rational connection between the need to sanction them and the need to deal with the emergency situation posed by Russia's invasion of Ukraine").  Plaintiffs again take particular issue with Section 1(a)(v) of EO 14024, claiming that its inclusion and use constitute "an act of terrorism" by the United States.  *Id.* ¶ 79; *see id.* ¶¶ 22, 26, 81.  Plaintiffs also invoke the Fifth Amendment in support of this theory.  *Id.* ¶¶ 80-81.  They ask the Court to issue declaratory relief and "order Defendants to delist Plaintiffs . . . from the SDN list[.]"  *Id.*, Prayer for Relief ¶¶ 1-2.

## LEGAL STANDARDS OF REVIEW

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing the court's subject-matter jurisdiction.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  "The D.C. Circuit has consistently treated the political-question doctrine as bearing on subject-matter jurisdiction."  *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 89 (D.D.C. 2016) (citations omitted).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555 (internal citations omitted).  For purposes of a Rule 12(b)(6) motion, the "complaint" also includes matters incorporated therein and documents upon which the complaint relies.  *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009).

## DISCUSSION

I.     **Plaintiffs' Challenge to the President's Selection of Designation Criteria Fails**

In Count I, Plaintiffs challenge the President's decision to include certain criteria for designation in EO 14024—specifically, the provision permitting the designation of a person determined to be a spouse or adult child of an SDN designated under the Order.  Compl. ¶¶ 70-71. As discussed below, however, Plaintiffs' theory is both unreviewable and unpersuasive.

A.     **The President's Selection of Designation Criteria is Unreviewable**

1.     **Plaintiffs' Claim Presents a Political Question**

"The political question doctrine is essentially a function of the separation of powers . . . and excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (en banc) (citations omitted); *see Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) ("[T]he courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary . . . ." (citation omitted)).

As explained by the Supreme Court in *Baker v. Carr*, 369 U.S. 186 (1962), the political question doctrine bars a court from considering a claim when

10

[p]rominent on the surface of [the] case . . . is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id*. at 217.  To find that it lacks subject-matter jurisdiction because the claim under review is a political question, "the Court need only conclude that one factor is present, not all." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 313 (D.C. Cir. 2014) (citation omitted).

As an initial matter, the President's decision to declare a national emergency with respect to certain harmful foreign activities of the Government of the Russian Federation presents an unreviewable political question.  *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020) (emphasizing that "*no* court has ever reviewed the merits of such a declaration"). For similar reasons, the Court cannot review the President's determination of how to address that emergency—that is, his selection of which criteria may be considered by the Secretary of State, in consultation with the Secretary of the Treasury, in making designation decisions.

Economic sanctions involve "the intersection of national security, foreign policy, and administrative law[.]"  *Islamic Am. Relief Agency (IARA-USA) v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007).  The Executive has relied on this tool for centuries to achieve a wide range of national security and foreign policy goals.  *Rakhimov*, 2020 WL 1911561, at *1 ("Since our nation's infancy, many of its leaders have viewed economic sanctions as 'the most likely means of obtaining our objects without war.'" (quoting James Madison, "Political Observations," National Archives (Apr. 20, 1795))); *see, e.g.*, *Dames & Moore*, 453 U.S. at 673 (explaining that blocking orders "permit the President to maintain the foreign assets at his disposal for use in

negotiating the resolution of a declared national emergency[,]" and that "[t]he frozen assets serve as a 'bargaining chip' to be used by the President when dealing with a hostile country").  Further, "[i]t cannot . . . be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."  *Schneider*, 412 F.3d at 195; *see Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches[.]").  Indeed, the President expressly relied on his Constitutional powers—in addition to those conferred by statute—in issuing EO 14024.  *See* EO 14024, Preamble.  Thus the first *Baker* factor strongly indicates the presence of a political question.

Second, there are no judicially manageable standards to evaluate the President's selection of designation criteria to address the threat posed by Russia.  As described above, IEEPA grants broad discretion to the President.  *Dames & Moore*, 453 U.S. at 677 (IEEPA "indicat[es] congressional acceptance of a broad scope for executive action" and "delegates broad authority to the President to act in times of national emergency with respect to property of a foreign country."); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 159 (D.C. Cir. 2003) (explaining that IEEPA "clothes the President with extensive authority"); *Rahmani v. Yellen*, Civ. A. No. 24-0285 (RC), 2024 WL 1701681, at *11 (D.D.C. Apr. 19, 2024) ("[T]he President's 'sweeping' and 'broad' authority under IEEPA is settled." (citation omitted)).  Congress chose not to define the terms "national emergency," "deal with," or "unusual and extraordinary threat," nor limit the types of conduct or status that the President may deem to be sanctionable in order to address emergencies and threats.  *See* 50 U.S.C. §§ 1701-1702.  Such determinations are left to the President's discretion, *id.*, subject only to oversight from Congress, *id.* § 1703; *see United States v. George S. Bush & Co.*, 310 U.S. 371, 378-79 (1940) ("There is no express provision in the Act that the rate

of exchange must be taken for the same period as the invoice prices. To imply it would be to add what Congress has omitted and doubtless omitted in view of the very nature of the problem. The matter was left at large. The President's method of solving the problem was open to scrutiny neither by the Court of Customs and Patent Appeals nor by us."). IEEPA thus sets forth no standards from which the Court could judge the President's selection of designation criteria or determine whether specific criteria effectively address an unusual and extraordinary threat to the United States' interests, and "[t]he judiciary lacks the capacity for such a task." *El-Shifa Pharm. Indus. Co*., 607 F.3d at 845; *see Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp*., 333 U.S. 103, 111 (1948) (explaining that foreign policy decisions "are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil[,]" and that "[t]hey are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry"); *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev*., 887 F.2d 275, 281-82 (D.C. Cir. 1989) ("[W]here the President acted under a congressional grant of discretion as broadly worded as any we are likely to see, and where the exercise of that discretion occurs in the area of foreign affairs, we cannot disturb his decision simply because some might find it unwise or because it differs from the policies pursued by previous administrations."); *cf. Ctr. for Biological Diversity*, 453 F. Supp. 3d at 32 ("[T]he statute simply allows the President to declare an emergency to activate special emergency powers created by Congress. Nothing else guides how the President should make this decision.").

Plaintiffs' reliance on 50 U.S.C. § 1701(b) does not advance their argument. Compl. ¶¶ 18, 70. That section of IEEPA provides that "[t]he authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to

which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b). But again, the text of IEEPA confirms that Congress—not the Judiciary—is responsible for overseeing the President's compliance with § 1701(b). *Id.* § 1703; *see id.* § 1622. And even if the Court could evaluate the President's adherence to this provision, its review would be limited to considering whether the President is invoking his § 1702 authorities outside the context of a declared national emergency (an essentially procedural question answerable by the language of the Executive Order), or whether the President is dealing with a declared national emergency with measures that fall outside the scope of § 1702. *See Dames & Moore*, 453 U.S. at 654-76 (determining whether § 1702 of IEEPA permitted nullifying attachments or suspending claims).[3] By contrast, § 1701(b) does not permit review of how, or how effectively, the President's selected criteria address an emergency declared under § 1701(a). *See Deripaska v. Yellen*, No. 21-5157, 2022 WL 986220, at *2 (D.C. Cir. Mar. 29, 2022) ("[C]ontrary to Deripaska's suggestions, . . . neither executive order requires a showing of how the particular sanction bears on the declared emergency; rather, the orders reflect the President's judgment that the covered actions contribute to the situation in Ukraine."); *Islamic Am. Relief Agency*, 477 F.3d at 735 (rejecting argument that OFAC must determine that an entity itself threatens the United States' national security; "once the President has declared a national emergency, the IEEPA authorizes the blocking of property to protect against that threat" (citing 50 U.S.C. § 1702(a)(1)(B))); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (holding government's determination that "'the terrorist activity of the organization threatens the security of United States nationals or the national security of the United

---

[3] Plaintiffs do not assert that the President authorized the blocking of assets of SDNs' spouses or adult children outside the context of a declared national emergency, or that the blocking of assets is not permitted by § 1702. Nor can they. *See* Part I.B, below.

States' . . . is nonjusticiable"); *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 28 (D.D.C. 2015)

("Whether continued blocking is an effective strategy at fulfilling OFAC's foreign policy

objectives, however, is not a question for this court."); *cf. Industria Panificadora, S.A. v. United

States*, 763 F. Supp. 1154, 1161 (D.D.C. 1991) ("[P]laintiffs' action involves judicial review of

executive branch decisions pertaining to the nature, conduct, and implementation of a

presidentially-directed military operation in a foreign country.  This goes to the heart of the

political question doctrine."), *aff'd on other grounds*, 957 F.2d 886 (D.C. Cir. 1992).  And for this

reason, Plaintiffs' specific connection to Russia's invasion of Ukraine is immaterial.  *See* Compl.

¶ 71.

Nor can Plaintiffs rely on the subsection of IEEPA providing that "[i]n any judicial review

of a determination made under this section, if the determination was based on classified

information . . . such information may be submitted to the reviewing court ex parte and in camera."

50 U.S.C. § 1702(c).  Congress made clear that this provision "does not confer or imply any right

to judicial review." *Id.*; *see* EO 14024, § 12, as amended by Executive Order 14114, § 1, 88 Fed.

Reg. 89,271 (Dec. 26, 2023) (Executive Order "does not[] create any right or benefit, substantive

or procedural, enforceable at law or in equity[.]").  Moreover, and consistent with the constraints

imposed by the political question doctrine, judicial review of economic sanctions actions has

typically focused on the reasonableness of the Department of State's or OFAC's determination

that an individual or entity meets the President's criteria for designation, not on whether the

President's selection of designation criteria adequately addresses or is sufficiently related to a

declared national emergency, *e.g.*, *Deripaska*, 2022 WL 986220, at *2; *People's Mojahedin Org.

of Iran*, 182 F.3d at 24; *Olenga*, 507 F. Supp. 3d at 279—and even then, judicial review "is

extremely deferential[,]" *Islamic Am. Relief Agency*, 477 F.3d at 734.[4]

The third *Baker* factor—"the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion[,]" *Baker*, 369 U.S. at 217—further indicates the presence of a political question here.  Plaintiffs essentially challenge Section 1(a)(v) of EO 14024 as too harsh, disproportionate, or drastic a measure to address the threat posed by Russia.  Compl. ¶ 22 ("Section 1(a)(v) of E.O. 14024 is both novel and barbaric.").  In their view, designating an individual on the basis of being a spouse or adult child of an SDN is simply beyond the pale, as sanctions should instead be limited to those with what they would characterize as a more direct connection to Russia's invasion of Ukraine.  *See id.* ¶¶ 70-71.  But "[t]o determine whether drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policymaking."  *Schneider*, 412 F.3d at 197.

Similarly, the Court cannot "undertak[e] independent resolution without expressing lack of the respect due coordinate branches of government[.]"  *Baker*, 369 U.S. at 217.  Judicial review of the President's choice of designation criteria would be inconsistent with the well-established principle of deferring to the President in matters pertaining to national security and foreign affairs.  *E.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010); *Haig v. Agee*, 453 U.S. 280, 292 (1981); *Chi. & S. Air Lines*, 333 U.S. at 111; *Ameziane v. Obama*, 699 F.3d 488, 494 (D.C. Cir. 2012).  Thus the fourth *Baker* factor also weighs against review here.  *See Schneider*, 412 F.3d at 198.

Finally, Plaintiffs' claim implicates the sixth *Baker* factor, "the potentiality of

---

[4] Judicial review of OFAC's decision to deny a license application may also be available.  *See Rusaviainvest, OOO v. Yellen*, No. 18 Civ. 5676 (PGG), 2023 WL 6198256, at *6 (S.D.N.Y. Sept. 21, 2023); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 158 (D.D.C. 2010).

embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217.  In issuing Executive Orders pursuant to IEEPA, the President is not merely declaring a national emergency and defining criteria for designation; as "the sole organ of the nation in its external relations, and its sole representative with foreign nations[,]" *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936), he is also sending an important message to the international community about the United States' foreign policy positions, affirming support for the country's allies, and warning its adversaries.  EO 14024 is no exception, emphasizing, among other things, "free and fair democratic elections and democratic institutions in the United States and its allies[,]" "security in countries and regions important to United States national security[,]" and "principles of international law, including respect for the territorial integrity of states[.]"  *See* EO 14024, Preamble; *see also* https://www.state.gov/holding-russia-and-belarus-to-account (discussing actions taken "[w]ith our allies and partners" to hold Russia accountable).[5] Congress—the branch of government responsible for overseeing the President's use of discretionary IEEPA authorities, 50 U.S.C. §§ 1622, 1703—has not terminated the emergency declared by the President, nor indicated that it disapproves of how the President has wielded his discretion.  If the Court were to exercise jurisdiction over Plaintiffs' claim, it would thus unduly undermine the President's efforts to address an unusual and extraordinary foreign threat.  *See Al-Tamimi v. Adelson*, 916 F.3d 1, 13 (D.C. Cir. 2019) ("The Executive is institutionally well-positioned to understand the foreign policy ramifications of the court's resolution of a potential political question.  Accordingly, an Executive Branch opinion regarding these ramifications is owed deference, no matter what form it takes."); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 48

---

[5] OFAC's actions on April 12, 2023 also illustrate this point.  https://perma.cc/4KLA-5JE2 (noting that sanctions are "part of a continued effort, and to reaffirm our commitment to working alongside our allies").

(D.D.C. 2010) (sixth *Baker* factor present in case requesting "after-the-fact judicial review of the Executive's decision to employ military force abroad"); *Sanchez-Espinoza v. Reagan*, 568 F. Supp. 596, 600 (D.D.C. 1983) (expressing concern about "rattl[ing] the delicate diplomatic balance that is required in the foreign affairs arena"), *aff'd*, 770 F.2d 202 (D.C. Cir. 1985); *cf. Dames & Moore*, 453 U.S. at 673.

Because this case presents a political question, the Court must consider whether that question is "inextricable from the case." *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 31 (quoting *Al-Tamimi*, 916 F.3d at 8). Here, Plaintiffs' "entire claim hinges on whether the Court agrees with the President or [Plaintiffs'] assessment" of the President's selection of designation criteria in EO 14024. *Id.* at 33. The Court should therefore dismiss Count I of Plaintiffs' Complaint pursuant to Rule 12(b)(1).

        **2.**     **The Court Otherwise Lacks Jurisdiction to Review Plaintiffs'** *Ultra Vires* **Claim**

When courts are confronted with a claim alleging that the President has "violated the terms of" a statute, "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President." *Dalton v. Specter*, 511 U.S. 462, 474 (1994).[6] Nonetheless, Plaintiffs claim that the President exceeded his statutory authority under 50 U.S.C. § 1701, because IEEPA "limits the President's authority to impose sanctions to actions that 'deal with' an ongoing national security crisis[,]" and Plaintiffs allegedly have not "aid[ed] Russia in its war effort in Ukraine." Compl. ¶¶ 70-71. That is, Plaintiffs argue that the President's selection of designation criteria was improper given the factual circumstances in Russia. *Dalton*

---

[6] The Supreme Court only "assume[d] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA." *Dalton*, 511 U.S. at 474.

forecloses this argument.

As an initial matter, it is the President's view of how to address the threat posed by Russia—not Plaintiffs'—that matters. *E.g.*, *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (referencing the Supreme Court's "customary policy of deference to the President in matters of foreign affairs"). Further, Plaintiffs' claim "concerns not a want of Presidential power, but a mere excess or abuse of discretion in exerting a power given." *Dalton*, 511 U.S. at 474 (citation omitted). Again, Congress did not define the terms "national emergency" or "deal with," nor impose any conditions or restrictions in IEEPA that would limit the President's authority to decide the circumstances in which individuals' property and interests in property should be blocked pursuant to a national emergency. Instead, Congress intentionally left these determinations to the President's discretion. *See* 50 U.S.C. § 1701(a); *id.* § 1702(a)(1)(B) (identifying authorities that the President "may" utilize, including blocking any transaction "involving[] any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States"); *id.* § 1704 ("The President may issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this chapter."); *see also* Part I.A, *supra* (discussing the President's broad and sweeping authority under IEEPA).

A declaration of a national emergency, in other words, is the key that unlocks the full array of § 1702 authorities to deal with that emergency, in whatever way the President deems appropriate. *E.g.*, *Islamic Am. Relief Agency*, 477 F.3d at 735; *Fulmen Co. v. OFAC*, 547 F. Supp. 3d 13, 17 (D.D.C. 2020) (explaining that IEEPA "grants the President broad discretion to sanction foreign entities and individuals in the event there is a national emergency"). Here, in accordance with § 1701, the President chose to confront the threat posed by Russia by declaring a national

emergency and authorizing the Secretary of State, in consultation with the Secretary of the Treasury, to designate individuals and entities based on criteria chosen by the President.  *See generally* EO 14024.  There is no basis for the Court to second-guess that national security and foreign policy judgment because "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review."  *Dalton*, 511 U.S. at 476; *see also, e.g.*, *Farrakhan v. Reagan*, 669 F. Supp. 506, 512 (D.D.C. 1987) ("In this situation, where the court is incapable of evaluating or controlling the potential for direct or indirect diversion of money within Libya, the court has little choice but to defer to the judgment of the President that all economic intercourse with Libya should cease."), *aff'd*, 851 F.2d 1500 (D.C. Cir. 1988).  Plaintiffs may disagree with the President's discretionary choice of how to utilize his traditional § 1702 authorities to address the threat posed by Russia; judicial review of such a dispute, however, is not available.  *Dalton*, 511 U.S. at 474-76.

Plaintiffs' theory, moreover, reflects a fundamental misunderstanding of IEEPA.  The statute does not require the President (or the Department of State or OFAC) to find that every sanctions target poses a risk to national security or foreign policy.  *See* 50 U.S.C. § 1701.  Indeed, the D.C. Circuit rejected an argument similar to Plaintiffs' nearly 20 years ago, *Islamic Am. Relief Agency*, 477 F.3d at 735 (agreeing with the district court that "the threat need not be found with regard to each individual entity"), and has since reaffirmed that principle, *Deripaska*, 2022 WL 986220, at *2 (declining to impose a requirement, absent from the Executive Orders, that the government demonstrate a nexus between the sanctions target and the declared emergency).  IEEPA mandates only that the President limit his use of § 1702 authorities to situations where a national emergency has been declared, which is precisely what the President has done in EO 14024 here.  *See* 50 U.S.C. §§ 1701-1702; EO 14024, Preamble.

**B.      Plaintiffs Fail to State a Claim that the President Acted *Ultra Vires***

Even if Plaintiffs could proceed with an *ultra vires* claim against the President—and they cannot—the scope of the Court's review would be limited.  Where an *ultra vires* claim does not involve Presidential action, a plaintiff must demonstrate "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (citation omitted).  The D.C. Circuit has repeatedly described such a claim as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *Id.* (citation omitted).  An *ultra vires* claim concerning Presidential action should be just as limited, if not more so, particularly where the President is acting in the realm of national security and foreign affairs.

Plaintiffs cannot come close to meeting this standard.  The President expressly invoked his powers under IEEPA in issuing EO 14024.  *See* EO 14024, Preamble.  The President found that "specified harmful foreign activities of the Government of the Russian Federation . . . constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[,]" and "declare[d] a national emergency to deal with that threat."  *Id.*  Having declared such an emergency, IEEPA permits the President to exercise "[a]ny authority granted to [him] by section 1702 . . . to deal" with the threat posed by Russia.  50 U.S.C. § 1701(a).  Consistent with § 1702, the President chose to block the property and interests in property, subject to U.S. jurisdiction, of persons designated under the Executive Order.  EO 14024, § 1; *see* 50 U.S.C. § 1702(a)(1).  Although not required by IEEPA to do so, the President identified the criteria for designation in Section 1 of EO 14024, and left no doubt that he made this selection to deal with

21

the national emergency.   EO 14024, § 1; *see id.*, Preamble (declaring emergency and "[a]ccordingly . . . order[ing]" the blocking of assets of those meeting the criteria in Section 1).

The designation criteria in Section 1 reflect the causes and consequences of the threats specified in the Preamble to EO 14024.  For instance, given Russia's lack of respect for territorial integrity, EO 14024, Preamble, the President authorized sanctions against those who "operate or have operated in the technology sector or the defense and related materiel sector of the Russian Federation economy," *id.* § 1(a)(i), as well as those who, on Russia's behalf, have engaged in "activities that undermine the peace, security, political stability, or territorial integrity of the United States, its allies, or its partners[,]" *id.* § 1(a)(ii)(F).   Additionally, the President reasonably authorized sanctions against those who lead the entities engaging in sanctionable conduct (regardless of their individual wrongdoing), *see id.* § 1(a)(iii), thereby allowing the United States to exert additional pressure to facilitate change.

Further, the President included designation criteria that would minimize the risk of asset flight, which has the potential to cripple economic sanctions programs.  *Cf. Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015).  In accordance with his concern about individuals' "ability to transfer funds or other assets instantaneously," EO 14024 § 7, the President authorized sanctions against those who may be used by SDNs to hide assets or otherwise evade blocking measures. This category includes persons who "have acted or purported to act for or on behalf of, directly or indirectly," any SDN designated under EO 14024.  *Id.* § 1(a)(vii).  It also includes those who are "a spouse or adult child of any person whose property and interests in property are blocked pursuant to th[e] order."  *Id.* § 1(a)(v).  By including these criteria for designation, the President ensured that the Secretary of State and the Secretary of the Treasury would have the tools necessary to efficiently dismantle entire networks of illicit activity.  *See* U.S. Dep't of the Treasury, *FACT*

*SHEET: Disrupting and Degrading – One Year of U.S. Sanctions on Russia and Its Enablers* (Feb. 24, 2023), https://perma.cc/LXK2-BGCY ("Moving or hiding money through family members is a known practice of those trying to evade sanctions."); Multilateral REPO Task Force, *Global Advisory on Russian Sanctions Evasion* at 2 (Mar. 9, 2023), available at https://home.treasury.gov/system/files/136/REPO_Joint_Advisory.pdf ("Family members and close associates of designated persons are well placed to act as proxies and facilitate this kind of sanctions evasion and illicit financial activity."); *cf. Bello v. Gacki*, 94 F.4th 1067, 1072 (D.C. Cir. 2024) (discussing effectiveness of simultaneous sanctions in disrupting drug trafficking organizations).  Inclusion of these criteria can also serve as an additional deterrent to those considering engaging in sanctionable conduct, assuming they do not wish to see their spouse or adult children on the SDN List.  *See Hearing on Ukraine: Five Years After the Revolution of Dignity: Ukraine's Progress and Russia's Malign Activities Before the S. Subcomm. on Europe and Regional Security Cooperation of the S. Comm. on Foreign Relations* at 13 (June 18, 2019), https://perma.cc/6TD8-35DJ (statement of Ambassador (Ret.) John E. Herbst) (explaining that sanctioning family members of Kremlin officials "makes sense" both because "sanctioned individuals often 'transfer' their assets to their relatives" and to encourage release of unjustly imprisoned Ukrainians); *see also Karadzic v. Gacki*, 602 F. Supp. 3d 103, 114 (D.D.C. 2022) ("Sanctions can serve various foreign policy goals."  (citing *Olenga*, 507 F. Supp. 3d at 281-82)).  Section 1(a)(v) similarly warns close relatives of those engaged in illicit activity that they should take proactive steps to distance themselves from such individuals, lest they themselves be targeted for sanctions.  By working in conjunction with other designation criteria, Section 1(a)(v) thus helps prevent illicit actors and networks from accessing and moving funds.

Plaintiffs cannot advance their argument by relying on the Supreme Court's recent decision

in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), which overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See* Compl. ¶ 70. Defendants here have not relied on *Chevron*, instead explaining that the plain language of IEEPA defeats Plaintiffs' argument. Further, the traditional respect accorded to the Executive Branch's views on national security and foreign relations matters does not flow, as *Chevron* deference did, from assumptions that Congress left gaps in ambiguous statutes to be filled by agency expertise in the course of APA rulemaking. Rather, such due consideration follows from Article II principles inherent in the Executive's authority over foreign affairs. *Curtiss-Wright Export Corp.*, 299 U.S. at 320 (noting the "very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress"). Thus, the traditional consideration accorded to the Executive Branch in economic sanctions cases flows from separation-of-powers principles and a caution against judicial interference in foreign relations and national security matters, not *Chevron*. *See, e.g.*, *Wald*, 468 U.S. at 242. *Loper Bright* did not address this form of deference to the Executive Branch, which remains well established throughout the law, in and outside of the sanctions context. *See, e.g.*, *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) ("It is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'" (citation omitted)); Restatement (Fourth) of Foreign Relations Law § 306(6) (2018) ("Courts in the United States have final authority to interpret a treaty for purposes of applying it as law in the United States. In doing so, they ordinarily give great weight to an interpretation by the executive branch."); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (suggesting that when the Department of State files a statement of interest "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"); *Islamic Am. Relief*

*Agency*, 477 F.3d at 734.  Finally, at its core, *Loper Bright* held that *Chevron* deference was inconsistent with the principle of judicial review contained in Section 706 of the APA.  The APA in turn provides for judicial review only with respect to "agency action."  5 U.S.C. §§ 702, 704. The President, however, is not an "agency" within the meaning of the APA, and thus his actions are not reviewable under that statute.  *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements.").

Unable to support their claim with law or logic, Plaintiffs resort to inflammatory rhetoric, characterizing the President and his agencies as "unamerican[,]" "gravely immoral[,]" and "engag[ing] in an act of terrorism" for including and relying on Section 1(a)(v) in EO 14024. Compl. ¶¶ 22, 26, 79, 81.  The Court may strike such allegations.  *See* Fed. R. Civ. P. 12(f) (permitting court to strike "any redundant, immaterial, impertinent, or scandalous matter"); *Chandler v. Berlin*, Case No. 18-cv-02136 (APM), 2018 WL 8646840, at *1 (D.D.C. Oct. 16, 2018) ("'Scandalous' matter refers to 'any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court.'" (citation omitted)).  To the extent any response is warranted, Defendants first note that Plaintiffs' naked allegations are inconsistent with the presumption of good faith accorded to Executive Branch officials.  *Comcast Corp. v. FCC*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008); *Armstrong v. Exec. Off. of the President, Off. of Admin.*, 1 F.3d 1274, 1293 (D.C. Cir. 1993).  Nor can Plaintiffs overcome that presumption, given the eminently reasonable purposes of Section 1(a)(v), discussed above, as well as a basic understanding of the meaning of "terrorism."  *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 101 (D.D.C. 2017) ("The objective of terrorism is to use violence and fear to achieve political means."); *Bernhardt v. Islamic Republic of Iran*, Civ. A.

No. 18-2739 (TJK), 2023 WL 2598677, at *17 (D.D.C. Mar. 22, 2023) ("All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience." (citation omitted)); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 40 (D.D.C. 2016) ("Indeed, 'terrorism' is defined to mean 'the use of violent acts to frighten the people in an area as a way of trying to achieve a political goal.'" (citation omitted)).  Further, the Court should reject Plaintiffs' efforts to analogize their situation to that of minor-aged immigrant children seeking access to public schooling, Compl. ¶¶ 25-26, or children forced into internment camps during World War II based on their ancestry, *id.* ¶ 27.  Section 1(a)(v) of EO 14024 applies to adults.  EO 14024, § 1(a)(v).  Freezing property and interests in property is not a punishment (and plainly not a violent act), but an economic measure designed to achieve national security and foreign policy goals.  And the only Plaintiff before the Court sanctioned under that provision—who shuttles back and forth between his residences in Cyprus and London, living in the home of and subsisting off a father who "is a prolific enabler of Russian oligarchs[,]" https://perma.cc/4KLA-5JE2, Compl. ¶ 13—is hardly "[l]ike the children in *Korematsu*," Compl. ¶ 26; *see Trump v. Hawaii*, 585 U.S. 667, 710 (2018) ("The forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority.  But it is wholly inapt to liken that morally repugnant order to a facially neutral policy denying certain foreign nationals the privilege of admission.").

In summary, the President declared a national emergency and utilized the tools provided in IEEPA to address that emergency.  While Plaintiffs may disagree with the President's selection of designation criteria, that disagreement is not a basis to find that the President acted *ultra vires*.  The Court should thus grant Defendants' motion with respect to Count I.

## II.       Plaintiffs' APA Claim Fails

### A.       The Department of State's Decisions were Reasonable

Plaintiffs fare no better in recasting their challenge to the President's authority as an APA claim against Defendants. *See* Compl. ¶ 76. Plaintiffs do not contend that the Department of State lacked a rational basis to conclude that they met the criteria for designation in EO 14024, i.e., that Plaintiff Anna Maria Vassiliades is or has been "a leader, official, senior executive officer, or member of the board of directors of" an entity designated under EO 14024, *see* EO 14024, § 1(a)(iii)(C), or that Plaintiff Giorgos Vassiliades is the adult child of an individual designated under EO 14024, *see id.* § 1(a)(v). Rather, they simply assert that the President lacked the authority under IEEPA to include Section 1(a)(v) in EO 14024. *See* Compl. ¶ 76. But that claim fails for the reasons described above. *See DKT Mem'l Fund Ltd.*, 887 F.2d at 281 ("The APA has never been construed to grant to this or any other court the power to review the wisdom of policy decisions of the President."). Moreover, because the President permissibly included Section 1(a)(v) in the Executive Order, the Department of State necessarily acted within its authority in relying on that designation criteria. *See Islamic Am. Relief Agency*, 477 F.3d at 735 (affirming dismissal of APA claim against OFAC because "once the President has declared a national emergency, the IEEPA authorizes the blocking of property to protect against that threat[,]" and "[i]t is that authority OFAC invoked when it blocked IARA-USA's assets"); *Deripaska v. Yellen*, Case No. 19-cv-00727 (APM), 2021 WL 2417425, at *5 (D.D.C. June 13, 2021) ("[T]he record reflects that the President declared a national emergency and identified criteria pursuant to which individuals may be sanctioned, and OFAC determined Deripaska met those criteria for sanctions. OFAC therefore acted within its authority in sanctioning Deripaska."), *aff'd*, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022). For that reason, Plaintiffs cannot persuasively argue that the Court

should vacate the agency's decisions because the Department of State "failed to consider the lawfulness" of the designation criteria or how those decisions align with the policy goals of economic sanctions.  Compl. ¶ 77.

Nor can Plaintiffs advance their claim by arguing that "there is no rational connection between the need to sanction them and the need to deal with the emergency situation posed by Russia's invasion of Ukraine."  *Id.* ¶ 78.  Again, the agency need not demonstrate that a particular target poses a threat to national security, nor otherwise explain how a given designation decision fits within a larger foreign policy framework.  *Deripaska*, 2022 WL 986220, at *2; *Islamic Am. Relief Agency*, 477 F.3d at 735; *OKKO Bus. PE*, 133 F. Supp. 3d at 28.

## B.    Plaintiffs' Constitutional Theories Fail

In asserting a cause of action under the APA, Plaintiffs also claim that the Department of State's designation decisions "violate[] the prohibition against imposing 'Corruption of Blood' as a sanction in Article III" of the Constitution, as well as "Fifth Amendment due process and equal protection principles."  Compl. ¶¶ 80-81.  The Court need not reach the merits of these theories, however, because Plaintiffs lack any constitutional protections.  And even if the Court were to reach the merits, Plaintiffs have failed to establish that the Department of State violated any constitutional rights they may enjoy.

### 1.    Plaintiffs Cannot Assert Constitutional Rights

"[N]on-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."  *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *accord Johnson v. Eisentrager*, 339 U.S. 763, 770-71 (1950).  Some constitutional protections may apply when aliens "have come within the territory of the United States and developed substantial connections with this country."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)

(plurality opinion).  Although the D.C. Circuit has not directly addressed substantial connection claims within the context of an OFAC sanctions case, the Circuit's discussion of the issue in Foreign Terrorist Organization cases is instructive.  *Cf. Kadi v. Geithner*, 42 F. Supp. 3d 1, 25-26 (D.D.C. 2012).  In *National Council of Resistance of Iran v. Department of State*, the D.C. Circuit concluded that two Iranian organizations could bring a due process challenge because they had an "overt presence within the National Press Building in Washington, D.C." and a "claim[] [of] an interest in a small bank account."  251 F.3d 192, 201 (D.C. Cir. 2001).  By contrast, in *32 County Sovereignty Committee v. Department of State*, the D.C. Circuit rejected the petitioners' claim to constitutional rights where they "demonstrated neither a property interest nor a presence in this country."  292 F.3d 797, 799 (D.C. Cir. 2002).

Here, Plaintiffs' connections to the United States are not just unsubstantial, they are non-existent.  They acknowledge that they are foreign nationals living abroad.  Compl. ¶¶ 12-13.  Further, they fail to identify any property or physical presence in the United States.  *See id.* ¶¶ 32-40.  Thus, the allegations that Plaintiffs have set forth are inadequate to demonstrate that they are entitled to any constitutional protections.  *See, e.g.*, *Hejeij v. Gacki*, Civ. A. No. 19-cv-1921 (TFH), 2020 WL 5545555, at *8 (D.D.C. Sept. 16, 2020) ("Because Mr. Hejeij has not alleged any connection to the United States, let alone a substantial one, the Court will dismiss Mr. Hejeij's Fifth Amendment due process claims."); *Bazzi v. Gacki*, 468 F. Supp. 3d 70, 78 (D.D.C. 2020) ("Since Bazzi has alleged no connection to the United States—outside OFAC's sanction—he is entitled to no protection under the Due Process Clause."); *Rakhimov*, 2020 WL 1911561, at *5 ("Because Rakhimov's own pleadings and submissions fail to allege the existence of even a single piece of his property in the United States, or his presence here at any moment in time, the Court will grant Defendants' Motion to Dismiss Count II [Rakhimov's due process claim]."); *Fulmen*

*Co.*, 547 F. Supp. 3d at 22 ("Because Fulmen's own pleadings demonstrate no property or presence in the United States, it cannot establish the 'substantial connections' necessary to potentially entitle it to constitutional protections as a non-resident alien.").  Moreover, Plaintiffs cannot salvage these theories by asserting them through the APA framework; "where [a plaintiff] lacks the right to due process, the APA does not provide him separate constitutional-equivalent protection." *Bazzi*, 468 F. Supp. 3d at 82.

**2.**    **Plaintiffs' Constitutional Arguments are Meritless**

Even if Plaintiffs had constitutional rights—and they do not—the Court should reject their arguments.

a.    *Due Process*.  The crux of Plaintiffs' due process argument is difficult to discern. Insofar as Plaintiffs are asserting a procedural due process claim, their challenge fails because the agency has provided them more than adequate "notice and an opportunity to be heard." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976)); *see Zevallos*, 793 F.3d at 116 (pre-deprivation notice not required when the government is imposing economic sanctions).  The Department of State's press release and Federal Register Notice are clear as to the basis for Plaintiffs' designations, explaining that "Anna Maria Vassiliades (Anna Maria) is being designated pursuant to Section 1(a)(iii)(C) for being or having been a leader, official, senior executive officer, or member of the board of directors . . . of Vassiliades UK[,]" and "Giorgos Vassiliades, the adult son of [Christodoulos Georgiou] Vassiliades, is being designated pursuant to Section 1(a)(v) for being the spouse or adult child of [Christodoulos Georgiou] Vassiliades." https://perma.cc/4KLA-5JE2; *see* 88 Fed. Reg. at 58,020-21.  Additionally, Plaintiffs have the opportunity to be heard by submitting a delisting petition. Compl. ¶¶ 42, 46.  "Due process does not require more." *Bello*, 94 F.4th at 1076; *see Zevallos*,

30

793 F.3d at 118; *Al-Aqeel v. Paulson*, 568 F. Supp. 2d 64, 71 (D.D.C. 2008).

The Department of State's delisting procedures further mitigate any due process concerns. Plaintiffs do not appear to directly challenge the adequacy of those procedures. *See* Compl. ¶¶ 72-81. In any event, the Court here should require Plaintiffs to exhaust the administrative remedies provided by the Department of State before considering such a challenge. *See Hettinga v. United States*, 560 F.3d 498, 502-03 (D.C. Cir. 2009) ("Parties have long been required to exhaust administrative remedies before seeking relief from federal courts, . . . either as a matter of congressional command or to protect the authority of the agency and to promote judicial efficiency[.]" (citation omitted)). The delisting process is available to any SDN sanctioned by the Department of State under EO 14024, regardless of the specific basis for designation, https://www.state.gov/sanctions-delisting, and may lead to removal from the SDN List—even for designations based on familial status, *cf.* U.S. Dep't of State, *Syria Caesar Act Designations* (June 17, 2020), https://2017-2021.state.gov/syria-caesar-act-designations/ (designating Sumaia Hamcho under Section 2(a)(ii) of Executive Order 13894, which permits sanctions against a person determined to be "an adult family member of a person designated under subsection (a)(i) of" the Executive Order); OFAC, *Syria Designations; Syria-related Designations and Designation Removal* (July 29, 2020), https://ofac.treasury.gov/recent-actions/20200729 (removing Sumaia Hamcho from the SDN List). And notwithstanding the exhaustion doctrine, "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000); *see Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008) (explaining that "the availability of [government] procedures is fatal" to a procedural due process claim where a plaintiff has not completed the relevant procedures); *see also Ralls Corp.*, 758 F.3d at 317 (recognizing that the

Third and Tenth Circuits have "declared that there can be no claim of a due process violation if a plaintiff voluntary foregoes the due process procedures provided him").  While Plaintiffs have initiated the administrative remedies available to them by submitting delisting petitions to the Department of State, *see* Compl. ¶¶ 42, 46, the Department of State has not yet adjudicated those petitions, *see id.* ¶¶ 44, 48, making dismissal of their claim proper, *cf. Rakhimov*, 2020 WL 1911561, at *7 (explaining that the Court will "allow the reconsideration process to unfold[,]" and noting that "if Plaintiff believes that OFAC's decision on his delisting petition is incorrect or insufficiently justified, he may challenge that decision when it is issued").

Plaintiffs also appear to assert that the government's use of Section 1(a)(v) renders the Department of State less likely to grant Giorgos Vassiliades's petition, because he will always be the adult son of Christodoulos Georgiou Vassiliades.  *See* Compl. ¶¶ 20-21, 42.  But that theory does not sound in procedural due process, as it pertains to the outcome of the Department of State's process, not the process itself.  *See Nat'l Collegiate Preparatory v. D.C. Charter Sch. Bd.*, Civ. A. No. 19-1785 (JEB), 2019 WL 7344826, at *3 (D.D.C. Dec. 11, 2019) (explaining that a due process claim requires a court to "distinguish between outcomes and procedures" and that "the due-process clause does not protect any particular outcome; instead, it merely ensures that the procedures that led to such outcome are fair" (citing *Bishop v. Wood*, 426 U.S. 341, 350 (1976))); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 32 (D.D.C. 2014) ("So far, none of these proceedings has gone Plaintiff's way, but an unfavorable outcome is not a violation of due process.  Put more bluntly, Plaintiff's beef is with the result, not the process.").

Nor can Plaintiffs proceed on this theory if they were to reframe it as a substantive due process claim.  "[S]ubstantive due process forbids only 'egregious government misconduct,' . . . involving state officials guilty of 'grave unfairness' so severe that it constitutes either 'a substantial

infringement of state law prompted by personal or group animus,' or 'a deliberate flouting of the law that trammels significant personal or property rights[.]'" *Zevallos*, 793 F.3d at 118 (citations omitted).  "To ensure claims remain within these parameters, the threshold question for a violation of substantive due process is whether the actions may 'be fairly said to shock the contemporary conscience.'" *New Vision Photography Program*, 54 F. Supp. 3d at 32-33 (quoting *Est. of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006)).  Plaintiffs, however, "ha[ve] not suggested misconduct even approaching this egregious standard." *Zevallos*, 793 F.3d at 118.  That is especially true given the reasonableness of the President's decision, grounded in national security and foreign policy considerations, to include Section 1(a)(v) in EO 14024 as a basis for designation, *see supra* at 22-23, as well as the government's demonstrated willingness to remove individuals sanctioned on a similar basis, *see supra* at 31 (citing designation and delisting of Sumaia Hamcho); *see also Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 638 F.3d 794, 801 (D.C. Cir. 2011) (statute barring renewal of trademarks comported with substantive due process, as "[t]he 1998 Act is rationally related to the legitimate government goals of isolating Cuba's Communist government and hastening a transition to democracy in Cuba"); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 77 (D.D.C. 2002) (holding that where, as here, an agency's decision to impose economic sanctions was not arbitrary or capricious, "it [is] clear that the agency action did not rise to the level of a [substantive due process] constitutional violation"), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

Precedent affirming OFAC's ability to impose sanctions for past conduct further demonstrates the weakness of Plaintiffs' argument.  Numerous Executive Orders permit the Department of State and OFAC to designate individuals for prior events or positions that cannot be changed as a historical fact.  *E.g.*, Exec. Order 13219, 66 Fed. Reg. 34,777 (June 26, 2001), as

amended by Exec. Order 13304, § 3(a)(ii)(D), 68 Fed. Reg. 32,315 (May 28, 2003) (addressing threat posed by the situation in the Western Balkans and authorizing sanctions against persons determined "to have materially assisted in, sponsored, or provided financial, material, or technological support for, or goods or services in support of, . . . any person listed in or designated pursuant to this order"); Exec. Order 13671, § 1(a)(ii)(C), 79 Fed. Reg. 39,949 (July 8, 2014) (addressing threat posed by the conflict in the Democratic Republic of the Congo and authorizing the designation of foreign persons found "to have engaged in, directly or indirectly," certain proscribed activities); EO 14024, § 1(a)(iii) (authorizing the designation of persons who "have been a leader, official, senior executive officer, or member of the board of directors of" various entities and organizations, including the Government of the Russian Federation).  Courts have not only upheld the government's exercise of these authorities, *e.g.*, *Karadzic*, 602 F. Supp. 3d at 114; *Olenga*, 507 F. Supp. 3d at 281, but have also recognized that "nothing in the regulations compels OFAC to delist an individual who has ceased to engage in previous sanctionable conduct." *Basengezi v. Smith*, Civ. A. No. 23-1249 (JEB), 2024 WL 1050340, at *7 (D.D.C. Mar. 11, 2024) (citing *Karadzic*, 602 F. Supp. 3d at 114-15 and *Olenga*, 507 F. Supp. 3d at 281-82), *appeal filed*, No. 24-5130 (D.C. Cir. May 14, 2024).  Plaintiffs offer no reason for the Court to chart a new course here.

b.      *"Corruption of Blood."*  Plaintiffs also claim that Section 1(a)(v) of EO 14024 "violates the Constitution's condemnation of the 'Corruption of Blood' principle."  Compl. ¶ 3; *see id.* ¶¶ 23-24, 80.  As Plaintiffs appear to recognize, however, the Constitution's reference to "Corruption of Blood" appears only in Article III, section 3, clause 2, which provides that "[t]he Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted."  *See* U.S.

Const. art. III, § 3, cl. 2.  No attainder of treason is at issue here.  Further, "Corruption of Blood" refers to a punishment at common law that "prevented the attainted party's heirs from inheriting his property."  *BellSouth Corp. v. FCC*, 144 F.3d 58, 64 (D.C. Cir. 1998); *see Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 475 (1977).  By contrast, "[i]t is clear that [the Department of State's] designation or blocking order does not involve the 'punitive confiscation of property,' but instead furthers legitimate purposes[.]"  *Kadi*, 42 F. Supp. 3d at 43 (rejecting argument that designation constitutes a bill of attainder); *cf. Holy Land Found. for Relief & Dev.*, 219 F. Supp. 2d at 78-79 (explaining that a blocking measure "does not constitute a seizure" and "is a temporary freezing and title does not vest in the government" (citation omitted)).  The "Corruption of Blood" principle thus simply does not apply in this case.

       c.    *Equal Protection.*  Third, Plaintiffs claim that imposing sanctions under Section 1(a)(v) of EO 14024 violates equal protection.  Compl. ¶¶ 3, 81.  Plaintiffs, however, cannot "meet [the] demanding standard" that governs their claim.  *See Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395-96 (D.C. Cir. 2022).  "The threshold inquiry in evaluating an equal protection claim is . . . to determine whether a person is similarly situated to those persons who allegedly received favorable treatment."  *Frederick Douglass Found., Inc. v. District of Columbia*, 531 F. Supp. 3d 316, 339 (D.D.C. 2021) (quoting *Women Prisoners of D.C. Dep't of Corr. v. Dist. of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996)).  Plaintiffs' Complaint offers no explanation of how Plaintiff Giorgos Vassiliades has received such comparatively unfavorable treatment, and his equal protection claim necessarily fails.  *Chang v. United States*, Civ. A. No. 22-352 (RBW), 2023 WL 8697831, at *20 (D.D.C. Dec. 15, 2023), *aff'd*, 2024 WL 3299620 (D.C. Cir. July 2, 2024); *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 35 (D.D.C. 2015).

       Nor can Plaintiffs' challenge pass muster under rational basis review, which applies

because Section 1(a)(v) does not "proceed[] along suspect lines or infringe[] fundamental constitutional rights[.]" *Mark v. Republic of the Sudan*, 77 F.4th 892, 897 (D.C. Cir. 2023) (citation omitted), *cert. denied*, 144 S. Ct. 1456 (2024).  Plaintiffs must "refut[e] 'every conceivable basis which might support'" that provision.  *Sanchez*, 45 F.4th at 396 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)); *see id.* at 398 ("Under rational-basis review, the policy choices of the political branches are 'not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" (quoting *Beach*, 508 U.S. at 315)).  They cannot do so.  The government's interests in national security and foreign affairs are not only legitimate but compelling.  *Haig*, 453 U.S. at 307.  And for the reasons discussed above, *supra* at 22-23, blocking the assets of adult children of other SDNs serves those interests.

The Court should therefore dismiss Count II of the Complaint.

## III.    The Requested Relief is Improper

Plaintiffs ask that the Court "issue a declaratory judgment . . . that Plaintiffs' [*sic*] designation of A.M. Vassiliades and G. Vassiliades is unlawful."  Compl., Prayer for Relief ¶ 1. Insofar as Plaintiffs seek a declaration that the President acted *ultra vires* by including Section 1(a)(v) in EO 14024, that request is unavailing.   "It is incompatible with [the President's] constitutional position that he be compelled personally to defend his executive actions before a court."  *Franklin*, 505 U.S. at 827-28 (Scalia, J., concurring); *accord Newdow v. Roberts*, 603 F.3d 1002, 1012-13 (D.C. Cir. 2010) (explaining that "declaratory relief" against the President for his non-ministerial conduct "is unavailable").  Moreover, with respect to Executive Branch officials, a "declaratory judgment is the functional equivalent of an injunction," *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008), because "it must be presumed that federal officers will adhere to the law as declared by the court," *Sanchez-*

*Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985).  Therefore, "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment."  *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996).  Thus, this Court cannot enter any relief as against the President.  *See Newdow*, 603 F.3d at 1013.

Nor may the Court "[o]rder Defendants to delist Plaintiffs . . . from the SDN list[.]" Compl., Prayer for Relief ¶ 2.  A judicial order dictating who should be included on the SDN List would be an unprecedented and unjustified intrusion into the national security and foreign affairs functions of the Executive Branch, inconsistent with the deference due in this area.  *See, e.g.*, *Chi. & S. Air Lines*, 333 U.S. at 111; *Islamic Am. Relief Agency*, 477 F.3d at 734.  Rather, the only relief available to Plaintiffs in this lawsuit is vacatur of any final agency action and remand.  *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012).

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated September 17, 2024                    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/Stuart J. Robinson*
STUART J. ROBINSON
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635
Fax: (415) 436-6632
Email: stuart.j.robinson@usdoj.gov
Cal. Bar No. 267183

*Counsel for Defendants*