# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANNA MARIA VASSILIADES, *et al.*, | |
| Plaintiffs | |
| v. | No: 1:24-cv-01952 (TJK) |
| ANTONY BLINKEN, in his official capacity as Secretary of State, *et al.*, | |
| Defendants | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Christopher D. Man (Bar No. 453553)
Cari N. Stinebower (Bar No. 457147)
Spencer W. Churchill (Bar No. 1645370)
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, D.C.  20036
(202) 282-5000 (phone)
(202) 282-5100 (fax)
CMan@winston.com
CStinebower@winston.com
SChurchill@winston.com

*Counsel for Anna Maria and Giorgos Vassiliades*

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.    THE PRESIDENT'S BROAD AUTHORITY UNDER IEEPA IS NOT UNLIMITED ....... 3

      A.    IEEPA Authorizes The President To Use Emergency Powers Only To "Deal
            With" Certain Declared Emergencies ..................................................................... 3

      B.    The Secretaries' View Of IEEPA Would Violate The Non-Delegation Doctrine
            And Is Precluded By The Executive Branch's Past Litigation Positions ............... 5

II.   THE POLITICAL QUESTION DOCTRINE IS NOT APPLICABLE .................................. 8

      A.    The Secretaries Cite Nothing In The Constitution To Show A "Textually
            Demonstrable Constitutional Commitment" Of Sanctions To The President ....... 9

      B.    IEEPA Provides A Judicially Manageable Standard Rather Than Depending
            Exclusively On Congressional Oversight or Administrative Appeal .................. 11

      C.    The Court Can Interpret Congress's Delegation Of Power In IEEPA Without
            Making Foreign Policy Determinations That Supplant The President's Role ...... 14

      D.    A Determination That The Executive Has Exceeded The Power Delegated By
            IEEPA Is Not The Type Of "Embarrassment" That Bars Judicial Review .......... 15

III.  THE SECRETARIES EXCEEDED THEIR STATUTORY AUTHORITY .................... 16

      A.    Plaintiffs Challenge The Secretaries' Designation Decisions ............................. 16

      B.    Sanctioning Children On The Basis Of Parentage Exceeds The Authority
            Conferred By IEEPA ........................................................................................... 17

IV.   THE SECRETARIES VIOLATED THE APA ............................................................. 20

CONCLUSION ................................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Haramain Islamic Found., Inc. v. Dep't of Treasury*,
  686 F.3d 965 (9th Cir. 2012) .................................................13

*Am. Airlines Charterers, Inc. v. Regan*,
  746 F.2d 865 (D.C. Cir. 1984) ...............................................10

*Baker v. Carr*,
  369 U.S. 186 (1962).................................................... 9, 14-15

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ..............................................................16

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)..............................................................21

*Colo. River Water Conserv. Dist. v. United States*,
  424 U.S. 800 (1976)..............................................................14

*Dalton v. Specter*,
  511 U.S. 462 (1994)................................................................7

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981)................................................. 1, 4, 10-11

*Deripaska v. Yellen*,
  2022 WL 9862202 (D.C. Cir. Mar. 29, 2022) ................... 19-20

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) .................................................8

*Ethyl Corp. v. EPA*,
  306 F.3d 1144 (D.C. Cir. 2002) .............................................16

*Freedom to Travel Campaign v. Newcomb*,
  82 F.3d 1431 (9th Cir. 1996) ...................................................3

*Gill v. Islamic Republic of Iran*,
  249 F. Supp. 3d 88 (D.D.C. 2017)............................................3

*Holy Land Found. for Relief and Dev. v. Ashcroft*,
  333 F.3d 156 (D.C. Cir. 2003) ..........................................2, 11

*INS v. Chadha*,
    462 U.S. 919 (1983) ................................................................12

*Islamic Am. Relief Agency v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007) ................................... 1-2, 11, 19

*Islamic Am. Relief Agency v. Unidentified FBI Agents*,
    394 F. Supp 2d 34 (D.D.C. 2005) ..........................................19

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) ..................................................................8

*Luokung Tech. Corp. v. Dep't of Defense*,
    2021 WL 1820265 (D.D.C. May 5, 2021) .........................1, 11

*Marbury v. Madison*,
    5 U.S. 137 (1803) ................................................................8, 12

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ..................................................................8

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................................21

*Regan v. Wald*,
    468 U.S. 222 ..............................................................................4

*Sierra Club v. Trump*,
    977 F.3d 853 (9th Cir. 2020) .................................................12

*United States v. Amirnazmi*,
    2010 WL 406254 (3d Cir. Sept. 16, 2010) ...........................5-6

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011).........................................1, 5, 13

*United States v. Anvari-Hamedani*,
    2005 WL 5653417 (N.D. Oh. Mar. 23, 2005) ......................5-6

*United States v. Arch Trading Co.*,
    987 F.2d 1087 (4th Cir. 1993) ...........................................1, 5

*United States v. Dhafir*,
    2005 WL 6284834 (2d Cir. Dec. 7, 2005) ...............................6

*United States v. Dhafir*,
    461 F.3d 211 (2d Cir. 2006).....................................................5

*United States v. Saboonchi*,
  2014 WL 2801682 (D. Md. Mar. 13, 2014)..................................................................6

*Wallach v. Van Riswick*,
  92 U.S. 202 (1875)......................................................................................................21

*Weber v. Aetna Cas. and Surety Co.*,
  406 U.S. 164 (1972)....................................................................................................21

*Whitman v. Am. Trucking Ass'n*,
  531 U.S. 457 (2001)......................................................................................................5

*Xiaomi Corp. v. Dep't of Defense*,
  2021 WL 950144 (D.D.C. Mar. 12, 2021)............................................................1, 11

*Zevallos v. Obama*,
  793 F.3d 106 (D.C. Cir. 2015)....................................................................................13

**Statutes**

5 U.S.C. § 706(2)(A).......................................................................................3, 16, 20

50 U.S.C. ch. 35 § 1701 *et seq.*.....................................................................3-4, 8, 17-18

50 U.S.C. § 1622(a)..............................................................................................12

50 U.S.C. § 1622(c)..............................................................................................12

50 U.S.C. § 1701....................................................................................................8

50 U.S.C. § 1701(a)................................................................................................3

50 U.S.C. § 1701(b)........................................................................................4, 17-18

50 U.S.C. § 1702...............................................................................................3, 17

50 U.S.C. § 1703....................................................................................................12

Administrative Procedure Act.............................................................................3, 7

Trading with the Enemy Act of 1917 .....................................................1, 4-5, 10-11

**Other Authorities**

Erich C. Ferrari, *Shooting In The Dark, Blindfolded, With No Bullets: The OFAC
  SDN Dedesignation Process*, Aspatore (2016), 2016 WL 3924415........................13

Exec. Order No. 14024 .................................................................................9, 15-17

H.R. Rep. No. 95-459 (1977)............................................................................................4

Local Rule 7(n) ...........................................................................................................2

S. Rep. No. 95-466 (1977)............................................................................................4

U.S. Const. art. II ...................................................................................................9-10

**INTRODUCTION**

Secretaries Blinken and Yellen seek to hide behind the skirt of the political question doctrine to advance the extraordinary claim that the President is king-like, wielding emergency powers that are not subject to judicial review. Despite a century of sanctions practice under the Trading with the Enemy Act of 1917 (TWEA) and the International Emergency Economic Powers Act of 1977 (IEEPA)—the Secretaries fail to cite any case supporting those theories when sanctioned parties have challenged their designations. That is for good reason. The Supreme Court reached the opposite conclusion in *Dames & Moore v. Regan*, which considered the merits and upheld a challenge to a remedy pursued by the President as not authorized by IEEPA. 453 U.S. 654, 675 (1981) (finding the President's suspension of judicial claims against Iran was not permitted by IEEPA).

Moreover—as noted in Plaintiffs' Complaint and ignored by the Secretaries—the Executive Branch has rebuffed non-delegation doctrine challenges to IEEPA by arguing the opposite of what the Secretaries argue now, that under IEEPA, "the President's powers are 'explicitly defined and circumscribed.'" Compl. ¶19 (quoting *United States v. Amirnazmi*, 645 F.3d 564, 576 (3d Cir. 2011) (quoting *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092–94 (4th Cir. 1993)). Indeed, in case after case in which sanctioned parties have challenged their designations, courts have exercised judicial review and examined the Executive Branch's designations under the plain language of the applicable statutes. *See, e.g.*, *Dames & Moore*, 453 U.S. at 671–72. Sometimes plaintiffs prevail in challenging their designations. *See Xiaomi Corp. v. Dep't of Defense*, 2021WL 950144 (D.D.C. Mar. 12, 2021) (enjoining the Department of Defense from enforcing its designation); *Luokung Tech. Corp. v. Dep't of Defense*, 2021 WL 1820265 (D.D.C. May 5, 2021) (same). But even when plaintiffs' claims fail, courts consider the challenges to their designations on the merits. *See, e.g.*, *Islamic Am. Relief Agency v. Gonzales*,

477 F.3d 728 (D.C. Cir. 2007); *Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003). There is no reason for the Court to avoid the merits of Plaintiffs' claims here.

The reason the Secretaries are so eager for the Court to avoid examining their designations of the Plaintiffs here is that those designations fail to withstand scrutiny. Plaintiffs do not challenge the President's determination that Russia's invasion of Ukraine is an emergency or his power to sanction those who have aided Russia's aggression. But in sanctioning the Plaintiffs, the Secretaries did not find that either Plaintiff had done anything to aid Russia. Instead, the Secretaries sanctioned the Plaintiffs' father on their belief that he aided Russia,[1] and they then designated the Vassiliades children Plaintiffs merely because they are his children.[2] Sanctioning children for the alleged misconduct of their parents in an effort to frighten and coerce their parents into changing their behavior is "arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[1] To be clear, Christodoulos Vassiliades disputes the Secretaries' grounds for sanctioning him. Among the more dubious of the Secretaries' claims against him—a Cypriot lawyer who is neither Russian nor fluent in Russian—is that he was designated "for being or having been a leader, official, senior executive officer, or member of the board of directors of the Government of the Russian Federation." DE15-1 at 7 (quoting State Department notice of designation). Mr. Vassiliades, a non-Russian, never served in the Government of the Russian Federation.

[2] The Secretaries acknowledge that Giorgos Vassiliades was sanctioned based solely on his status as his father's son, but they take issue with Plaintiffs' claim that Anna Maria Vassiliades was sanctioned based on this same corruption of blood principle. DE15-1 at 8. The Secretaries' argument is flatly inconsistent with their claim that "the Court need not review an administrative record to resolve Defendants' motion" (DE16 at 2), and highlights the prejudice of the Secretaries' refusal to produce the administrative record in response to Plaintiffs' numerous requests and Local Rule 7(n). The Complaint notes that the Secretaries highlighted that Ms. Vassiliades's father had been sanctioned, but they claim she was sanctioned because she worked for her father's company, Vassiliades UK. Compl. ¶29. But neither Vassiliades UK, nor Ms. Vassiliades personally, ever did anything more than incidental work for Russian clients, and Vassiliades UK appears to have been sanctioned along with other companies controlled by her father based solely on the fact that he had been sanctioned. No other employee of Vassiliades UK has been sanctioned. Thus, it appears that Ms. Vassiliades was sanctioned not because the Secretaries thought she had done anything to violate U.S. sanctions, but simply because she is the daughter of her sanctioned father. Moreover, Ms. Vassiliades subsequently resigned from the law firm and Vassiliades UK has been dissolved, yet the Secretaries have not acted on her delisting petition despite these changes in circumstance. It is her parentage that has not changed.

accordance with law" under the Administrative Procedure Act (APA), and an abhorrent act of terrorism.  5 U.S.C. § 706(2)(A).[3]

## ARGUMENT

## I.    THE PRESIDENT'S BROAD AUTHORITY UNDER IEEPA IS NOT UNLIMITED

### A. IEEPA Authorizes The President To Use Emergency Powers Only To "Deal With" Certain Declared Emergencies

After formally declaring a national emergency, Section 1701(a) of IEEPA authorizes the President to "deal with any unusual and extraordinary threat" to the national security of the United States "which has its source in whole or substantial part outside the United States."  50 U.S.C. § 1701(a).  This power to declare an emergency has certain limits.  For example, it cannot arise from domestic threats to national security and may arise only from foreign national security threats that are "unusual and extraordinary."

Even after an emergency is declared, the President's emergency powers under IEEPA may be exercised "only if necessary 'to deal with'" the national emergency that triggered those powers.  *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1436–37 (9th Cir. 1996) (quoting 50 U.S.C. § 1701(a)).  Section 1701(b) provides:  "The authorities granted to the President by section

---

[3] The Secretaries object to the terrorism label, but their conduct meets even their own definition of the term—the use of "fear to achieve political means."  DE15-1 at 25 (quoting *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 101 (D.D.C. 2017).  The Secretaries are seeking to coerce Plaintiffs' father through the fear or terror that the U.S. government will harm his innocent children if he does not align his conduct with the U.S. government's foreign policy goals.  *See* DE15-1 at 23 (stating that sanctions based on familial relations rather than misconduct serve as a deterrent to individuals who "do not wish to see their spouse or adult children on the SDN List").  The fact that the Secretaries are not using violence or that they believe their cause is just does not alter the fact that they are using the fear of harming children to coerce the children's parents to achieve political ends.  Violence is not the only way to terrorize someone.  Economic embargos or blockades, or efforts to disable infrastructure, may be terrorist acts because they instill fear in their victims and undermine the ability of people to sustain themselves, which is precisely what the Secretaries seek to accomplish by sanctioning children who are not even alleged to have engaged in any misconduct.

1702 of this title may *only* be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter *and may not be exercised for any other purpose*." 50 U.S.C. § 1701(b) (emphasis added).  Further underscoring the limits of the President's power, that Section adds: "Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat." *Id.*  Plainly, the emergency powers conferred upon the President by IEEPA are tied to dealing with the threat causing the emergency.

The textual limitations imposed by IEEPA are central to the statute's purpose, which was to narrow the authority the President had enjoyed under the prior TWEA regime.  The Supreme Court explains that "IEEPA was enacted to provide for some limitation on the President's emergency powers." *Dames & Moore*, 453 U.S. at 681; *see also Regan v. Wald*, 468 U.S. 222, 227 & 228 n.8 (1984) (noting IEEPA was enacted to limit the broader emergency powers under TWEA to war time emergencies); *id.* at 244, 248–49 (Blackmun, J., dissenting) (explaining IEEPA was intended to narrow the emergency powers conferred by TWEA, and expressing the dissent's view that those limits were violated).  The President's broad authority to exercise emergency powers under TWEA were limited by IEEPA to times of war, with IEEPA supplanting TWEA as the statute governing the President's ability to declare non-wartime emergencies.  *See, e.g.*, *Regan*, 468 U.S. at 228 n.8; H.R. Rep. No. 95-459 at 2 (1977) (stating that IEEPA "confers upon the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of section 5(b) [of TWEA] and subject to various procedural limitations"); S. Rep. No. 95-466 (1977) ("The purpose of the bill is to revise and delimit the President's authority to regulate international economic transactions during wars or national emergencies.").  Even the Secretaries agree that IEEPA narrowed the President's power under

TWEA, without appreciating that this contradicts their claim that IEEPA nevertheless allows the President to respond to an emergency "in whatever way the President deems appropriate."  DE15-1 at 19; *see id.* at 3 ("IEEPA limited TWEA's application to periods of declared wars").

### B. The Secretaries' View Of IEEPA Would Violate The Non-Delegation Doctrine And Is Precluded By The Executive Branch's Past Litigation Positions

As the Executive Branch has acknowledged in past IEEPA cases, "the governing principle under the non-delegation doctrine is that 'when Congress confers decisionmaking authority upon agencies Congress must lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'"  Gov't Br., *United States v. Anvari-Hamedani*, 2005 WL 5653417, at 2–3 (N.D. Oh. Mar. 23, 2005) (quoting *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001)).  At the Executive Branch's urging, federal courts have consistently rejected the claim now advanced by the Secretaries, that the exercise of emergency power under IEEPA is unlimited and unreviewable.  As noted in Plaintiffs' Complaint, federal courts have found that under IEEPA "the President's powers are 'explicitly defined and circumscribed.'"  Compl. ¶19 (quoting *Amirnazmi*, 645 F.3d at 576 (quoting *Arch Trading,* 987 F.2d at 1092–94)).  By passing a statute that "'meaningfully constrains' the President's discretion," "Congress reaffirmed its 'essential legislative function.'"  *Amirnazmi*, 645 F.3d at 576–77 (citations omitted).  That view appears to be unanimous among all federal courts to have considered the issue.  *See, e.g.*, *United States v. Dhafir*, 461 F.3d 211, 217 (2d Cir. 2006) ("And the authorities delegated are defined and limited."); *see also* Gov't Br, *United States v. Amirnazmi*, 2010 WL 406254, at *36 (3d Cir. Sept. 16, 2010) ("All the courts that have considered the issue have concluded that the IEEPA contains adequate constraints and thus does not violate the non-delegation doctrine.").

These decisions echo the briefs filed by the Executive Branch in those cases, which state "[t]he powers granted to the President are explicitly defined and circumscribed."  Gov't Br,

*Amirnazmi*, 2010 WL 406254, at *45.  In those cases, the Executive Branch argued that "IEEPA provides an 'intelligible principle' to constrain the President's discretion" and that its "carefully defined and circumscribed delegation in IEEPA is constitutionally sound."  Gov't Br., *United States v. Dhafir*, 2005 WL 6284834, at 5 (2d Cir. Dec. 7, 2005); *see* Gov't Br., *United States v. Saboonchi*, 2014 WL 2801682, at 4 (D. Md. Mar. 13, 2014) ("IEEPA contains an 'intelligible principle' that constrains the exercise of power delegated to the Executive Branch"); Gov't Br., *United States v. Anvari-Hamedani*, 2005 WL 5653417, at 2–3 (N.D. Oh. Mar. 23, 2005) ("Because the IEEPA provides an adequate 'intelligible principle' to guide Executive Branch actions— defining the circumstances under which the President may act, and imposing limitations on such actions—it does not run afoul of the non-delegation doctrine") (citations omitted).

Despite the Executive Branch arguing and persuading federal courts to find that IEEPA meaningfully constrains the President's emergency powers to avoid constitutional challenges under the non-delegation doctrine, the Secretaries now take the opposite position that the President has absolute discretion in exercising his emergency power free from judicial review.  They argue that IEEPA allows the President unreviewable discretion to declare an emergency, and then to "deal with that emergency, in whatever way the President deems appropriate," repeatedly emphasizing the notion that "the Court cannot review the President's determination of how to address that emergency."  DE15-1 at 11, 19.  In their current view, "IEEPA thus sets forth no standards from which the Court could judge the President's selection of designation criteria or determine whether specific criteria effectively address an unusual and extraordinary threat to the United States' interests."  *Id.* at 13.

The Secretaries' argument that there are "no standards" to guide the President in exercising his emergency powers is an acknowledgment that IEEPA is unconstitutional under the non-

delegation doctrine.  Saying there are "no standards" to guide the President is no different from saying there is no "intelligible principle" to guide him.  And yet the Secretaries make that point repeatedly, claiming: "Congress did not define the terms 'national emergency' or 'deal with,' nor impose any conditions or restrictions in IEEPA that would limit the President's authority to decide the circumstances in which individuals' property and interests in property should be blocked pursuant to a national emergency."  *Id.* at 19.  This reads like a passage from one of the plaintiffs' motions in a case arguing that IEEPA violates the non-delegation doctrine.

The Secretaries' mistaken claim that IEEPA is standardless does not support their repeated invocation of *Dalton v. Specter* to preclude judicial review.  *See* DE15-1 at 18–20 (citing 511 U.S. 462 (1994)).  As the Secretaries acknowledge, *Dalton* turned on the fact that "the statute in question commits the decision to the discretion of the President," there a decision that the President made personally.  *Id.* at 18 (quoting *Dalton*, 511 U.S. at 474).  *Dalton* turned on the reviewability of the President's discretionary choices because (1) there was no final agency action reviewable under the APA and (2) there was no alleged "want of [Presidential] power," only a challenge to the manner in which the President exercised discretion that was expressly granted to him by statute (not inferred from Congress's decision not to define everyday terms like "deal with").  *Dalton*, 511 U.S. at 474, 476.  Here, the Secretaries do not dispute that the sanctions they issued are final agency action reviewable under the APA, and the Executive Branch lacks power to issue sanctions against the innocent children of a sanctioned individual, because harming innocent people for acts alleged to have been committed by third parties is not part of the emergency power "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States."  *See* 50 U.S.C. § 1701.

Even if the Secretaries' new reading of IEEPA were correct, it would not advance their cause. If they are right—and the Executive Branch's prior litigating position and the cases that relied upon it are wrong—then IEEPA is unconstitutional under the non-delegation doctrine. But having been successful in arguing the opposite position, that IEEPA meaningfully constrains the President's powers, principles of judicial estoppel prevent the Secretaries from repudiating the Executive Branch's prior position now. *See, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). With those limitations on the President's powers in place, the sanctions imposed here are indefensible.

## II.   THE POLITICAL QUESTION DOCTRINE IS NOT APPLICABLE

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). In contrast to controversies that revolve around what the law is, "those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch" are excluded from judicial review by the political question doctrine. *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (*en banc*) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).

Thus, the political question doctrine is "essentially a function of the separation of powers," does not apply to all "political cases," and applies only if "[p]rominent on the surface of [the] case is found":

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  Because Count I of the Complaint turns on the proper construction of IEEPA's statutory text, none of these *Baker* factors is "inextricable from the case at bar" and the political question doctrine does not apply.  *See id.*[4]  The Secretaries' argument that the political question doctrine bars jurisdiction over Count I therefore fails.  *See* DE15-1 at 10–18.

**A.  The Secretaries Cite Nothing In The Constitution To Show A "Textually Demonstrable Constitutional Commitment" Of Sanctions To The President**

The Secretaries' argument that judicial review is precluded by a "textually demonstrable constitutional commitment" of power exclusively to the President is not supported by any citation to or quotation from the text of the Constitution.  DE15-1 at 11–12.  The Secretaries cite generally to "Article II of the Constitution" in a different part of their brief, but quickly backtrack by noting that the President's power to impose economic sanctions has always been conferred by Congress through statute.  *Id.* at 1–3.  Their position appears to be that the President has unreviewable sanctions authority because sanctions are a "tool" that can be used to pursue national security and foreign policy goals and because national security and foreign policy are constitutionally entrusted to the President.  *Id.* at 11–12.  But sanctions are fundamentally domestic regulations, blocking property "in the United States" or "within the possession or control of any United States person." *See* E.O. 14024, §1.  Although sanctions have the potential to create incentives for foreign actors, most of this incentive potential flows from the fact that sanctions regulate U.S. persons.  The fact that such domestic regulation can be used to pursue foreign policy goals does not make it an inherent Article II power of the President that can exercised without a delegation from Congress.  That is why the President's sanctions authority always has depended upon statutory authority from Congress.

---

[4] The Secretaries do not argue for application of the fifth *Baker* factor ("an unusual need for unquestioning adherence to a political decision already made").  DE15-1 at 10–18.  Each disputed factor is discussed below.

Even with a delegation of power from Congress, the President's emergency powers under IEEPA and TWEA are not unlimited or beyond the ability of courts to adjudicate. Both the Supreme Court and the D.C. Circuit have invalidated remedies pursued by the President under those statutes. The Supreme Court rejected the Secretaries' argument in *Dames & Moore*, which concerned actions taken by the President to obtain the release of hostages from Iran following the seizure of the U.S. Embassy in Tehran. The President declared an emergency and imposed sanctions on Iran, and various litigants brought legal claims attaching an interest in blocked Iranian property. In implementing an executive agreement with Iran to resolve the crisis, the President took two actions that were challenged judicially: (1) the President nullified any attachments on Iranian property and ordered that property transferred to the Federal Reserve, and (2) the President suspended all claims against Iran brought in U.S. courts. Construing the "plain language" of IEEPA, the Supreme Court upheld the President's nullification and attachment orders. 453 U.S. at 671. By contrast, the Court "conclude[d] that although the IEEPA authorized the nullification of the attachments, it cannot be read to authorize the suspension of the claims" because that power was not within the "terms of the IEEPA." *Id.* at 675.[5]

The D.C. Circuit reached a similar conclusion under TWEA in *American Airlines Charterers, Inc. v. Regan*, 746 F.2d 865 (D.C. Cir. 1984). In an opinion by then-Judge Ginsburg, the D.C. Circuit rejected Treasury's position that its designation of someone as subject to U.S. sanctions on Cuba prevented the designee from forming an attorney-client relationship without

---

[5] The Supreme Court did uphold the espousal of these claims under the President's Article II power, explaining the President has regularly and consistently exercised this power to espouse claims against foreign governments through executive agreements. 453 U.S. at 679–683. There is no Article II power for the President to impose economic sanctions on individuals, as that has always been done in conformance with statutes enacted by Congress, and there is no extensive history (as there was for espousal through executive agreements) of such sanctions ever being imposed on the children of people who violate U.S. sanctions.

advance approval by OFAC through a license.  Judge Ginsburg explained for the D.C. Circuit: "The agency, we believe, has gone beyond mere interpretation.  It has effectively legislated in an area in which our tradition indicates the lawmakers themselves—Congress—should speak with a clear voice in advance of administrative action."  *Id.* at 873.

*Dames & Moore* and *American Airlines* both explicitly reject the Secretaries' notion that the President's powers are unlimited and not subject to judicial review.  Add to those cases the recent decisions by this Court enjoining the Department of Defense from enforcing its designations.  *Xiaomi*, 2021WL 950144; *Luokung*, 2021 WL 1820265.  Even when plaintiffs' challenges to their designations fail, they fail on the merits, not because of any claim that those challenges are not reviewable.  *See, e.g.*, *Islamic Am. Relief Agency*, 477 F.3d 728; *Holy Land Found. for Relief and Dev.*, 333 F.3d 156.

### B. IEEPA Provides A Judicially Manageable Standard Rather Than Depending Exclusively On Congressional Oversight or Administrative Appeal

The Secretaries jump from the premise that "IEEPA grants broad discretion to the President" to the conclusion that there are no judicially manageable standards to "limit the types of conduct or status that the President may deem to be sanctionable in order to address emergencies and threats."  DE15-1 at 12.  Under this theory, IEEPA's authorization to impose sanctions that "deal with" a national emergency "which has its source in whole or substantial part outside the United States" is so ambiguous that courts could never tell whether the statute was being followed.  Even if the Executive Branch sanctioned all people whose names begin with A, there simply would be no knowing whether such sanctions deal with Russia's war on Ukraine.  The Secretaries go a step farther, saying that a sanctioned individual's "specific connection to Russia's invasion of Ukraine is immaterial."  DE15-1 at 15.

Perhaps to suggest that they still have some accountability, the Secretaries suggest that the President's power under IEEPA is "subject only to oversight from Congress," emphatically claiming that "Congress—not the Judiciary—is responsible for overseeing the President's compliance with § 1701(b)."  DE15-1 at 12, 14.  But that is not how separation of powers work under the Constitution.  From the earliest days of the Republic, it has been clear that "[i]t is emphatically the duty of the Judicial Department to say what the law is."  *Marbury*, 5 U.S. at 177. It would defy separation of powers principles for the Executive Branch and Legislative Branch to conspire to cut the Judicial Branch out of the ability to interpret IEEPA.

But that is not even what Congress and the President sought to do.  When the President declares an emergency, he is required to provide Congress with regular reports on the emergency. 50 U.S.C. § 1703.  An emergency declared by the President can be terminated if "there is enacted into law a joint resolution terminating the emergency," and Congress established a process for adopting such a joint resolution.  *Id.* § 1622(a), (c).

This provision does not provide Congress with any sort of check on the President's powers beyond the usual power to legislate.  Although Congress initially gave itself the ability to terminate an emergency by merely passing a joint resolution, Congress amended the statute to add the "enacted into law" language in response to *INS v. Chadha*, 462 U.S. 919 (1983), which found these sorts of congressional veto provisions unconstitutional.  *See Sierra Club v. Trump*, 977 F.3d 853, 865 (9th Cir. 2020) (explaining the amendment), *vacated on other grounds*, *Biden v. Sierra Club*, 142 S. Ct. 56 (2021); Pub. L. No. 99–93,  § 801, 99 Stat. 448 (Aug. 16, 1985).  Thus, the President would need to sign the joint resolution for it to be enacted into law, or Congress would have to override the President's veto.  Whenever the President exercises his statutory authority in any way

that Congress does not like, Congress has the power to amend the statute, so this mechanism is nothing special.

This provision is not much of a congressional check on the President's power for other reasons. First, as a legal matter, the provision only allows for the termination of an emergency; it does not allow Congress to fine-tune the President's response to that emergency to correct the sort of abuses that Plaintiffs identify. Second, as a practical matter, the provision has never been used to terminate an emergency, and the congressional consulting requirements are rarely followed. *Amirnazmi*, 564 F.3d at 578 (finding no consequence for failure to follow congressional consulting requirements).

The Secretaries also suggest that there is no great need for judicial review because they can correct any mistake by acting on delisting petitions, but they acknowledge that they have not acted on Plaintiffs' delisting petitions that were filed more than a year ago on June 23, 2023. DE15-1 at 8. The ineffectiveness of the delisting process is well recognized, and Plaintiffs' relatively simple delisting petitions illustrate that. Their father has retired and shuttered his law firm, and he is doing nothing to assist Russia, yet his children remain sanctioned because they cannot change their parentage. OFAC traditionally handles delisting petitions, and experience has shown that process often takes years. *See Zevallos v. Obama*, 793 F.3d 106, 111 (D.C. Cir. 2015) (explaining a delisting was sought in 2004, but not denied until 2013); *Al Haramain Islamic Found., Inc. v. Dep't of Treasury*, 686 F.3d 965, 974 (9th Cir. 2012) (noting a three-year delay between a reconsideration request and a denial); Erich C. Ferrari, *Shooting In The Dark, Blindfolded, With No Bullets: The OFAC SDN Dedesignation Process*, Aspatore (2016), 2016 WL 3924415, at *17 ("[T]he length of time OFAC takes to carry out this process has been criticized by both counsel and courts alike. Indeed, in a recent case handled by the author, OFAC took nearly five years to

return a decision—a duration made all the more troubling when one considers that for the last three years of that period OFAC continuously told the designated party that their matter was in the final stages of review."). Although the State Department recently began handling delisting petitions where it is the adjudicating agency, it applies the same standards as OFAC and there is no indication that it will proceed any faster. U.S. Dep't of State, *Learn More About The Department Of State's Delisting Process*, https://www.state.gov/sanctions-delisting/ (explaining "the U.S. government applies the same standards to petition reviews across all sanctions programs"). Given the devastating immediate impacts of sanction—which by design are meant to be crippling— sanctioned parties are often bankrupted or destroyed by the time the Secretaries act on a delisting petition.

In short, the delisting process is no reason for this Court to ignore its "virtually unflagging obligation" to exercise jurisdiction in this case. *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976). The Secretaries have had more than a year to address the issues raised by the Plaintiffs, and the Secretaries have done nothing. And oversight by Congress is no substitute for judicial review when actual people have been harmed by the Executive Branch's abuse of its statutory authority. Parties with standing who face a continuing and dire threat have sought judicial relief, and the Judicial Branch exists to ensure that the law is followed.

### C. The Court Can Interpret Congress's Delegation Of Power In IEEPA Without Making Foreign Policy Determinations That Supplant The President's Role

The Secretaries' arguments under the third and fourth *Baker* factors are no more persuasive. First, the Secretaries claim it is an "impossibility" for the Court to decide Count I without making an inappropriate policy determination about whether sanctioning someone for being the adult child of a sanctioned individual is "too harsh, disproportionate, or drastic a measure to address the threat posed by Russia." DE15-1 at 16. But Count I simply asks the Court whether

sanctioning the Plaintiffs is consistent with the parameters set by IEEPA—none of which involve evaluations of what would be a proportionate response to the level of threat Russia poses. Whether sanctions targeting people who are not even alleged to have made the smallest contribution to a national emergency "deal with" that emergency is a matter of textual interpretation well suited for resolution by the Court. It presents a legal question and not a foreign policy determination.

Second, the Secretaries claim that deciding Count I would "express[] lack of the respect due" to the President pursuant to the general "principle of deferring to the President in matters pertaining to national security and foreign affairs." *Id.* But they do not identify any case applying the general principle of deference in such matters to preclude review of sanctions determinations. *Id.* Nor do they explain how Count I, which asks the Court to interpret the text of IEEPA, would supplant the President's role in making foreign policy. As already explained in Part II.A, courts consistently reach the merits of challenges to sanctions, and the Secretaries' argument that this is somehow disrespectful to the President is no reason for a different approach here.

### D. A Determination That The Executive Has Exceeded The Power Delegated By IEEPA Is Not The Type Of "Embarrassment" That Bars Judicial Review

The Secretaries' final effort to preclude judicial review of Count I misconstrues the concern in *Baker* for the risk of "embarrassment from multifarious pronouncements by various departments on one question." DE15-1 at 16–17. They note that EO 14024 pronounces U.S. support for things like democracy and the territorial integrity of states, but they identify no contrary message that would be sent by a judicial determination that IEEPA does not authorize sanctioning two innocent children for the alleged misconduct of their father. *Id.* To the extent the Executive Branch might be "embarrassed" by a determination that it exceeded its statutory authority, that is not embarrassment "from multifarious pronouncements . . . on one question" and therefore does not

implicate the sixth *Baker* factor any more than in the numerous cases where courts have exercised

jurisdiction over challenges to sanctions.

## III.     THE SECRETARIES EXCEEDED THEIR STATUTORY AUTHORITY

### A.  Plaintiffs Challenge The Secretaries' Designation Decisions

The Secretaries misunderstand that the Plaintiffs' grievance is with the President's criteria

for imposing sanctions under EO 14024.   The Plaintiffs' challenge is, more specifically, to the

designations made by the Secretaries.  *See* DE2-2 at 22–23 (alleging "Defendants Have Exceeded

Their Statutory Authority" and "the designations of Plaintiffs are invalid").   The President is not a

defendant in this case and did not designate the Plaintiffs as SDNs.   It is the Secretaries that

exceeded their statutory authority by making designations that should be found invalid.[6]

It is true that Plaintiffs' arguments show EO 14024 is deeply flawed because it authorizes

the novel step of imposing sanctions on innocent children of sanctioned parties, but Plaintiffs'

complaint is that they have been sanctioned by the Secretaries on this basis.   In EO 14024, the

President did not require the Secretaries to sanction the children of any sanctioned party, and the

Secretaries often have sanctioned people without sanctioning their children.   It was the Secretaries

who chose to sanction the Vassiliades children based on their parentage, and the Vassiliades

children have standing to mount an as-applied challenge to the imposition of sanctions on them.

Agency action is often challenged on the ground that, even though the agency's decision

may be permitted by a regulation, it is invalid under an authorizing statute.   An agency action that

---

[6] Defendants claim the Court cannot provide declaratory or injunctive relief against a President (DE15-2 at 36-37), but, again, Plaintiffs seek that relief against the Secretaries.  *See Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948) (distinguishing the discretion afforded to decisions by the President from agency decisions, explaining "[t]hose orders which do not require Presidential approval are subject to judicial review to assure application of the standards Congress has laid down").   That sort of relief is regularly granted against administrative agencies, even in the sanctions context.  *Xiaomi*, 2021 WL 950144 (preliminary injunction against enforcement of sanctions); *Luokung*, 2021 WL 1820265 (same).

"violates [a statute] is 'not in accordance with law' within the meaning of 5 U.S.C. § 706(2)(A)."
*Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979); *see also Ethyl Corp. v. EPA*, 306 F.3d 1144,
1150 (D.C. Cir. 2002) (holding that agency action that violated authorizing statute was "not in
accordance with law").  EO 14024 is no different from a regulation, as it derives its authority from
a statute, IEEPA.  The Vassiliades children do not claim that the EO has been violated (they
concede that they are their father's children), but they do challenge their designations as unlawful
under IEEPA and the APA.

### B. Sanctioning Children On The Basis Of Parentage Exceeds The Authority Conferred By IEEPA

The reason the Secretaries try so hard to dissuade the Court from examining the merits of
their statutory claim, and the reason the Secretaries try so hard to portray IEEPA as standardless,
is that the designation of the Vassiliades children cannot withstand scrutiny.  Again, IEEPA
provides: "The authorities granted to the President by section 1702 of this title may *only* be
exercised to deal with an unusual and extraordinary threat with respect to which a national
emergency has been declared for purposes of this chapter *and may not be exercised for any other
purpose*."  50 U.S.C. § 1701(b) (emphasis added).  This italicized language cannot be ignored.  In
keeping with traditional sanctions practice, EO 14024 validly authorizes sanctions to be imposed
on a host of actors who contributed to the declared emergency—here, by enabling Russia's
aggression against Ukraine.  Sanctioning children who have not contributed in any way to the
emergency is inconsistent with traditional sanctions practice and is no way "to deal with [this]
unusual and extraordinary threat."  Moreover, Treasury and State have repeatedly said in press
releases and in public speeches that the point of sanctions is not to punish but rather, to change
behavior.  Designations of adult children based on parentage is not behavior that can be changed.

The Secretaries respond with two arguments, neither of which is persuasive.  First, they claim sanctioned parties may try to evade sanctions by transferring assets to family members.  That is true, but sanctioning innocent children without any indication that they would try to circumvent U.S. sanctions admits an overbroad prophylactic rationale with no limiting principle.  *See* DE15-1 at 23.  The U.S. may "deal with" the threat posed by Russian aggression by sanctioning those who contribute to that threat; it does not "deal with" that threat by sanctioning innocent parties who do not contribute to that threat.  Congress surely did not contemplate that it was conferring on the President authority to harm innocent children in an effort to extort their parents.

The threat of Russian aggression is met by sanctioning those who contribute to that threat.  Relatives or others who help a sanctioned individual evade sanctions can be subjected to derivative sanctions for contributing to the threat by undermining sanctions designed to deal with it.  The longstanding practice under prior sanctions regimes is to rely on derivative sanctions to deter such misconduct.  Imposing sanctions on children who engage in no misconduct as if they were contributing to the threat at issue removes the deterrent effect of derivative sanctions and goes beyond "deal[ing] with" an emergency.

Second, the Secretaries advance their terrorism rationale, claiming such sanctions "serve as an additional deterrent to those considering engaging in sanctionable conduct, assuming they do not wish to see their spouse or adult children on the SDN List."  DE15-1 at 23.  In other words, they warn the world: Don't cross us or we will come for your children.  Threatening to harm innocent children and loved ones is the practice of thugs and terrorists, and surely not the authority Congress intended to confer on the President.

Here too, the Secretaries' position has no limiting principle.  A sanctioned person could seek to evade sanctions in other ways, by transferring assets to friends, acquaintances, and perhaps

sympathetic persons of Russian descent.  Indeed, some such persons may be more willing than family members.  While the Executive Branch has not gone so far, there is no principled legal restriction on its power to do so under this boundless theory.

The Secretaries also make a sleight of hand in arguing that the "statute does not require the President (or the Department of State or OFAC) to find that every sanctions target poses a risk to national security or foreign policy."  DE15-1 at 20.  It is true that not every sanctions target must independently pose a threat, but they must at least contribute to the emergency that the President has deemed a threat.  That is plain from IEEPA itself, which makes clear that the President's powers "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared."  50 U.S.C. § 1701(b).

The Secretaries distort Plaintiffs' argument in claiming the D.C. Circuit rejected this argument "nearly 20 years ago" in *Islamic American Relief Agency*, quoting that decision as stating that "the threat need not be found with regard to each individual entity."  DE15-1 at 20 (quoting 477 F.3d at 735).  The plaintiff's primary argument in that case was one of mistaken identity, that the government designated an organization with a similar name as a terrorist organization and that plaintiff's organization was separate and had nothing to do with terrorist fundraising.  The district court rejected that claim, finding "substantial evidence" that the plaintiff's organization was connected to the terrorist organization.  *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp 2d 34, 46 (D.D.C. 2005).  The plaintiff's fallback argument was that its assets had not been shown to have been used to support terrorism, but the District Court and D.C. Circuit rejected that tracing argument because plaintiff's assets had been linked to an organization that had supported terrorism.  *Id.*

19

There is no such connection here.  The Vassiliades Plaintiffs agree that the Executive Branch is not required to show that the actions of any designated entity alone caused the emergency; it is sufficient that the sanctioned party contributed to the emergency in some way, but no such allegation is made against them.  They are not alleged to have done anything to have contributed to the Russian war effort.

The Secretaries' citation to *Deripaska v. Yellen*, 2022 WL 9862202 (D.C. Cir. Mar. 29, 2022), is no better.  *See* DE15-1 at 20.  In *Deripaska*, the sanctioned party argued he was designated under false pretenses, based on a non-declared emergency, because he helped Russia generally, as opposed to with its war effort in Ukraine.  The D.C. Circuit rejected that the designation was pretextual explaining, "neither executive order requires a showing of how the particular sanction bears on the declared emergency; rather, the orders reflect the President's judgment that the covered actions contribute to the situation in Ukraine."  2022 WL 9862202. at *2.  By contrast, there is no allegation that the Vassiliades children engaged in any actions that contributed to the situation in Ukraine or aided Russia in any way.

The historic use of sanctions has been to target those who have contributed to a threat that has generated an emergency.  Sanctions also may be imposed where a person has engaged in activity supporting those already sanctioned.  Passive status as a relative of a sanctioned party does not contribute to the bad acts of the already-sanctioned party.  The Secretaries have not identified any case where sanctions have been upheld against someone who did not contribute to such a threat.

## IV.    THE SECRETARIES VIOLATED THE APA

The Secretaries' designation of the Vassiliades children violates the APA because those designations are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Plaintiffs establish above that the Secretaries' designation is not

authorized by IEEPA, which renders the designations "not in accordance with law." The grotesque nature of sanctioning innocent children is arbitrary, capricious and an abuse of discretion as well.

The Secretaries mistake that the Vassiliades children are making some kind of constitutional claim, and they insist that they can harm children however they like if those children lack standing to assert constitutional claims. But the Vassiliades children are not bringing a constitutional claim. Rather, they are bringing a claim under the APA and using cases in the constitutional law context to demonstrate that the course taken by the Secretaries here is shockingly inappropriate.

The Secretaries pretend the Framers' prohibition against corruption of blood is irrelevant because this is not a treason case, but that misses the point. *See* DE15-1 at 34–35. Treason was the most serious offense at our nation's founding and the only criminal offense addressed by name in the Constitution. And while the Constitution itself calls for the death penalty to be imposed on those convicted of treason, the Framers found it abhorrent that the convicted person's children should suffer by being denied their inheritance rights.

The long-established notion that it is irrational and overly punitive for children to pay for the sins of their parents is turned on its head here. *See Wallach v. Van Riswick*, 92 U.S. 202, 210 (1875). No U.S. court has convicted Christodoulos Vassiliades of treason or any crime; he has been designated by political appointees under less than a preponderance-of-the-evidence standard. And the sanctions against his children are far more Draconian than the corruption of blood penalty that would interfere with their ability to inherit. Not only can they not do business with U.S. persons, the fear of derivative sanctions has the practical effect of preventing them from doing business with anyone. Their own existing funds and ability to earn a living and support themselves

is precluded.  No one will hire them, and they cannot purchase food, housing, medical care, pay their taxes, pay employees, or anything else a person requires to survive in the modern era.

As demonstrated in Plaintiffs' Complaint, there are a host of Supreme Court cases that find harming children on the basis of actions of their parents unconstitutional because such a practice is irrational and violates fundamental conceptions of justice.  Compl. at ¶¶24–27.  While those constitutional provisions are not in play here, the reasoning that such practices are irrational and unjust certainly is relevant to whether the same conduct is arbitrary, capricious, or an abuse of discretion under the APA.

The sanctions here are more extreme than in any of those cases.  The Supreme Court has found it unconstitutional to deny public school benefits to children of unlawful aliens and to deny other rights and benefits to illegitimate children based on the conduct of the children's parents. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985); *Plyler v. Doe*, 457 U.S. 202, 219–20 (1982); *Weber v. Aetna Cas. and Surety Co.*, 406 U.S. 164, 175 (1972).  The sanctions here go beyond denying government benefits to children.  They prevent children from making use of what they already have and preclude them from building a future for themselves. This harm is not inflicted on them because of anything they did or anything within their power to change; they are sanctioned based on what the Secretaries believe their father did.

It shocks the conscience when anyone threatens to harm a child to coerce the child's parent into doing what they want.  That is just as true when a kidnapper places a gun to a child's head as when the Secretaries threaten the child with crippling sanctions designed to prevent the child from obtaining food, shelter, medicine, or the ability to work.  The conduct is abhorrent in either case. This form of sanctions was not authorized by Congress in IEEPA and they violate the APA.

## CONCLUSION

The Secretaries' motion to dismiss should be denied.

Dated:  October 1, 2024

Respectfully submitted,

/s/ Christopher D. Man
Christopher D. Man (Bar No. 453553)
Cari N. Stinebower (Bar No. 457147)
Spencer W. Churchill (Bar No. 1645370)
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, D.C.  20036
(202) 282-5000 (phone)
(202) 282-5100 (fax)
CMan@winston.com
CStinebower@winston.com
SChurchill@winston.com

*Counsel for Anna Maria and Giorgos Vassiliades*

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed on October 1, 2024 with the Clerk of Court using the

CM/ECF system, which automatically sent a notice of electronic filing to all counsel of record.

*/s/ Christopher D. Man*
Christopher D. Man