**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANNA MARIA VASSILIADES, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:24-cv-01952 (TJK) |
| ANTONY BLINKEN, in his official capacity as Secretary of State, *et al.*, | |
| Defendants. | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

DISCUSSION ................................................................................................................. 2

I.      Plaintiffs' Challenge to the President's Selection of Designation Criteria Fails ............... 2

      A.      Plaintiffs' Claim Presents an Inextricable Political Question ................................ 2

      B.      The Court Otherwise Lacks Jurisdiction to Review Plaintiffs' Challenge to Section 1(a)(v) of EO 14024 ............................................................................... 9

      C.      Plaintiffs' Arguments Fail on the Merits .......................................................... 11

II.     Plaintiffs' APA Claim Fails ........................................................................................ 15

III.    Plaintiffs' Non-Delegation and Judicial Estoppel Arguments are Without Merit ........... 18

CONCLUSION ............................................................................................................. 21

# TABLE OF AUTHORITIES

## CASES

*American Airways Charters, Inc. v. Regan*,
746 F.2d 865 (D.C. Cir. 1984) ................................................................................. 6

*Baker v. Carr*,
369 U.S. 186 (1962) ................................................................................... 2, 4, 7

*Bazzi v. Gacki*,
468 F. Supp. 3d 70 (D.D.C. 2020) ......................................................................... 15

*Bello v. Gacki*,
94 F.4th 1067 (D.C. Cir. 2024) ............................................................................. 14

*Calloway v. District of Columbia*,
216 F.3d 1 (D.C. Cir. 2000) .................................................................................. 17

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ........................................................................ 11, 13

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ............................................................................................. 14

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985) ............................................................................................. 16

*\*Dalton v. Specter*,
511 U.S. 462 (1994) ................................................................................... 2, 9, 11

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) .................................................................................... 3, 5, 6

*Deripaska v. Yellen*,
Case No. 19-cv-00727 (APM), 2021 WL 2417425 (D.D.C. June 13, 2021),
*aff'd*, No. 21-5157, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022)........................... 12

*Deripaska v. Yellen*,
No. 21-5157, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022) ................................. 8, 12

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*,
887 F.2d 275 (D.C. Cir. 1989) ..................................................................... 9, 11, 14

*\*El-Shifa Pharm. Indus. Co. v. United States*,
607 F.3d 836 (D.C. Cir. 2010) ................................................................. 4, 8, 9, 21

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ........................................................ 3

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...................................................................... 11

*Haig v. Agee*,
  453 U.S. 280 (1981) ...................................................................... 14

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ..................................................................... 5, 14

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  333 F.3d 156 (D.C. Cir. 2003) ........................................................ 7

*\*Islamic Am. Relief Agency v. Gonzales*,
  477 F.3d 728 (D.C. Cir. 2007) ................................................ *passim*

*Islamic Am. Relief Agency v. Unidentified FBI Agents*,
  394 F. Supp. 2d 34 (D.D.C. 2005) ................................................. 13

*Jaber v. United States*,
  861 F.3d 241 (D.C. Cir. 2017) ........................................................ 8

*Karadzic v. Gacki*,
  602 F. Supp. 3d 103 (D.D.C. 2022) ............................................... 15

*Luokung Tech. Corp. v. Dep't of Def.*,
  538 F. Supp. 3d 174 (D.D.C. 2021) ................................................. 7

*Marbury v. Madison*,
  5 U.S. 137 (1803) ........................................................................... 4

*Mathews v. Lucas*,
  427 U.S. 495 (1976) ................................................................ 16, 17

*Med. Imaging & Tech. All. v. Libr. of Cong.*,
  103 F.4th 830 (D.C. Cir. 2024) ..................................................... 11

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ...................................................................... 20

*Olenga v. Gacki*,
  507 F. Supp. 3d 260 (D.D.C. 2020) ............................................... 15

*Pejcic v. Gacki*,
No. 19-cv-02437 (APM), 2021 WL 1209299 (D.D.C. Mar. 30, 2021) ..................................... 5

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
182 F.3d 17 (D.C. Cir. 1999) ........................................................................................ 9

*Plyler v. Doe*,
457 U.S. 202 (1982) ..................................................................................................... 17

*Rahmani v. Yellen*,
Civ. A. No. 24-0285 (RC), 2024 WL 1701681 (D.D.C. Apr. 19, 2024) ................................... 6

*Rakhimov v. Gacki*,
Civ. A. No. 19-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020)................................. 5

*Rodriguez ex rel. Rodriguez v. United States*,
169 F.3d 1342 (11th Cir. 1999) ................................................................................... 17

*\*Schneider v. Kissinger*,
412 F.3d 190 (D.C. Cir. 2005) ....................................................................... 3, 5, 8, 14

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
560 F. Supp. 3d 81 (D.D.C. 2021) ................................................................................. 3

*United States v. Amirnazmi*,
No. 10-1198, 2010 WL 4060254 (3d Cir. Sept. 16, 2010) .................................................. 19

*United States v. Amirnazmi*,
645 F.3d 564 (3d Cir. 2011).............................................................................. 4, 18, 19

*United States v. Anvari-Hamedani*,
No. 3:04-cr-786, 2005 WL 5653417 (N.D. Ohio May 23, 2005)........................................... 20

*United States v. Brown*,
484 F.2d 418 (5th Cir. 1973) ...................................................................................... 17

*United States v. Dhafir*,
No. 05-4770, 2005 WL 6284834 (2d Cir. Dec. 7, 2005)...................................................... 19

*United States v. Dhafir*,
461 F.3d 211 (2d Cir. 2006)................................................................................... 18, 19

*United States v. Nejad*,
No. 18-cr-224, 2019 WL 6702361 (S.D.N.Y. Dec. 6, 2019).................................................. 5

iv

*United States v. Saboonchi*,
   No. PWG-13-0100, 2014 WL 2801682 (D. Md. Mar. 31, 2014) ............................................ 19

*United States v. Shih*,
   73 F.4th 1077 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 820 (2024) .................................... 4

*Weber v. Aetna Casualty and Surety Co.*,
   406 U.S. 164 (1972) ........................................................................................................ 17

*Woytowicz v. George Washington Univ.*,
   327 F. Supp. 3d 105 (D.D.C. 2018) ................................................................................. 18

*Xiaomi Corp. v. Dep't of Def.*,
   Civ. A. No. 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021) ................................. 7

## STATUTES

5 U.S.C. § 706 ............................................................................................................... 10, 15

50 U.S.C. § 5 ........................................................................................................................ 6

50 U.S.C. § 1622 ............................................................................................................. 4, 19

50 U.S.C. § 1701 ........................................................................................................ *passim*

50 U.S.C. § 1702 ........................................................................................................ *passim*

50 U.S.C. § 1703 ............................................................................................................. 4, 19

50 U.S.C. § 1704 ............................................................................................................... 12

50 U.S.C. § 1705 ............................................................................................................... 19

50 U.S.C. § 1706 ............................................................................................................... 19

## LEGISLATIVE HISTORIES

H.R. Rep. No. 95-459 (1977) ............................................................................................ 13

## EXECUTIVE MATERIALS

Executive Order 14024, 86 Fed. Reg. 20,249 (Apr. 19, 2021) ................................... *passim*

## INTRODUCTION

Plaintiffs ask this Court to second-guess one of the President's determinations of how to address the threat posed by certain harmful foreign activities of the Government of the Russian Federation. In Plaintiffs' view, the President should not have included Section 1(a)(v) in Executive Order 14024 ("EO 14024"), which authorizes the Department of State and the Department of the Treasury to block the assets of adult children of individuals designated under that Order. EO 14024, § 1(a)(v), 86 Fed. Reg. 20,249, 20,250 (Apr. 19, 2021). As Defendants explained in their motion to dismiss, however, Plaintiffs' claims are neither reviewable nor plausible, particularly given the President's Article II responsibilities in the context of national security and foreign affairs and the powers conferred on him by Congress in the International Emergency Economic Powers Act ("IEEPA"). *See* Mem. in Supp. of Defs.' Mot. to Dismiss at 10-26, ECF No. 15-1 ("Defs.' Mem."). Nothing in Plaintiffs' opposition to Defendants' motion, ECF No. 17 ("Pls.' Opp."), demonstrates otherwise.

First, Plaintiffs assert that the designation criteria in EO 14024 are reviewable because economic sanctions are "domestic regulations" and because Plaintiffs are simply asking the Court to enforce IEEPA's limits on the Executive Branch. *Id.* at 8-20. Yet economic sanctions plainly fall within the political branches' national security and foreign affairs responsibilities. Moreover, Plaintiffs fail to identify any textual constraints on the President's authority to select designation criteria in response to a declared national emergency; nor do they explain how a court (as opposed to Congress) can evaluate the President's exercise of his discretionary powers. Plaintiffs likewise fail to engage with the fact that the President expressly included Section 1(a)(v) to deal with the emergency declared in EO 14024, and neither IEEPA nor EO 14024 requires the government to show that a particular sanctions target has enabled Russia's invasion

of Ukraine.  Accordingly, Plaintiffs' challenge presents an inextricable political question, is otherwise non-justiciable in light of the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462, 474 (1994), and also fails on the merits.

Additionally, Plaintiffs' opposition makes clear that they cannot proceed on their challenge under the Administrative Procedure Act ("APA"), as Plaintiffs do not dispute that substantial evidence supports the Department of State's determination that they meet the criteria for designation.  Rather, they assert that the decision to designate Plaintiff Giorgos Vassiliades for being the adult child of Specially Designated National and Blocked Person ("SDN") Christodoulos Georgiou Vassiliades is "inappropriate" in light of constitutional law principles. Pls.' Opp. at 21-22.  But Plaintiffs misconstrue the applicable APA standard, especially as they acknowledge that they are not advancing any constitutional claims.  *See id.*  Further, Plaintiffs cannot shore up these deficiencies by invoking the non-delegation and judicial estoppel doctrines.  *Id.* at 5-8.

Therefore, and for the reasons discussed more fully below, the Court should grant Defendants' motion and dismiss this case in its entirety.

## DISCUSSION

I.     **Plaintiffs' Challenge to the President's Selection of Designation Criteria Fails**

A.     **Plaintiffs' Claim Presents an Inextricable Political Question**

Defendants have previously explained that, in light of the factors set out in *Baker v. Carr*, 369 U.S. 186 (1962), the Court should dismiss Plaintiffs' challenge to the inclusion of Section 1(a)(v) in EO 14024.  Defs.' Mem. at 10-18.  Plaintiffs' response—which does not attempt to distinguish the numerous cases cited by Defendants, *see* Pls.' Opp. at 9-16—only confirms that this case presents the quintessential political question.

2

1.      First, Plaintiffs do not dispute that "decision-making in the areas of foreign policy and national security is textually committed to the political branches." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).   Rather, they assert that economic sanctions do not sufficiently implicate foreign policy and national security because "sanctions are fundamentally domestic regulations[,]" and "[a]lthough sanctions have the potential to create incentives for foreign actors, most of this incentive potential flows from the fact that sanctions regulate U.S. persons." Pls.' Opp. at 9.  The D.C. Circuit, however, has emphasized that economic sanctions decisions concern "the intersection of national security, foreign policy, and administrative law[.]" *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007); *see also, e.g.*, *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 100 (D.D.C. 2021).  Moreover, the purpose of economic sanctions is not just to regulate U.S. persons, but also to regulate the movement of assets so that illicit actors cannot fund operations detrimental to the United States' national security, foreign policy, or economy.  50 U.S.C. § 1701; *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981); *cf. Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 770 (D.C. Cir. 2022) ("The Act regulates the movement across the United States' borders of items that could pose a grave risk to our national security if they were to fall into the wrong hands. . . .  These issues lie at the heart of the United States' national security and foreign policy interests.").  And whether the President can utilize economic sanctions without delegated authority from Congress, *see* Pls.' Opp. at 9, is beside the point, as the relevant inquiry concerns whether the Constitution commits the issue to the political branches, as opposed to the Judiciary.  *Schneider*, 412 F.3d at 194.  Here, it does.  *See id.* ("Absent precedent, there could still be no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government.").

2.     As to the second *Baker* factor—whether the case presents "a lack of judicially discoverable and manageable standards for resolving it[,]" 369 U.S. at 217—Plaintiffs insist that judicial review is available by invoking the maxim from *Marbury v. Madison*, 5 U.S. 137, 177 (1803), that "[i]t is emphatically the [province and] duty of the [j]udicial [d]epartment to say what the law is." Pls.' Opp. at 12.  But here, that invocation serves as mere platitude, since there is no separation-of-powers problem where a court "refrain[s] from deciding political questions." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010) (en banc).

Congress's oversight of the President's use of his IEEPA authorities confirms the lack of judicially manageable standards, as Defendants have previously explained.  Defs.' Mem. at 13-14; *see* 50 U.S.C. §§ 1622, 1703.  In response, Plaintiffs simply assert that "this mechanism is nothing special." Pls.' Opp. at 13.  That position, however, cannot be reconciled with precedent highlighting Congress's role as a significant aspect of IEEPA.  *E.g.*, *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) ("[IEEPA] specifies the steps the President must take before invoking an emergency, including consultation with Congress, and establishes reporting requirements."), *cert. denied*, 144 S. Ct. 820 (2024); *United States v. Amirnazmi*, 645 F.3d 564, 572 (3d Cir. 2011) ("IEEPA subjected the President's authority to a host of procedural limitations designed to ensure Congress would retain its essential legislative superiority in the formulation of sanctions regimes erected under the Act's delegation of emergency power."). Further, IEEPA does not limit the bases for Congress to terminate a national emergency, *see* 50 U.S.C. §§ 1622, 1703, meaning Congress may do so not only if it disagrees with the declaration itself, but also with the way the President has responded to it.  Although Section 1622 may not contemplate "fine-tun[ing] the President's response[,]" Pls.' Opp. at 13, that does not lessen the force of Congress's oversight role or its ability to hold the President accountable, *cf. United*

*States v. Nejad*, No. 18-cr-224, 2019 WL 6702361, at *11 (S.D.N.Y. Dec. 6, 2019) ("Congress built into the IEEPA a check on the emergency economic powers the statute endows the President with: Congress may vote to terminate the national emergency, thereby extinguishing the emergency economic powers authorized pursuant to it." (citations omitted)).   Nor can Plaintiffs bolster their theory by noting that Congress has thus far declined to terminate an emergency.  *See* Pls.' Opp. at 13.  The Court should defer to the political branches in these sensitive areas, especially as Congress itself shares national security and foreign policy responsibilities with the President.   *See Schneider*, 412 F.3d at 194; *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) ("We have noted that 'neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people.'" (citation omitted)).

Plaintiffs similarly cannot conjure a judicially manageable standard by complaining about the government's delisting process.  Pls.' Opp. at 13-14.  Although Plaintiffs' petitions for delisting remain pending, *see id.*, that fact says nothing about whether the Court can evaluate the President's selection of designation criteria.  And contrary to Plaintiffs' assertion, *see id.*, courts have consistently recognized the importance of the delisting process, *e.g.*, *Pejcic v. Gacki*, Case No. 19-cv-02437 (APM), 2021 WL 1209299, at *8 (D.D.C. Mar. 30, 2021); *Rakhimov v. Gacki*, Civ. A. No. 19-2554 (JEB), 2020 WL 1911561, at *7 (D.D.C. Apr. 20, 2020).

The cases cited by Plaintiffs are inapposite.  In *Dames & Moore v. Regan*, 453 U.S. 654, 672-65 (1981), cited in Pls.' Opp. at 1, 10, the Supreme Court considered whether IEEPA authorized the President to nullify attachments and suspend claims.  That challenge was subject to judicial review because 50 U.S.C. § 1702(b) expressly constrains the Executive Branch in regulating certain types of transactions, and thus provides a standard to guide a court's analysis.

*See Dames & Moore*, 453 U.S. at 671-74 (holding the nullification of assets is covered by § 1702); *id.* at 675 ("We conclude that although the IEEPA authorized the nullification of the attachments, it cannot be read to authorize the suspension of the claims.  The claims of American citizens against Iran are not in themselves transactions involving Iranian property or efforts to exercise any rights with respect to such property.").  By contrast, there is no similar statutory constraint on the President's selection of designation criteria.  *See* 50 U.S.C. §§ 1701-1702; *see also Dames & Moore*, 453 U.S. at 677 (IEEPA "indicat[es] congressional acceptance of a broad scope for executive action" and "delegates broad authority to the President to act in times of national emergency with respect to property of a foreign country."); *Rahmani v. Yellen*, Civ. A. No. 24-0285 (RC), 2024 WL 1701681, at *11 (D.D.C. Apr. 19, 2024) ("[T]he President's 'sweeping' and 'broad' authority under IEEPA is settled." (citation omitted)).

*American Airways Charters, Inc. v. Regan*, 746 F.2d 865, 866 (D.C. Cir. 1984), cited in Pls.' Opp. at 10, is even farther afield.  In that case, the Office of Foreign Assets Control ("OFAC") had designated a closely held corporation pursuant to the Trading with the Enemy Act ("TWEA").  *Id.* at 878.  OFAC subsequently informed counsel for the corporation that "legal representation of a 'designated national' required a specific license."  *Id.* at 868.  The D.C. Circuit held that OFAC could not rely on Section 5(b) of TWEA—which concerns the transactions the President may regulate, including "transactions involving any property in which any foreign national has any interest"—in controlling an entity's attorney-client relationship.  *Id.* at 870-71 (quoting 50 U.S.C. § 5(b)); *see id.* at 874-75 ("OFAC's power, however, extends only to the freezing or blocking of AAC's assets and the licensing of its transactions; OFAC has no authority to seize the corporation itself, to vest its assets, or—beyond the power it has over employment contracts entered into by AAC—to rearrange its internal affairs.").  Here, however,

Plaintiffs challenge not the agency's regulation of a given transaction, but the President's determination of how to confront the threat posed by Russia.

Plaintiffs likewise cannot rely on cases where designated individuals or entities brought suit against the agency that sanctioned them pursuant to the APA.  *See* Pls.' Opp. at 1-2, 10-11 (citing *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003), *Islamic Am. Relief Agency*, 477 F.3d at 728, *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174 (D.D.C. 2021), and *Xiaomi Corp. v. Dep't of Def.*, Civ. A. No. 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021)).  In those cases, the courts focused on whether the agency adequately explained its decision and whether substantial evidence supported the agency's determination that the individual or entity met the criteria for designation; further, the courts neither called into question the President's or Congress's selection of that criteria nor required a showing that the individual or entity personally contributed to the threat posed by the declared national emergency.  *Holy Land Found. for Relief & Dev.*, 333 F.3d at 162-63; *Islamic Am. Relief Agency*, 477 F.3d at 732-75; *Luokung Tech. Corp.*, 538 F. Supp. 3d at 183-91; *Xiaomi Corp.*, 2021 WL 950144, at *5-12.

3.     The third *Baker* factor considers "the impossibility of deciding [the case] without an initial policy determination of a kind clearly for nonjudicial discretion[.]"  *Baker*, 369 U.S. at 217.  According to Plaintiffs, this factor does not indicate the presence of a political question because "Count I simply asks the Court whether sanctioning the Plaintiffs is consistent with the parameters set by IEEPA[.]"  Pls.' Opp. at 14-15.  But Plaintiffs still fail to identify any provision of IEEPA that restricts the President's authority to include certain designation criteria in an Executive Order.  *See id.*  Again, Plaintiffs may believe that the President should authorize sanctions only against those who engage in certain types of conduct, *see id.* at 15, but such

decisions reflect policy determinations, not questions of statutory interpretation, *see Schneider*, 412 F.3d at 197; *cf. Deripaska v. Yellen*, No. 21-5157, 2022 WL 986220, at *2 (D.C. Cir. Mar. 29, 2022).

Nor can Plaintiffs advance their argument by asserting that their claim "presents a legal question and not a foreign policy determination." Pls.' Opp. at 15. The D.C. Circuit has made clear that a plaintiff cannot avoid dismissal by simply recasting a political question in legal terms. *Jaber v. United States*, 861 F.3d 241, 246 (D.C. Cir. 2017) ("While Plaintiffs clearly assert claims under the TVPA and ATS, the precise grounds they raise in their Complaint call for a court to pass judgment on the wisdom of Executive's decision to commence military action— mistaken or not—against a foreign target."); *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 842 ("The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion."); *Schneider*, 412 F.3d at 197 ("[R]ecasting foreign policy and national security questions in tort terms does not provide standards for making or reviewing foreign policy judgments.").

Here, even a cursory examination of Plaintiffs' challenge reveals that it presents a political—not legal—question. The President included Section 1(a)(v) in EO 14024 to deal with the threat posed by specific harmful foreign activities of the Government of the Russian Federation. EO 14024, § 1; *see id.*, Preamble (declaring emergency and "[a]ccordingly . . . order[ing]" the blocking of assets of those meeting the criteria in Section 1). Plaintiffs do not identify any statutory restrictions against including such criteria. *See* Pls.' Opp. at 14-15. Further, 50 U.S.C. § 1701(b) is of no help to Plaintiffs. *See id.* at 17. While that provision prevents the President from utilizing the authorities detailed in Section 1702 outside the context

of a declared national emergency, here the President *has* declared such an emergency.  EO

14024, Preamble.  At bottom, then, Plaintiffs simply disagree with the President that Section

1(a)(v) helps to confront the threat identified in the Executive Order.  Pls.' Opp. at 15; Compl. ¶

70.  That disagreement, however, is insufficient to demonstrate the Court's jurisdiction.  *El-Shifa*

*Pharm. Indus. Co.*, 607 F.3d at 844-45; *see People's Mojahedin Org. of Iran v. U.S. Dep't of*

*State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (concluding that the question of whether an organization

threatens U.S. national security interests "is nonjusticiable"); *see also DKT Mem'l Fund Ltd. v.*

*Agency for Int'l Dev.*, 887 F.2d 275, 281-82 (D.C. Cir. 1989).

4.    Plaintiffs' discussion of the remaining *Baker* factors largely relies on their

unsupported argument that they are asserting a legal claim and not questioning the President's

policy choice.  *See* Pls.' Opp. at 15-16.  That argument fails for the reasons discussed above.

And as to their assertion that "courts consistently reach the merits of challenges to sanctions[,]"

*id.* at 15; *see id.* at 16, Defendants reiterate that those decisions have focused on whether

substantial evidence supports an agency's decision that an individual or entity meets the criteria

for designation in an Executive Order.  *See supra* at 7; Defs.' Mem. at 15-16.  Those decisions

have not, by contrast, opined on the President's selection of designation criteria in the first

instance, a determination firmly rooted in national security and foreign policy considerations.

**B.    The Court Otherwise Lacks Jurisdiction to Review Plaintiffs' Challenge to Section 1(a)(v) of EO 14024**

Defendants have also explained that the Court should dismiss Count I because judicial

review is generally unavailable where a plaintiff challenges how the President has decided to

exercise the discretion conferred on him by statute.  Defs.' Mem. at 16-18 (discussing *Dalton v.*

*Specter*, 511 U.S. 462, 474 (1994)).  In response, Plaintiffs attempt to disclaim such an argument,

asserting that their theory is limited to the specific designation decisions by the Secretary of

State, not the President's inclusion of Section 1(a)(v) in EO 14024.  Pls.' Opp. at 16.  The allegations in Plaintiffs' Complaint, however, leave no doubt about the focus of their challenge:

- "By permitting designations against children to be imposed based simply on the alleged misdeeds of their parents, it exceeds the authority conferred on the President by IEEPA . . . ."  Compl. ¶ 3.

- "IEEPA does not confer upon the President a free-wheeling authority to sanction whoever the President may choose, only those who pose a threat related to the declared emergency."  *Id.* ¶ 19.

- "The President's actions in E.O. 14024 go far beyond the proposed Civil War Era sanctions that were thought to be unconstitutional by restricting the ability of children to inherit from their parents."  *Id.* ¶ 24.

- "Any action under IEEPA that cannot be shown to deal with the ongoing national security crisis is therefore outside the President's scope of authority under the statute and is unconstitutional."  *Id.* ¶ 70.

- "While the President may order that property owned or controlled by a designated person be blocked, IEEPA does not authorize imposing sanctions upon the children of a designated person."  *Id.* ¶ 71.

The causes of action asserted by Plaintiffs also confirm that they are in fact challenging Presidential decision-making.  While the APA allows a plaintiff to claim that a final agency decision exceeds the agency's statutory authority, *see* 5 U.S.C. § 706(2)(C), Plaintiffs did not bring Count I under the APA, *see* Compl. ¶ 71; *see also id.* ¶¶ 3-4 (summarizing Counts I and II, and invoking the APA only with respect to the latter).  If Count I were targeted at final agency action, Plaintiffs would be required to assert their claim pursuant to the APA.  *See Med. Imaging*

& *Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 842 n.7 (D.C. Cir. 2024) ("Because we hold that Congress has provided for APA review . . . , the *ultra vires* claim is no longer available, and we need not address it." (citing *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022))).  The only explanation for Plaintiffs' decision to frame Count I outside the APA context, i.e., as an *ultra vires* claim, is that they seek review of Presidential action yet recognize the well-established principle that the President is not subject to the APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).[1]

Nor have Plaintiffs distinguished *Dalton*.  In arguing that *Dalton* does not apply because the Department of State's designation decisions constitute final agency action, *see* Pls.' Opp. at 7, Plaintiffs are conflating two separate holdings.  First, the Supreme Court concluded that APA review against the defendant agencies was not available due to the absence of final agency action.  *Dalton*, 511 U.S. at 469.  Second, the Court concluded that "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for our review."  *Id.* at 476.  The Supreme Court did not indicate, however, that a final agency decision would allow review of the President's exercise of discretion.  *See generally id.*; *see also DKT Mem'l Fund Ltd.*, 887 F.2d at 281 ("The APA has never been construed to grant to this or any other court the power to review the wisdom of policy decisions of the President.").

## C.     Plaintiffs' Arguments Fail on the Merits

Plaintiffs' arguments on the merits are on equally weak footing.  Asserting that they have not personally enabled Russia's invasion of Ukraine, they first highlight IEEPA's requirement that "[t]he authorities granted to the President by section 1702 of this title may *only* be exercised

---

[1] Moreover, the availability of *relief* against an agency rather than the President, *see* Pls.' Opp. at 16 n.6, does not indicate Plaintiffs may seek review of the President's discretionary act by naming agencies as defendants, contrary to Plaintiffs' suggestion, *id.* at 16.

to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter *and may not be exercised for any other purpose*." Pls.' Opp. at 17 (quoting 50 U.S.C. § 1701(b), emphases added by Plaintiffs); *see id.* at 2-3.  But again, Plaintiffs provide no factual or legal support to suggest that the President included Section 1(a)(v) in EO 14024 for a purpose other than dealing with the declared national emergency, and the plain text of the Executive Order demonstrates otherwise.  *See* EO 14024, Preamble & § 1.

Further, nothing in IEEPA requires the Executive Branch to tie each sanctioned individual or entity to the declared national emergency or the threat posed by that emergency. *See* 50 U.S.C. §§ 1701-1702.  Rather, the statute broadly authorizes the President, after declaring a national emergency, to "block 'any right, power, or privilege' in 'any property in which *any foreign country or a national thereof* has any interest by any person.'"  *Deripaska v. Yellen*, Case No. 19-cv-00727 (APM), 2021 WL 2417425, at *1 (D.D.C. June 13, 2021) (quoting 50 U.S.C. § 1702(a)(1)(B)) (emphasis added), *aff'd*, No. 21-5157, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022); *see also* 50 U.S.C. § 1704 ("The President may issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this chapter.").  And EO 14024 "reflect[s] the President's judgment that [being a spouse or adult child of an individual designated pursuant to EO 14024] contribute[s] to" the threat posed by Russia.  *Deripaska*, 2022 WL 986220, at *2.

The D.C. Circuit's reasoning in *Islamic American Relief Agency* further demonstrates the flaw in Plaintiffs' argument that "every sanctions target . . . must at least contribute to the emergency that the President has deemed a threat."  Pls.' Opp. at 19.  During district court proceedings in that case, the plaintiff "argue[d] that there is no evidence of an 'unusual and extraordinary threat' to the United States to warrant the blocking of the IARA–USA's assets, as

12

there is no evidence that the plaintiff engaged in or supported terrorist activities." *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 46 (D.D.C. 2005).  The district court rejected this theory, holding "50 U.S.C. § 1701 does not form the basis for challenging an individual designation." *Id.*  The D.C. Circuit "agree[d] with the district court" "that the threat need not be found with regard to each individual entity." *Islamic Am. Relief Agency*, 477 F.3d at 735.    Accordingly, as neither IEEPA nor EO 14024 requires the Executive Branch to demonstrate a nexus between a given sanctions target and Russia's invasion of Ukraine, Plaintiffs' argument fails.  *Cf. Changji Esquel Textile Co.*, 40 F.4th at 725 ("For an agency to act *ultra vires*, it must transgress 'clear and mandatory' limits that Congress has imposed on its authority." (citation omitted)).

Finding no solace in the text of IEEPA, Plaintiffs turn to the legislative history and purpose.  *See* Pls.' Opp. at 4.  But those sources confirm that any substantive limitations imposed by Congress in IEEPA do not pertain to the types of status or conduct that the President may deem sanctionable.  *See* H.R. Rep. No. 95-459, at 10-11, 16 (1977).  Further, the legislative history demonstrates that Congress, not the courts, is best positioned to review the President's discretionary acts under IEEPA.  *See id.* at 16 (explaining that it is "both feasible and necessary for Congress to reserve for itself the right to veto regulations and definitions which go beyond the purposes and authorities of the act").

Plaintiffs fare no better in describing the inclusion of Section 1(a)(v) in EO 14024 as "inconsistent with traditional sanctions practice and . . . no way to 'deal with'" the threat articulated in EO 14024.  Pls.' Opp. at 17; *see id.* at 18 (characterizing Section 1(a)(v) as "an overbroad prophylactic rationale"); *id.* at 18-19 (analogizing reliance on Section 1(a)(v) to "the

practice of thugs and terrorists").[2]   IEEPA does not mandate that the President hold fast to a single and unchanging set of designation criteria across economic sanctions programs.   Nor would such a restriction help achieve the statute's goals, given the continually evolving nature of threats to national security and foreign policy.   *See DKT Mem'l Fund Ltd*., 887 F.2d at 281-82 ("[W]here the President acted under a congressional grant of discretion as broadly worded as any we are likely to see, and where the exercise of that discretion occurs in the area of foreign affairs, we cannot disturb his decision simply because some might find it unwise or because it differs from the policies pursued by previous administrations.").   Plaintiffs may prefer that the government wait to impose sanctions on individuals until after they launder money or otherwise evade sanctions for their relatives, *see* Pls.' Opp. at 18, yet they fail to appreciate the need for the government to deter and swiftly dismantle networks of illicit activity, *see Bello v. Gacki*, 94 F.4th 1067, 1072 (D.C. Cir. 2024); *see also* Defs.' Mem. at 22-23 (citing reports and testimony about risk posed by family members of SDNs).   And Plaintiffs' disagreement with the Executive Branch about the effectiveness of such sanctions is immaterial, given the deference due to the President in this area.   *E.g*., *Holder*, 561 U.S. at 33-34; *Haig v. Agee*, 453 U.S. 280, 292 (1981); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp*., 333 U.S. 103, 111 (1948); *cf. Schneider*, 412 F.3d at 197 ("To determine whether drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policymaking.").

Finally, Plaintiffs note that "[d]esignations of adult children based on parentage is not behavior that can be changed."   Pls.' Opp. at 17.   However, they offer no response to

---

[2] Plaintiffs now claim that *any* use of economic sanctions "may be terrorist acts[.]"   Pls.' Opp. at 3 n.3.   Plaintiffs' view is incompatible with decades of binding and persuasive precedent upholding blocking actions as legitimate and effective tools to promote national security and foreign policy.   *E.g*., *Islamic Am. Relief Agency*, 477 F.3d at 734.

Defendants' explanation that SDNs designated under Section 1(a)(v) of EO 14024 can still avail themselves of the delisting process, *see* Defs.' Mem. 31-33, including by showing that they have distanced themselves from their SDN relatives.

The Court should therefore grant Defendants' motion with respect to Count I.

## II.     Plaintiffs' APA Claim Fails

Plaintiffs do not dispute that they meet the criteria for designation under EO 14024.  They also acknowledge that they are not asserting a constitutional claim.  Pls.' Opp. at 21.  Plaintiffs nonetheless argue that they are "using cases in the constitutional law context to demonstrate that the course taken by the Secretaries here is shockingly inappropriate."  *Id.*  That assertion fails on numerous grounds.

First, because Plaintiffs have no constitutional rights, their APA claim is not informed by constitutional law principles.  *Bazzi v. Gacki*, 468 F. Supp. 3d 70, 82 (D.D.C. 2020) ("[W]here [a plaintiff] lacks the right to due process, the APA does not provide him separate constitutional-equivalent protection.").  Nor does the APA prohibit final agency action that a party believes is "inappropriate."  Pls.' Opp. at 21.  The question instead is whether the action is arbitrary or capricious, 5 U.S.C. § 706(2)(A), i.e., whether substantial evidence supports the basis for designation as set forth in the applicable Executive Order, *see, e.g.*, *Olenga v. Gacki*, 507 F. Supp. 3d 260, 279-80 (D.D.C. 2020); *see also Islamic Am. Relief Agency*, 477 F.3d at 735; *Deripaska*, 2021 WL 2417425, at *5.  "[H]ad the President wanted to incorporate [constitutional] principles [in EO 14024], he could have."  *Karadzic v. Gacki*, 602 F. Supp. 3d 103, 111 (D.D.C. 2022).  But he did not, and there is no basis to impute those principles to Plaintiffs' APA claim.

While Plaintiffs' lack of constitutional rights should end the inquiry, a correction of their other factual and legal errors is warranted.  First, the addition of an individual to the SDN List

does not "preclud[e]" that person from "earn[ing] a living and support[ing] themselves."  Pls.'
Opp. at 21-22; *see* 50 U.S.C. § 1702.  Second, the designation of Plaintiffs does not prohibit
them from acquiring medical care.  Pls.' Opp. at 22; *see* 50 U.S.C. § 1702(b)(2).

Third, Plaintiffs overstate the import of the cases on which they rely (and which do not
apply in any event because they concern constitutional challenges).  Pls.' Opp. at 22.  For
instance, *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 441 (1985), did not involve
a question of parentage, but rather "[a] Texas city [that] denied a special use permit for the
operation of a group home for the mentally retarded."  *Id.* at 435.  Moreover, the Court in *City of
Cleburne* explained that heightened scrutiny should apply where laws "reflect prejudice and
antipathy—a view that those in the burdened class are not as worthy or deserving as others."  *Id.*
at 440.  There can be no serious argument that EO 14024, rooted in national security and foreign
policy responses to the threat posed by Russia, expresses such a view towards those designated
under Section 1(a)(v).  And insofar as *City of Cleburne* was concerned with the disparate
treatment of individuals based on parentage without consideration of "the individual's ability to
participate in and contribute to society[,]" *id.* at 441 (quoting *Mathews v. Lucas*, 427 U.S. 495,
505 (1976)), that concern has no relevance here, where Plaintiff Giorgos Vassiliades—the only
Plaintiff designated under Section 1(a)(v)—neither participates in nor otherwise contributes to
society in the United States.

The passage from *City of Cleburne* relied on by Plaintiffs derives from *Mathews*, 427
U.S. at 505, where the Supreme Court *upheld* a provision of the Social Security Act that
"discriminat[ed] between individuals on the basis of their legitimacy[.]"  *Id.* at 506; *see id.* at 509
("We conclude that the statutory classifications are permissible, however, because they are
reasonably related to the likelihood of dependency at death.").  Thus, while *Mathews* was also

16

decided outside the national security and foreign policy context, it at least refutes Plaintiffs' argument that classifications based on parentage are categorically impermissible. *See id.* at 505 ("[I]rrationality in some classifications does not in itself demonstrate that other, possibly rational, distinctions made in part on the basis of legitimacy are inherently untenable.").

Even less applicable is *Plyler v. Doe*, 457 U.S. 202, 219-20 (1982). *See* Pls.' Opp. at 22. In that case, the Supreme Court struck down a Texas statute excluding from public education children who were not legally admitted to the United States. "*Plyler* is inapposite because it deals with a Fourteenth Amendment challenge to a *state's* classification of aliens. Nothing in *Plyler* even arguably suggests that a heightened level of scrutiny would have applied if the challenged statute had been enacted by Congress[.]" *Rodriguez ex rel. Rodriguez v. United States*, 169 F.3d 1342, 1350 (11th Cir. 1999); *see Calloway v. District of Columbia*, 216 F.3d 1, 7 (D.C. Cir. 2000) (explaining that *Plyler* presented "unique circumstances" and is limited to its facts). Moreover, the Supreme Court in *Plyler* emphasized that the challenged statute regulated *minor* children present in the United States but unable to conform their conduct to societal norms, *Plyler*, 457 U.S. at 219-20, quite unlike adult SDNs such as Plaintiff Giorgos Vassiliades designated under Section 1(a)(v). For similar reasons, *Weber v. Aetna Casualty and Surety Co.*, 406 U.S. 164, 165 (1972)—which "concern[ed] the right of dependent unacknowledged, illegitimate children to recover under Louisiana workmen's compensation laws benefits for the death of their natural father on an equal footing with his dependent legitimate children"—is inapposite. Plaintiffs offer no persuasive reason to apply such precedent to the President's determination, made in the context of national security and foreign affairs, that adults may be sanctioned if the government also blocks their parents' assets. *Cf. United States v. Brown*, 484 F.2d 418, 426 (5th Cir. 1973) ("Restrictions upon the President's power which are appropriate in

17

cases of domestic security become artificial in the context of the international sphere.").

The Court should therefore dismiss Count II of the Complaint.

### III.    Plaintiffs' Non-Delegation and Judicial Estoppel Arguments are Without Merit

Seeking to prevent dismissal, Plaintiffs grasp at the doctrines of non-delegation and judicial estoppel.  Pls.' Opp. at 5-8.  In doing so, they misconstrue the government's position and the applicable law.

As an initial matter, Plaintiffs have not asserted in their Complaint that IEEPA violates the non-delegation doctrine, *see generally* Compl., and they "may not amend their complaint[] through briefs in opposition to motions to dismiss[,]" *Woytowicz v. George Washington Univ.*, 327 F. Supp. 3d 105, 119 n.4 (D.D.C. 2018) (citation omitted).

Plaintiffs' theory also fails on the merits.  Had Plaintiffs raised it in their Complaint, the question would be whether IEEPA violates the non-delegation doctrine—not, as they put it, whether the government's "[v]iew" of the statute does.  Pls.' Opp. at 5.  Moreover, as Plaintiffs themselves acknowledge, courts have uniformly upheld IEEPA as consistent with that doctrine. *See* Pls.' Opp. at 5; *see also, e.g.*, *Amirnazmi*, 645 F.3d at 576-77; *United States v. Dhafir*, 461 F.3d 211, 216-17 (2d Cir. 2006).

Additionally, there is no tension between that precedent and the government's position here.  Contrary to Plaintiffs' contention, the government is not claiming that "the exercise of emergency power under IEEPA is unlimited and unreviewable."  Pls.' Opp. at 5; *see id.* at 6. Rather, and as Defendants have explained, Defs.' Mem. at 14, a court may refer to the language of the Executive Order to review whether the President is invoking his Section 1702 authorities outside the context of a declared national emergency, and may also consider whether the President is dealing with a declared national emergency with measures that fall outside the scope

of Section 1702, *see Amirnazmi*, 645 F.3d at 576 ("IEEPA prohibits the President from regulating certain exempt transactions, . . . from prosecuting unwitting violators or holding liable those who act in good faith reliance on the statute and regulations, . . . and from obviating Congress's role as ultimate arbiter of emergency trade policy[.]" (citing 50 U.S.C. §§ 1622(b), 1702(a)(3), 1702(b), 1703, 1705(c), 1706)); *Dhafir*, 461 F.3d at 216-17 ("The IEEPA meaningfully constrains the President's discretion by requiring that the authorities granted to the President may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." (cleaned up)).  The lack of judicial reviewability as to the President's selection of designation criteria presents a separate issue that does not implicate these conclusions.

The government's prior litigation positions regarding IEEPA are also in accord.  *See* Br. for Appellee United States of America, *United States v. Amirnazmi*, No. 10-1198, 2010 WL 4060254, at *45-46 (3d Cir. Sept. 16, 2010) (citing "the authority to impose criminal sanctions only for 'willful' violations of the regulations[,]" the provision "protect[ing] the conduct of any person whose violation can be shown to be 'in good faith[,]'" and Congress's oversight role); Br. for Appellee United States of America at 19-20, *United States v. Dhafir*, No. 05-4770, 2005 WL 6284834 (2d Cir. Dec. 7, 2005) ("The President's authority is limited to meeting a foreign threat 'to the national security, foreign policy or economy of the United States' that is 'unusual and extraordinary,' and only then if he is able to declare the threat a 'national emergency' under the National Emergencies Act. He is required to consult with Congress, before, if possible, exercising the powers conferred, to explain his acts in specified respects, and to report regularly thereafter during the period of the emergency." (citations omitted)); Gov't's Resp. to Def.'s Suppl. Pre-Trial Mots. at 7, *United States v. Saboonchi*, No. PWG-13-0100, 2014 WL 2801682

(D. Md. Mar. 31, 2014) ("Both the Fourth and Second Circuits have found that the IEEPA's statutory provision that 'the authorities granted to the President by § 1702 ... may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared,' 50 US.C. § 1701(b), qualifies as an 'intelligible principle' that meaningfully constrains the President's discretion." (citations omitted)); United States of America's Mem. in Opp'n to Defs.' Mots. to Dismiss at 6, *United States v. Anvari-Hamedani*, No. 3:04-cr-786, 2005 WL 5653417 (N.D. Ohio May 23, 2005) ("Because the IEEPA provides an adequate 'intelligible principle' to guide Executive Branch actions—defining the circumstances under which the President may act, see 50 U.S.C. § 1701 (a) (conferring authority to deal with unusual and extraordinary threats to the national security, foreign policy or economy of the United States), and imposing limitations on such actions, see 50 U.S.C. § 1702(b) (precluding prohibitions on personal communications, donations of certain humanitarian articles, and information and informational materials)—it does not run afoul of the non-delegation doctrine.").  Plaintiffs do not, and cannot, point to any case where the government asserted that the non-delegation analysis should turn on whether a court may second-guess what conduct or status the President has determined to be sanctionable in response to a declared national emergency, or that the Executive Branch must link a designated individual to the threat articulated in an Executive Order.  *See* Pls.' Opp. at 5-8.  And for this reason, Plaintiffs cannot rely on the doctrine of judicial estoppel.  *Id*. at 8; *see New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (explaining that the doctrine applies only if "a party's later position [is] 'clearly inconsistent' with its earlier position" (citation omitted)).

The shortcoming in Plaintiffs' theory is most prominent in their assertion that "[s]aying there are 'no standards' to guide the President is no different from saying there is no 'intelligible

principle' to guide him." Pls.' Opp. at 7.  Simply because a case lacks judicially manageable standards for resolution does not imply that a statute lacks an intelligible principle.  If Plaintiffs were correct, any application of the political question doctrine or *Dalton* in response to an alleged statutory violation would indicate a non-delegation problem.  That is, of course, not the case. *See, e.g.*, *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 843-45.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated October 15, 2024                    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/Stuart J. Robinson*
STUART J. ROBINSON
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635
Fax: (415) 436-6632
Email: stuart.j.robinson@usdoj.gov
Cal. Bar No. 267183

*Counsel for Defendants*