## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANNA MARIA VASSILIADES et al.,

        *Plaintiffs*,

     v.

MARCO RUBIO et al.,

        *Defendants*.

Civil Action No. 24-1952 (TJK)

## <u>MEMORANDUM OPINION</u>

By enacting the International Emergency Economic Powers Act, Congress provided the President with significant authorities to deal with declared emergencies by regulating the assets of foreign entities and individuals. Then-President Biden invoked that authority over four years ago to address the threat posed by the Russian government's foreign activities. In doing so, he blocked the assets of anyone whom the Secretary of the Treasury finds to fall within any of the enumerated categories listed within his executive order. One of those individuals was Christodoulos Vassiliades. And because the President also directed the Secretary to designate for sanctions any adult children of persons already designated, his children's assets were blocked as well. In their telling, Vassiliades's children were sanctioned for the sins of their father—an action they claim is unlawful for two reasons. That kind of sanction, they contend, contravenes the statute authorizing these extraordinary powers because the sanction does not target persons contributing to the Russian threat. On top of that, the siblings say that their designation was arbitrary and capricious.

Contrary to the agencies' view, the Vassiliades children's challenge to whether the Executive exceeded its emergency authority under IEEPA by sanctioning them is neither barred by the political-question doctrine nor otherwise unreviewable. Still, clearing this reviewability hurdle

does little for them at the end of the day.  Congress cabined the President's use of IEEPA author-
ities by requiring that he exercise them only "to deal with" the threat underlying the declared
emergency.  But "to deal with" is a low bar, and designating the Vassiliades based on the executive
order's criteria fits comfortably within the expansive authority that IEEPA provides.  So their stat-
utory-authority claim falls short.  And although their vague and shifting arbitrary-and-capricious
claim seems to rest on shaky footing, the Court cannot assess it without the administrative record.
Thus, the Court will deny the motion to dismiss as to that claim and grant it as to the statutory-
authority claim.

I.    **Background**

A.    **Sanctions Under the International Emergency Economic Powers Act**

Shortly after the United States entered World War I, Congress gave the President substan-
tial authority to regulate international transactions with hostile powers.  *See* Trading with the En-
emy Act, Pub. L. No. 65-91, § 2, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. §§ 4301–
41).  That authority grew when Congress amended the Trading with the Enemy Act to regulate
"international trade even outside times of war."  *V.O.S. Selections, Inc. v. United States*, 772 F.
Supp. 3d 1350, 1360 (Ct. Int'l Trade 2025) (citing Emergency Banking Relief Act, Pub. L. No. 73-
1, § 2, 48 Stat. 1, 1–2 (1933)).  But in 1977, Congress cabined these statutory powers to wartime.
*See* Amendments to the Trading with the Enemy Act, Pub. L. No. 95-223, §§ 101–03, 91 Stat.
1625, 1625–26 (1977).  When it did so, Congress also enacted the International Emergency Eco-
nomic Powers Act ("IEEPA") to give "the President a new set of authorities" for national emer-
gencies—authorities "both more limited in scope than those of" the Trading with the Enemy Act
"and subject to more procedural limitations."  *V.O.S. Selections*, 772 F. Supp. 3d at 1361 (quoting
Comm. on Int'l Rels., *Trading with the Enemy Act Reform Legislation*, H.R. Rep. No. 95-459, at
2 (1977)).

Two provisions define what powers the President has under IEEPA and when he may use them. 50 U.S.C. § 1702(a)(1)(A) provides that the President may "investigate, regulate, or prohibit" transactions in foreign exchange, certain credit transfers and bank payments, and imports and exports of currency or securities. More relevant here, IEEPA also gives the President the power to "void" or "nullify" the "exercising" of "any right, power, or privilege with respect to . . . any property in which any foreign country or a national thereof has any interest." *Id.* § 1702(a)(1)(B). Put more directly, IEEPA "authorizes the blocking of property" of foreign nationals and entities when the property is subject to the jurisdiction of the United States. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007); *see also Consarc Corp. v. OFAC*, 71 F.3d 909, 914 (D.C. Cir. 1995). Through § 1702, then, "IEEPA delegates broad authority to the President to act" against "property." *Dames & Moore v. Regan*, 453 U.S. 654, 677 (1981). But those powers have limits. For one thing, the President may exercise them only after "declar[ing] a national emergency with respect" to an "unusual and extraordinary threat" to "the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). For another, the President's sweeping powers under § 1702 "may *only* be exercised to *deal with*" such a threat. *Id.* § 1701(b) (emphases added). Using them "for any other purpose" contravenes the statute. *Id.*

**B.    Executive Order 14024 and the Vassiliades Family**

In 2021, then-President Biden invoked IEEPA to "block[] property with respect to specified harmful foreign activities of the Government of the Russian Federation." Executive Order 14024, 86 Fed. Reg. 20249 (Apr. 15, 2021). According to the executive order, Russia had tried to undermine democratic elections, fostered "transnational corruption," "target[ed] dissidents or journalists," and infringed the "territorial integrity of states." *Id.* So the President blocked the property

3

of several groups, meaning that their property—if "within the United States" or controlled by "any United States person"—cannot "be transferred, paid, exported, withdrawn, or otherwise dealt in." *Id.* As relevant here, § 1(a)(iii) of the order blocks the property of anyone whom the Secretary of the Treasury—after consulting the Secretary of State—"determine[s]" to "be or have been a leader, official, senior executive officer, or member of the board of directors" of specified entities. *Id.* at 20250. Those entities include "the Government of the Russian Federation" and other entities "whose property" had been blocked under any provision of the executive order. *Id.* A different provision, moreover, swept in persons whom the Secretaries identify as "a spouse or adult child of any person whose property" was "blocked" under § 1(a)(iii).[1] *Id.*

Two years later, the State Department designated a host of individuals and entities under Executive Order 14024. *See* U.S. Dep't of State, *Further Curbing Russia's Efforts to Evade Sanctions and Perpetuate its War against Ukraine* (Apr. 12, 2023), https://perma.cc/4Q5M-QD8G.[2] Among other networks, the Department designated that of Christodoulos Vassiliades, a lawyer who purportedly "served as" a "prolific enabler[] of a number of Russian Oligarchs." *Id.* He was sanctioned for "being or having been a leader, official, senior executive officer," or board member "of the Government of the Russian Federation," as well as for having such a role in another blocked entity. *Id.* The Department also designated several entities that he controlled—or that acted on

---

[1] Continuing the delegation chain, the Secretary of the Treasury delegated to the Office of Foreign Assets Control ("OFAC") its authority to implement this executive order. *See* 31 C.F.R. § 587.802.

[2] The Court may—and does—take "judicial notice of" this "information posted on" an "official government website[] without transforming" Defendants' "motion into one for summary judgment." *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 163 n.3 (D.D.C. 2021). Plus, the fact sheet designating the Vassiliades is likely "[i]ncorporat[ed] by reference" because the "complaint" quotes that document and because the basis for the designations is "integral to" the claims. *Washington v. AlliedBarton Sec. Servs., LLC*, 217 F. Supp. 3d 208, 212 n.3 (D.D.C. 2016) (citation omitted).

his behalf—including Vassiliades & CO. UK Limited.  *Id.*  In turn, that sanction led the Department to designate Vassiliades's daughter Anna Maria because she had (or once had) a leadership role in that blocked UK entity.  *Id.*  And his son Giorgos was designated for being the "adult child" of his sanctioned father.  *Id.*

In June 2023, about two months after being designated, Anna Maria and Giorgos Vassiliades ("the Vassiliades") submitted de-listing petitions to the State Department and OFAC.  *See* ECF No. 1 ("Compl.") ¶¶ 42, 46.  Giorgos Vassiliades did not contest that he was Christodoulos Vassiliades's son and thus within the scope of the executive order.  *Id.* ¶ 42.  Rather, he allegedly explained how he "was never involved in any of the legal or business affairs of his father."  *Id.* After providing more requested information in December 2023, he has not received an answer on his petition.  *Id.* ¶ 44.  As for Anna Maria Vassiliades, she also conceded the factual predicate for her designation under the executive order—that she had worked as a director for a blocked entity within her father's network.  *Id.* ¶¶ 46, 49–50.  She contended instead that she was "*not* involved in any of the alleged sanctionable legal or business affairs of her father."  *Id.* ¶ 46.  And she informed the Department that she had resigned from the blocked entity as of February 2024.  *Id.* ¶¶ 50, 52.  Like her brother's, her delisting petition remains pending.  *Id.* ¶ 64.

Still without answers in July 2024, the Vassiliades sued the Departments of State and the Treasury, as well as their secretaries ("Defendants").  They allege that their designations under Executive Order 14024 "violate" several "constitutional provisions" and the Administrative Procedure Act.  Compl. ¶¶ 3–4.  Despite those allegations, the Vassiliades charge Defendants with "mistake[nly]" believing that they are raising "constitutional claim[s]."  ECF No. 17 at 27.  In any event, the claims the Vassiliades press at this point fall into two categories.  First, they allege that Defendants "exceeded their statutory authority" under IEEPA because that statute "does not

authorize sanctions" for "persons who do not themselves pose any threat related to the emergency declared by the President." Compl. at 22 & ¶ 71. Put another way, the Vassiliades contend that Defendants violated the APA by acting "not in accordance with law." *Id.* ¶ 76; *see also* ECF No. 17 at 26–27. Second, the Vassiliades allege that Defendants also acted arbitrarily and capriciously, even putting aside the statutory-authority problem. *See* Compl. ¶¶ 72–81. This claim is a bit of a moving target. What started as a claim that Defendants "failed to consider the lawfulness of sanctions" against the Vassiliades and "violate[d]" the Constitution, *see id.* ¶¶ 77–81, seems to have morphed into one that Defendants acted in a "shockingly inappropriate" way by designating the Vassiliades, *see* ECF No. 17 at 27. But the bottom line is that the Vassiliades appear to bring two claims: Defendants exceeded their statutory authority and, for one reason or another, acted arbitrarily and capriciously. Moving to dismiss, Defendants contend that the first claim is unreviewable and that both fail on the merits. *See* ECF No. 15. The Vassiliades oppose. *See* ECF No. 17.

## II.    Legal Standards

A plaintiff must establish the Court's subject-matter jurisdiction to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). In a facial challenge like the one here, the Court "assume[s] the truth of all material factual allegations in the complaint and 'construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged,' . . . and upon such facts determine[s] jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). Without subject-matter jurisdiction over a claim, the Court must dismiss it. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint

must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff states a facially plausible claim when he pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true "all well-pleaded factual allegations" and "construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014). But "mere conclusory statements" are not enough to establish a plausible claim, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). The Court may "consider only the facts alleged," "documents either attached to or incorporated in the complaint," and "matters of which [it] may take judicial notice." *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 164 (D.D.C. 2021) (quoting *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006)).

III.    **Analysis**

A.    **The Court Has Subject-Matter Jurisdiction to Review the Vassiliades' Statutory-Authority Claim**

Defendants argue that the Vassiliades' statutory-authority claim is unreviewable for two reasons. First, they contend that the political-question doctrine bars review of the criteria that a President selects for designating people and entities under IEEPA. Second, Defendants say that the Court lacks jurisdiction because the Vassiliades, in Count I, "challenge[] how the President has decided to exercise the discretion conferred on him by statute." ECF No. 21 at 15; *see also* ECF No. 15-1 at 29.

Because the latter question is more straightforward, the Court begins there. The Vassiliades have not sued the President, so their claim seems to fit comfortably within the familiar APA framework. Defendants—two agencies and their heads—allegedly exceeded their statutory authority under IEEPA when designating the Vassiliades and thus acted contrary to law, which

violates the APA.  *See* 5 U.S.C. § 706(2)(A) (reviewing courts shall "hold unlawful and set aside agency action found to be . . . not in accordance with law"); *see also id.* § 706(2)(C) (same for action "in excess of statutory jurisdiction, authority, or limitations").  Parsing the complaint, Defendants insist that the Vassiliades do not bring their statutory-authority claim under the APA because they mention the APA in "Count II"—which generally describes the arbitrary-and-capricious claim—while omitting it from "Count I"—which focuses on statutory authority.  *See* ECF No. 21 at 16–17.  But that argument demands too much of the complaint.  At this stage, what matters is whether the Vassiliades "alleged all the facts needed to state . . . a claim" that Defendants exceeded their statutory authority—not whether they "pin[ned]" that "claim for relief to a precise legal theory."  *Mohamed v. Select Portfolio Servicing, Inc.*, 215 F. Supp. 3d 85, 99 (D.D.C. 2016) (quoting *Skinner v. Switzer*, 562 U.S. 521, 530 (2011)).  The Vassiliades sued federal agencies and say that their designations exceed the scope of delegated authority under IEEPA.  Perhaps they "imperfect[ly] state[d]" their "legal theory supporting" that "claim" by not mentioning the APA in the count that seems to describe it.  *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam).  That kind of defect, though, does not "countenance dismissal."  *Id.*

Defendants might be suggesting that this claim is really a challenge to the President's authority because he delegated his power to Defendants to sanction the Vassiliades.  Even so, they overstate the bounds of the rule prohibiting review of challenges to the President's authority.  True enough, courts may not review "statutory" claims against the President "when the statute in question commits the" challenged "decision to the discretion of the President."  *Dalton v. Specter*, 511 U.S. 462, 474 (1994).  So *Dalton* and the rule it represents would pose a problem for the Vassiliades if they were challenging "[h]ow the President chooses to exercise the discretion Congress has granted him."  *Id.* at 476.  But in this count, the Vassiliades do not say that the President wrongfully

(or unwisely) used his discretion under IEEPA.

Instead, they claim that Defendants, through the delegation, *exceeded* the statute's "limits" on the "Executive Branch['s]" authority—specifically, the requirement that sanctions must "deal with" the declared emergency. *Compare* Compl. ¶ 70 (quoting 50 U.S.C. § 1701), *with Dalton*, 511 U.S. at 476 (explaining that the statute at issue there did "not at all limit the President's discretion"). Although the President may select different ways of dealing with an emergency, he—and agencies acting on his behalf—transgresses IEEPA's discretionary zone when he violates this statutory command. *Cf. United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) (where "the President *acted in full conformity with the statute*," "[n]o question of law is raised when the exercise of his discretion is challenged" (emphasis added)); *Dakota Cent. Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919). Had Congress intended to permit the President to use his IEEPA powers "in whatever way [he] deems appropriate" once he declares a national emergency, *see* ECF No. 15-1 at 30, Congress could have said so—for example, by authorizing him to exercise those authorities "when" or "if" he declares an emergency.[3] *But see* § 1701(b) ("The authorities granted to the President . . . may only be exercised to deal with an unusual and extraordinary threat . . . ."). Congress did not choose that route.

In short, "IEEPA meaningfully constrains the President's discretion," and the Vassiliades say that their designations breached those statutory limits. *United States v. Dhafir*, 461 F.3d 211, 216 (2d Cir. 2006) (internal quotation marks, citation, and alteration omitted). Because "a claim alleging that the President acted in excess of his statutory authority is judicially reviewable," the rule prohibiting review of discretionary presidential decisions does not apply here. *Am. Forest*

---

[3] The Court need not—and thus does not—offer any opinion on whether such delegated authority would raise concerns under the non-delegation doctrine. *See Mistretta v. United States*, 488 U.S. 361, 371–72 (1989).

*Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023). Expanding that rule, after all, "would permit the President to bypass scores of statutory limitations on governmental authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996). So the carveout for Presidential discretion does not preclude review here.

Whether the Vassiliades' statutory-authority challenge implicates an unreviewable political question requires more unpacking. An offshoot of "the constitutional principle of separation of powers," the political-question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution" to the Legislature or Executive. *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019) (citation omitted). The doctrine is jurisdictional. *See id.* at 7–8. And to see whether it precludes review, the Court proceeds in three steps: (1) "identify the issues" that the complaint raises; (2) "use the six *Baker* factors to determine whether any issue presents" an unreviewable "political question"; and (3) assess whether the "claims can be resolved without considering any political question." *Id.* at 8.

In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court described six factors that can reveal a political question. The first is whether there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker*, 369 U.S. at 217. Next, courts should see if the issue lacks "judicially discoverable and manageable standards for resolving it." *Id.* The D.C. Circuit has understood these two factors as being on slightly different footing than the remaining four, describing the latter group as "prudential factors." *Al-Tamimi*, 916 F.3d at 12. And those last four are: "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; "the impossibility of" independently resolving the issue "without expressing lack of the respect due coordinate branches"; "an unusual need for

unquestioning adherence to a political decision already made"; and the potential for "embarrass-ment from . . . various departments" making "multifarious pronouncements . . . on one question." *Baker*, 369 U.S. at 217.  Because the Supreme Court omitted these factors in a post-*Baker* decision, *see Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012), the D.C. Circuit has explained that—"if the first two *Baker* factors are not present"—something more "than apparent incon-sistency between a judicial decision and the position of another branch" is needed "to create a political question."  *Al-Tamimi*, 916 F.3d at 12.

All that said, courts should not deem a question unreviewable just because it implicates politically sensitive issues.  The doctrine "is one of 'political questions,' not one of 'political cases.'"  *Baker*, 369 U.S. at 217.  And courts retain their "responsibility to decide cases properly before" them—"even those [they] 'would gladly avoid.'"  *Zivotofsky*, 566 U.S. at 194–95 (citation omitted).  So when the question calls for a court to perform its "recurring and accepted task" of engaging in "statutory interpretation," that question is unlikely to be the type requiring a hands-off approach.  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  The divid-ing line is easy to state but sometimes hard to apply: does the claim require the court to assess (1) "policy choices" meant for "the political branches" or (2) "purely legal issues" meant for courts?  *Al-Tamimi*, 916 F.3d at 11.  Deciding whether a "discretionary" choice "in the realm of foreign policy or national security" was "wise" is generally off limits.  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc) (citation omitted).  Deciding "whether the government had legal authority to act" is typically not.  *Id.*

With that windup, the Court begins by identifying the precise questions that the Vassili-ades' statutory-authority claim presents.  The crux of that claim is twofold: they contend that IEEPA authorizes sanctions only if they "deal with" the declared emergency by targeting someone

who "pose[s]" some "threat related to the emergency," and that applying this rule to them shows that the sanctions are unlawful. Compl. ¶ 71. In other words, the Vassiliades present a question of statutory interpretation and then one of application. The first: what does IEEPA mean when it says that the President's powers under the statute "may only be exercised to deal with" the threat underlying a declared emergency? 50 U.S.C. § 1701(b). And the second: based on that understanding of the statute, did Defendants exceed the authority provided by IEEPA when they designated the Vassiliades? The former question poses fewer concerns than the latter. But for the reasons explained below, both questions are still fit for judicial review with "[d]ue regard for the Executive Branch as an independent and co-equal department." *Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *3 (D.C. Cir. June 6, 2025).

The first *Baker* factor does not trigger the political-question doctrine because the Vassiliades' claim does not require the Court to resolve an issue "constitutional[ly] commit[ted] . . . to a coordinate" branch. *Schieber v. United States*, 77 F.4th 806, 810 (D.C. Cir. 2023) (quoting *Baker*, 369 U.S. at 217). Indeed, the Judiciary is used to reviewing statutes. The Constitution, of course, does not "exclusive[ly] commit[] to the Executive . . . the power to determine the constitutionality of a statute." *Zivotofsky*, 566 U.S. at 197. Instead, the "Judicial Branch appropriately exercises that authority." *Id.* And the same holds true for "interpret[ing] statutes"—"one of the Judiciary's characteristic roles" that it "cannot shirk . . . merely because [the] decision may have significant political overtones." *Starr Int'l Co. v. United States*, 910 F.3d 527, 534 (D.C. Cir. 2018) (quoting *Japan Whaling*, 478 U.S. at 230). True, the D.C. Circuit has said that "decision-making in the fields of foreign policy and national security is textually committed to the political branches of government." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). But *Zivotofsky*—decided after *Schneider*—"confirms" that "no *per se* rule renders a claim nonjusticiable solely

because it implicates foreign relations." *Jaber v. United States*, 861 F.3d 241, 248 (D.C. Cir. 2017). As explained, the Constitution "commit[s] to the *judicial* branch" the role of "statutory interpretation." *Al-Tamimi*, 916 F.3d at 12 n.6 (emphasis added). So "statutory claim[s]" like this one are "less likely to present a political question." *Id.*

The specifics of the Vassiliades' statutory claim underscore why the first *Baker* factor does not bar its review. That claim requires the Court to perform only the role that the Constitution commits to it: use "the traditional rules of statutory construction" to see how IEEPA's text constrains the Executive's authority, and "appl[y]" its "analysis" of the statute's meaning "'to the particular set of facts' of [the] case." *Starr Int'l Co.*, 910 F.3d at 535 (quoting *Japan Whaling*, 478 U.S. at 230). In this way, the inquiry will not lead the Court into forbidden "reconsider[ation]" of "the wisdom of discretionary decisions" that the "political branches" have made "in the realm of foreign policy or national security"—decisions that may be constitutionally committed to those branches. *El-Shifa*, 607 F.3d at 842. That is especially so here because the question the Court must decide is not whether Defendants acted prudently within a settled zone of discretionary authority when they designated the Vassiliades. Rather, it is whether a specific statute authorized their action.[4] So giving "deference to the political branches' judgment in foreign affairs" calls *for* judicial review because "*Congress* has expressed *its* intent regarding an aspect of foreign affairs" within its authority that it delegated in a limited way to the President under IEEPA. *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 823 (9th Cir. 2017) (emphases added). In sum, the first *Baker* factor favors the Vassiliades because they "ask[]" not for the Court "to supplant a foreign

---

[4] Without elaboration, Defendants point out that Executive Order 14024 invokes IEEPA *and* "the authority vested in" the President "by the Constitution." ECF No. 15-1 at 23; 86 Fed. Reg. at 20249. The Court does not understand Defendants to argue that this common prefatory language means that Article II of the Constitution authorized Defendants to take the actions at issue here.

policy decision of the political branches with [its] own unmoored determination of" how economic sanctions should work, but for it to decide whether one political branch—the Legislature—has authorized another—the Executive—to act in a specific way. *Zivotofsky*, 566 U.S. at 196.[5]

Next, the second *Baker* factor also supports justiciability because the standards for resolving the Vassiliades' claim are "discoverable and manageable." *Baker*, 369 U.S. at 217. As before, statutory claims are more likely to clear this reviewability hurdle. *See Al-Tamimi*, 916 F.3d at 12 n.6. "[S]tatutory language," unsurprisingly, "is likely to include judicially manageable standards." *Id.* For instance, the D.C. Circuit has interpreted the "plain text" of IEEPA to decide whether it "authorizes the blocking of property in which the designated foreign national or country has 'any interest'"—*i.e.*, to assess whether the statute "imposes" a "limit." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) (citation omitted). And determining the standard for reviewing the Vassiliades' claim requires the Court to perform a similar task: analyze IEEPA's language to identify "the nature and scope of the" constraints—if any—"imposed upon the" President's authority by the statute. *Japan Whaling*, 478 U.S. at 230.

---

[5] This feature of the Vassiliades' claim undermines Defendants' reliance on *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005). There, the estate of deceased Chilean General René Schneider sued Henry Kissinger—the former National Security Advisor to the President—for allegedly causing "the kidnapping, torture, and death" of the general. *Schneider*, 412 F.3d at 191. Bringing a claim under the Federal Tort Claims Act, the plaintiffs contended that judicially manageable standards existed because tort "standards for evaluating wrongful death are well established." *Id.* at 196 (citation omitted). Not so, said the D.C. Circuit. Applying that standard would ensnare the court in policy decisions like "whether the covert operations" that allegedly caused the death "were wrongful." *Id.* at 197. And although the claim involved a statute, that statute dictated only whether the plaintiffs could recover—not whether the Executive was authorized to act in the first place. But IEEPA is not a "statute[]" that the Vassiliades are "su[ing]" "under." *Jaber*, 861 F.3d at 247 (explaining that the question whether a "drone strike" was "mistaken and not justified" is for the "political branches, regardless of the statutes under which Plaintiffs may seek to sue" (citation omitted)). Instead, the statute—and the Court's interpretation of it—dictates "whether the government had legal authority to act." *El-Shifa*, 607 F.3d at 842. And that kind of statutory involvement pushes the claim towards reviewability. *See id.*

Familiar tools "of statutory construction" give the Court enough to work with on this score and show why the second *Baker* factor poses no reviewability problems. *Starr Int'l Co.*, 910 F.3d at 534 (citation omitted). Beginning "with the language of the statute," the Court may use dictionaries and other resources to reveal the "ordinary meaning of" IEEPA's key phrase: "to deal with." *Lissack v. Comm'r of Internal Revenue*, 125 F.4th 245, 257 (D.C. Cir. 2025) (citation omitted). And it may consider "other phrases from" 50 U.S.C. § 1701 to "help inform the scope" of that meaning. *Id.* In other words, "statutory context" can shed light on the best way to construe the relevant IEEPA language. *Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1293–94 (2025). The Court can thus "'manage' the standards for applying 50 U.S.C. § 1701's 'deal with an unusual and extraordinary threat' language just as it 'manages' the standards for any other statutory enactment that constrains independent executive action." *V.O.S. Selections, Inc.*, 772 F. Supp. 3d at 1378.[6] That is precisely what the Court of International Trade did recently when deciding that the political-question doctrine does not bar review of whether IEEPA authorized some of President Trump's tariffs. *Id.*

This case shows why the routine judicial tasks of interpreting and applying statutory language need not require the Court to veer into a political question—and do not here. For the first question that the Vassiliades present with their statutory-authority claim—what does the phrase "to deal with" a threat mean?—dictionaries provide the starting point. Around when Congress

---

[6] The Federal Circuit stayed the Court of International Trade's ruling. *V.O.S. Selections, Inc. v. Trump*, Nos. 2025-1812, 2025-1813, 2025 WL 1649290, at *1 (Fed. Cir. June 10, 2025). But that court did not explain or even suggest why it did so. And this Court will not speculate whether the Federal Circuit found the political-question analysis problematic—especially because the government did not explicitly argue when moving for a stay that the phrase "to deal with" was unreviewable under the political-question doctrine. *See V.O.S. Selections, Inc. v. Trump*, No. 25-1812, Dkt. 6 at 23–25. To the contrary, the government focused on the merits question when briefing the stay by contending that the challenged tariffs "'deal with' the identified threat." *Id.*, Dkt. 47 at 10–11.

passed IEEPA in the late 1970s, the verb "deal" meant "to take action in regard to something." *Deal*, The Merriam-Webster Dictionary 188 (First Wallaby Books Printing 1978) (1974). Not much has changed in the decades since. *See, e.g.*, *Deal*, Oxford English Dictionary II.16 (defining "to deal with" as "to act in regard to, administer, handle, dispose in any way of (a thing)"). And the statutory context shows that IEEPA focuses on the *purpose* of the exercised authority, not its *effectiveness*. That focus flows from the statute's use of the "infinitive phrase" *to* deal with, *see Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 668, 671 n.2 (2008), and its neighboring reference to impermissible "*other purposes*," *see* 50 U.S.C. § 1701(b) (emphasis added). IEEPA, then, authorizes the President to exercise his statutory powers for the purpose of handling or acting against a threat. *Cf. Islamic Am. Relief Agency*, 477 F.3d at 735 ("[O]nce the President has declared a national emergency, IEEPA authorizes the blocking of property to protect against that threat."). And that, in turn, shows why the second question that the Vassiliades present—as interpreted, how does IEEPA apply here?—does not require the Court to venture into discretionary policy decisionmaking or judicially unmanageable standards. Put simply, the statute does not drag this Court in this case into knotty questions about how effective, wise, or reasonable specific sanctions are.

No doubt, these standards will not always be easy to apply. But it is "the character of the standards"—"not merely the difficulty of their application"—that matters for the second *Baker* factor. *Virginia v. Ferriero*, 525 F. Supp. 3d 36, 52 (D.D.C. 2021) (citation omitted). After all, a hard question lacking bright-line rules is not necessarily unreviewable. Our "judicial system" handles those questions all the time: it "determin[es] when punishment is 'cruel and unusual,' when bail is '[e]xcessive,' when searches are 'unreasonable,' and when congressional action is 'necessary and proper.'" *Starr Int'l Co.*, 910 F.3d at 533 (quoting *United States v. Munoz-Flores*,

16

495 U.S. 385, 396 (1990)).  Nor has the political-question doctrine prevented courts from deter-

mining "whether Israeli settlers are committing genocide," *Al-Tamimi*, 916 F.3d at 12–13; from

assessing "the meaning of the phrase 'during a national emergency,'" *Feliciano*, 145 S. Ct. at 1290;

or from deciding "whether the circumstances involve an act of war within the meaning of [a] stat-

utory exception," *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514 (D.C.

Cir. 2018); *see also J.G.G. v. Trump*, 772 F. Supp. 3d 18, 35 (D.D.C. 2025) (given "the political-

question doctrine's principles, . . . this Court is confident that it can—and therefore must, at the

appropriate time—construe the terms 'nation,' 'government,' 'invasion,' and 'predatory incur-

sion'").  To be sure, interpreting and applying the statutory phrase "to deal with" a threat may

prove challenging.  But doing so is not unmanageable for purposes of "the political question doc-

trine"—a "limited and narrow exception to federal court jurisdiction."  *Starr Int'l Co.*, 910 F.3d at

533.

    None of Defendants' arguments tip this second factor towards the political-question zone.

They emphasize the President's "extensive authority" under IEEPA.  ECF No. 15-1 at 23 (citation

omitted).  But congressional delegations of "broad discretion" can still have limits, and "it is pre-

cisely because this is a challenge to the statutory boundaries of defendants' authority that this case

*is* justiciable."  *Federation for Am. Immigr. Reform, Inc. v. Reno*, 897 F. Supp. 595, 602 (D.D.C.

1995) (citation omitted).  Nor does Congress's ability to "terminat[e]" a declared emergency via

"joint resolution" render judicial review unmanageable.  50 U.S.C. § 1622(a)(1); *see also id.*

§ 1703 (requiring certain consultation with and reporting to Congress).  Defendants never explain

why congressional oversight shows that the Court lacks standards to assess whether the Executive

has used IEEPA powers "to deal with" a threat, and the Court does not see how it could.  If De-

fendants suggest that Congress meant to *forbid* judicial review, that is separate from whether the

Court has manageable standards for reviewing a claim.  And in any event, Congress knows how to bar review when it wants to.  *See, e.g.*, 42 U.S.C. § 1395fff(d) (providing that "[t]here shall be no administrative or judicial review" of enumerated agency actions).  It used no language even hinting at that result here.

Further, courts frequently conduct "highly constrained" review in cases involving "matters of . . . national security" without transgressing the lines drawn by the first two *Baker* factors. *Trump v. Hawaii*, 585 U.S. 667, 704 (2018).  Indeed, courts can give appropriate deference to "the Executive's view" in such cases while still fulfilling their responsibility to interpret and apply statutes.  *J.G.G.*, 772 F. Supp. 3d at 35.  Though not "dispositive," the Executive's position "would be important: its 'evaluation of the facts' and 'informed judgment'" about specific sanctions "would be afforded significant 'respect.'"  *Id.* (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010)); *see also Trump*, 585 U.S. at 708 (cases involving "sensitive and weighty interests of national security and foreign affairs" require courts to appropriately account for "the Executive's evaluation of the underlying facts" (citation omitted)).  So here, if the Executive can offer a plausible basis for exercising IEEPA authorities in a way that "deal[s] with" a threat underlying a declared emergency, then the statutory text need not call for a more probing inquiry into how good that reason is.

Mostly for reasons already discussed, the remaining "prudential factors" point the same way as the first two.  *Schieber*, 77 F.4th at 811.  The third factor—whether the Court can decide the issue "without an initial policy determination" meant "for nonjudicial discretion"—overlaps with the second and, to a lesser extent, the first.  *Ctr. for Biological Diversity*, 868 F.3d at 822, 825 (citation omitted).  The Vassiliades' statutory-authority claim turns on IEEPA's scope, not on the wisdom of a discretionary policy decision.

As for the fourth factor, the Court can resolve this claim without unduly disrespecting the Legislature or Executive. Neither "[c]onstitutional" nor statutory "interpretation . . . disrespect[s] a coordinate branch of government, even when a court's interpretation does not accord with a political branch's view." *Virginia*, 525 F. Supp. 3d at 54. For as long as federal courts have "sa[id] what the law is," their duty to "exercis[e] independent judgment" when interpreting statutes has "often included according due respect to Executive Branch interpretations." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). But because the Judiciary is "not at liberty to surrender[] or to waive it[s]" independent judgment—even when this judgment "differ[s] from that of" the Executive—mere disagreement about how to interpret a statute is not the kind of disrespect that places a case within the political-question doctrine. *Id.* at 386–87 (quoting *United States v. Dickson*, 40 U.S. (15 Pet.) 141, 162 (1841)). And declining to "review[] the [E]xecutive's compliance" with "a federal statute" is "less respectful to Congress" than reviewing that compliance is to the Executive. *Ctr. for Biological Diversity*, 868 F.3d at 825.

Factors five and six do not move the needle. Defendants do not argue that the fifth factor applies, and this Court sees no "unusual need for unquestioning adherence to a political decision already made." *Baker*, 369 U.S. at 217. Finally, because federal courts are the "interpreter[s] of the Constitution" and federal statutes, "judicial resolution of" the Vassiliades' "claim will not result in" embarrassment from "'multifarious pronouncements by various departments on one question.'" *Powell v. McCormack*, 395 U.S. 486, 549 (1969) (quoting *Baker*, 369 U.S. at 211). Simply put, a federal court interpreting a statute differently than the Executive is not the kind of "embarrassment" that triggers the political-question doctrine. That type of disagreement is a feature of our constitutional system—not a bug that renders issues unreviewable. *See Al-Tamimi*, 916 F.3d

at 12 ("[I]f the first two *Baker* factors are not present, more is required to create a political question than apparent inconsistency between a judicial decision and the position of another branch.").

The recent decision in *Htet v. Trump* does not change the Court's conclusion. There, the plaintiff argued that "President Biden exceeded his authority under IEEPA by including the adult children of designated individuals" within an executive order about the overthrow of the Burmese government. *Htet v. Trump*, No. 23-cv-1446 (RC), 2025 WL 522033, at *1 (D.D.C. Feb. 18, 2025). Unlike this case, the parties there did "not debate the meaning of" IEEPA. *Id.* at *6. But assessing the claim, the court reasoned, would require deciding whether "blocking the assets of" such children "address[es]" the declared "national emergency." *Id.* at *4. And the court held that this question is "properly reserved for the political branches." *Id.* at *5. In so holding, it explained that it "would need to consider" the "*effectiveness* of the President's policy decision." *Id.* at *5–6 (emphasis added). And doing that would enmesh the court in a host of other thorny issues, including "foreign policy goals," "the economic structure surrounding Burma's military," "the effectiveness of pressuring designated individuals by also designating their family members," and the "ease" of "hid[ing] assets through a family member." *Id.* at *5. Against that backdrop, the *Htet* court found that the question was laden with "delicate, complex," and policy-focused inquiries that precluded review. *Id.* at *6 (citation omitted).

The Court respectfully disagrees with the court's conclusion in *Htet*. Perhaps because the parties did not dispute IEEPA's meaning, the court there assumed that deciding the question at hand would require it "to opine on whether the President's action *effectively* counters the threat." *Htet*, 2025 WL 522033, at *7 (emphasis added); *see also id.* at *5 ("[T]he Court would need to consider . . . the effectiveness of pressuring designated individuals . . . ."); *id.* at *6 ("[T]he core question . . . strays from the legal domain and into the effectiveness of the President's policy

decision . . . ."); *id.* ("The question . . . revolve[s] around . . . the effectiveness of the President's policy decision . . . ."). But neither question presented here forces the Court to do that. The first question about what IEEPA means is one "of interpretation" and thus within "the heartland of the judicial ken." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *6 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring). As explained, "[t]he judiciary, not the Executive, has the ultimate constitutional responsibility . . . for saying what statutes and statutory terms mean." *Id.* at *23 (Millett, J., concurring).

Nor does the second question require the Court to scrutinize how effective the sanctions are. Applying the statute to specific actions taken under IEEPA may be "harder." *J.G.G.*, 772 F. Supp. 3d at 35. But the Supreme Court has explained that both interpreting a statute *and* "applying th[at] analysis to the particular set of facts presented" are ordinarily "task[s] for the federal courts." *Japan Whaling*, 478 U.S. at 230. And Congress's decision to constrain the President's authority based not on whether his actions are *effective*, but on whether they have the *purpose* of addressing a threat, underscores that no political question prevents review here. More still, the Court's deferential review further insulates it from wading into national-security policymaking. To repeat, if the Court can discern a connection between the exercise of IEEPA authorities and the targeted threat such that the President plausibly had the purpose of trying to address the threat, then the statutory inquiry stops there. Viewed through this lens, IEEPA does not require courts to entangle themselves with questions about whether the Executive has used the statutory authority wisely, effectively, reasonably, or proportionately. So the court's concerns in *Htet* about discerning how effective a sanctions policy is do not give this Court pause.

Another feature of IEEPA signals that the Court's inquiry will not tread into political questions. Some statutes premise delegated authority on a "finding." For example, "the Secretary of

State may designate a foreign entity" as a "Foreign Terrorist Organization" "if he *finds*," among other things, "that the organization threatens national security." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 313–314 (D.C. Cir. 2014) (quoting 8 U.S.C. § 1189(a)(1) (emphasis added)). When that statutory "finding" is enmeshed with issues committed to the political branches such that the Judiciary is "not competent to pass upon" the underlying question—say, whether an organization threatens national security—the D.C. Circuit has held that the political-question doctrine may bar review of that component of the statutory scheme. *Id.* at 314 (citation omitted). Unlike those statutes, though, IEEPA does not key the scope of the delegated authority to "a presidential *finding*" or determination. *V.O.S. Selections*, 772 F. Supp. 3d at 1379 (emphasis added). Instead, the statutory limitation turns on the *exercise* of the authorities: if used to deal with the threat, then the statute authorizes that action; if used for another purpose, then it does not. And Congress knew how to give the President authority tethered only to his findings: IEEPA prohibits him from regulating certain charitable donations unless "the President *determines* that such dona-tions . . . would seriously impair his ability to deal with any national emergency." 50 U.S.C. § 1702(b)(2) (emphasis added); *see also id.* § 1702(a)(1)(C) (authorizing property confiscation if the President "determines" that the owner has engaged in certain activities). But Congress did not provide that kind of authority with its "to deal with" constraint.

At bottom, the Vassiliades' claim turns on "whether the government had legal authority to act," so the political-question doctrine does not bar it. *El-Shifa*, 607 F.3d at 842. By so holding, the Court does not say that cases involving statutory interpretation "never" implicate unreviewable political questions. *Al-Tamimi*, 916 F.3d at 12 n.6. And reviewing this claim will not require the Court to decide the kinds of issues animating the doctrine, such as "whether a threat is worth 'deal[ing]' with" under IEEPA, *V.O.S. Selections*, 772 F. Supp. 3d at 1379, or what the Executive's

sanctions policy "*should* be," *Zivotofsky*, 566 U.S. at 196 (emphasis added).  Rather, the Court will perform its "responsibility" to "ensure that the President act[ed] within th[e] limits" that Congress imposed when it "cabin[ed] the discretion it grant[ed]" him in IEEPA.  *Am. Forest Res. Council*, 77 F.4th at 797.

### B.    Defendants Did Not Exceed Their Statutory Authority by Designating the Vassiliades

This victory on reviewability with respect to Count I is short-lived for the Vassiliades.  In their view, IEEPA prohibits the President (and, by delegation, Defendants) from using his power under the statute unless the target of the sanction has "contributed to the declared emergency." ECF No. 17 at 23.  And they contend that the alleged basis for their designations—being the adult children of a designated person—breaches that statutory limit.  *See id.* at 23–26.

The Vassiliades read IEEPA far too narrowly.  The key issue, recall, is what it means "to deal with" a threat.  As explained, the ordinary meaning of this phrase and its statutory context reveal a statutory focus on the purpose of the exercised authority, not its effectiveness.  So IEEPA authorizes the President to use his statutory authority for the purpose of acting against a threat. That constraint, limited as it may be, is the one that Congress imposed.

Just as important is what Congress did not say.  Contrary to the Vassiliades' understanding, IEEPA does not limit the President to sanctioning only those who have "contributed to a threat." ECF No. 17 at 26.  Nor does the statute require that the exercised authority "effectively" deal with the threat—say, by *directly* sanctioning individuals or entities actively contributing to the declared emergency.  Nor, for that matter, did Congress subject the President's authority to a proportionality requirement that might insist on a reasonable fit between the means—sanctioning adult children of designated individuals—and the end—countering the Russian Federation's harmful activities. And the Court cannot "add words to the law to produce what" the Vassiliades believe is a more

"desirable result": tighter limits on how the President may exercise his significant powers under IEEPA. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). Doing so would flout the Court's obligation to "determine the 'best' reading of" IEEPA and apply it. *Van Loon v. Dep't of Treasury*, 122 F.4th 549, 563 (5th Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 400).

Against that statutory backdrop, there is no doubt that IEEPA authorized Defendants, through their delegated authority, to designate the Vassiliades based on their father's designation, because doing so had the plausible purpose of addressing the identified threat. Defendants explain that taking that step "minimize[s] the risk of asset flight, which" can "cripple economic sanctions programs." ECF No. 15-1 at 33. This designation criterion is thus a plausible effort to address the threat of harmful Russian activities by trying to increase the likelihood that a designated individual like the Vassiliades' father feels the effect of the sanction. Beyond that, sanctioning adult children also operates more bluntly: it "serve[s] as an additional deterrent to those considering engaging in sanctionable conduct, assuming they do not wish to see their . . . adult children" designated. *Id.* at 34. That may be harsh. But IEEPA does not prohibit the President from using sanctions harshly when trying to deal with the relevant threat. And the Executive's "'evaluation of the facts' and 'informed judgment'" about these methods of addressing that threat are "afforded significant 're-spect.'" *J.G.G.*, 772 F. Supp. 3d at 35 (quoting *Holder*, 561 U.S. at 33–34).

The Vassiliades try to brush aside these rationales by invoking statutory limits that do not exist. For example, they criticize the "sanctioning" of "innocent children without any indication that they would try to circumvent U.S. sanctions." ECF No. 17 at 24. IEEPA, though, does not require that kind of individualized determination. True, the President "*can*" limit family-based sanctions "to derivative sanctions for contributing to the threat." *Id.* (emphasis added). But by pressing that argument, the Vassiliades fall back into one the Court already rejected—namely, that

IEEPA permits only sanctions that deal with a threat in a narrowly tailored way. So too for their insistence that Defendants' deterrence purpose is one "of thugs and terrorists." *Id.* Colorful rhetoric aside, the Vassiliades never explain how IEEPA constrains the President to imposing only sanctions that meet some amorphous standard of precision and decency. Congress chose a less restrictive limit, and the Vassiliades' perception of that limit as unfair or mistaken is irrelevant to their statutory-authority claim.

One final point on the designation of Anna Maria Vassiliades. Although Defendants say that they designated her for a different reason—her status as a former official or board member of a designated entity—the Vassiliades insist that Defendants *really* designated her because she is her father's daughter. *See, e.g.*, Compl. ¶¶ 29–31. Presumably for that reason, they focus their statutory-authority argument—unsuccessfully—on that basis. *See* ECF No. 17 at 23 ("Sanctioning children on the basis of parentage exceeds the authority conferred by IEEPA."). In contending that her familial status prompted her designation, however, the Vassiliades misunderstand Executive Order 14024. The President directed the Secretary of the Treasury to designate anyone found "to be *or have been*" an official or board member of a designated entity, *see* 86 Fed. Reg. at 20250 (emphasis added), so it is irrelevant whether she "resign[ed]" from her position within the designated entity as soon as reasonably possible, *see* Compl. ¶ 30. In any event, if the Vassiliades suggest that *this* basis for designation also exceeds the scope of IEEPA, that argument falls flat too. Again, the statute does not limit sanctions to individuals (or entities) who directly "contribute to" the declared emergency. And designating "a director of" of an otherwise designated entity is plausibly—to say the least—an effort to address the threat of harmful Russian activities. Compl. ¶ 49. Such a designation discourages individuals from working for potentially problematic entities and encourages them to investigate any entity they might join to ensure that it does not engage in

sanctionable conduct.

For all these reasons, the Court will grant Defendants' motion to dismiss as to Count I.

### C. The Court Cannot Decide on This Record Whether Defendants Acted Arbitrarily or Capriciously by Designating the Vassiliades

The contours of Count II, the Vassiliades' arbitrary-and-capricious claim, are hard to pin down.[7]  They allege that Defendants "failed to consider the lawfulness of sanctions against individuals who have not engaged in any misconduct based on the identity of their father."  Compl. ¶ 77.  They add that "no rational connection" exists "between the need to sanction them and the need to deal with the emergency situation."  *Id.* ¶ 78.  And they gesture at constitutional principles like "due process," "equal protection," and the prohibition on "Corruption of Blood" punishments for treason.  *Id.* ¶¶ 80–81.  But the Vassiliades later discard any constitutional claims, acknowledging that the "constitutional provisions are not in play," and instead contend that Defendants violated the APA because their designations are "shockingly inappropriate" and thus arbitrary and capricious.  ECF No. 17 at 27–28.

The short shrift that the Vassiliades give this claim in their opposition seems to reflect its likely infirmity.  They do not contest the factual bases for their designations; they allege or concede (or both) that they are their father's children and that Anna Maria Vassiliades was a director of a designated entity.  ECF No. 17 at 23; Compl. ¶¶ 1, 49.  And as explained, IEEPA authorized the

---

[7] Defendants do not contend that Count II is unreviewable.  And although the Court must police its own jurisdiction, at least at this point, it sees no jurisdictional problems stemming from the political-question doctrine or otherwise.  Whether Defendants acted arbitrarily or capriciously under the APA does not necessarily implicate the concerns animating that doctrine, and courts have not hesitated to "review[]" IEEPA-based designations under that "highly deferential . . . standard."  *Holy Land Found. for Relief & Dev.*, 333 F.3d at 162; *see also, e.g.*, *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280 (RC), 2021 WL 950144, at *1 & n.1 (D.D.C. Mar. 12, 2021).  That said, when this claim comes into clearer focus on summary judgment, the Court can revisit the issue of reviewability if that appears warranted.

President and Defendants to designate the Vassiliades based on those unchallenged facts.

Still, because Defendants have not produced "a complete administrative record," the "Court cannot properly evaluate" the Vassiliades' "claim[] that" Defendants "acted arbitrarily and capriciously." *Farrell v. Tillerson*, 315 F. Supp. 3d 47, 69 (D.D.C. 2018); *see also Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001). The allegations suggest that the administrative record will play little role here. And perhaps it will add nothing. But out of an abundance of caution, to ensure that the Court can "determine whether the agency's action was rational, or whether it was arbitrary and capricious," the Court will review that claim at summary judgment with the benefit of the "administrative record." *Int'l Longshoremen's Ass'n, AFL-CIO v. Nat'l Mediation Bd.*, No. 04-cv-824 (RBW), 2005 WL 850358, at *4 (D.D.C. Mar. 30, 2005). So the Court will deny Defendants' motion as to the arbitrary-and-capricious claim in Count II.

## IV.    Conclusion

For all these reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss, ECF No. 15. As to Plaintiffs' statutory-authority claim, identified as Count I in the Complaint, the Motion is granted. But as to Plaintiffs' arbitrary-and-capricious claim in Count II in the Complaint, the Motion is denied. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: July 10, 2025